**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

| | |
|---|---|
| CAROLYN CLARK, *on behalf of herself and* | : |
| *all other similarly situated individuals* | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | :     Civil Action No. 3:15-cv-391 (MHL) |
| | : |
| TRANS UNION, LLC, | : |
| | : |
| Defendant. | : |

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

The Plaintiff, Carolyn Clark ("Plaintiff" or "Ms. Clark"), *individually and on behalf of a class of similarly situated persons*, by counsel, submits this Memorandum in Opposition to Defendant Trans Union, LLC's ("Trans Union" or "Defendant") Motion to Dismiss (Dkt. No. 52).

## INTRODUCTION

This lawsuit arises from Trans Union's uniform violation of § 1681g(a)(2) of the Fair Credit Reporting Act ("FCRA"), which requires consumer reporting agencies to "clearly and accurately" disclose to consumers "[t]he sources of information" in their credit files. 15 U.S.C. § 1681g(a)(2). Trans Union systematically identifies the name of a courthouse or a governmental agency as the *sole* source of its public record information even though a third-party company, LexisNexis, actually gathers this information and provides it to Trans Union. Trans Union is more than aware that its failure to disclose LexisNexis violates the FCRA, yet it continues to omit this significant information from consumer reports.[1]

---

[1] *See Dennis v. Trans Union, LLC*, 2014 WL 5325231, at *8 (E.D. Pa. Oct. 20, 2014) ("Defendant's actual source of the tax lien information was a third party whose identity was not disclosed to Plaintiff when she made her request. Such failure to disclose that source to Plaintiff upon her request could constitute a violation of Section 1681 g(a)(2) and, accordingly, Plaintiff has

1

Instead of "clearly and accurately" disclosing LexisNexis as a source of the information, Trans Union intentionally withholds this information from consumers in order to minimize compliance costs and to avoid customer service inquiries (and litigation) directed at one of its most valued business partners. Trans Union thus deprives consumers of valuable information mandated by Congress and makes it more difficult for consumers to correct errors relating to these public records. Further, Trans Union's policy greatly burdens the actual court clerks and judicial administrators who must repeatedly explain to inquiring consumers that they have never provided any information to Trans Union.

In the present motion, Trans Union moves the Court to dismiss the Amended Complaint for two overarching reasons. First, Trans Union contends that Plaintiff lacks standing because Plaintiff's primary harm—her "informational injury"—is not sufficient for the purpose of Article III standing. Trans Union's argument is based on a misreading of the Supreme Court's decision in *Spokeo v. Robins*, __ U.S. __, 136 S. Ct. 1540 (2016). *Spokeo* simply reiterated that, to have standing, a plaintiff must show an injury that is *both* particularized *and* concrete. In doing so, *Spokeo* reaffirmed well-established Article III-standing principles—that "intangible injuries can nevertheless be concrete," as can injuries based on a "risk of harm." *Id*. at 1549. Relying on this guidance from *Spokeo*, this Court recently rejected a similar challenge in an FCRA case, holding: "where a consumer alleges, as [plaintiff] has here, that he or she has received a disclosure that does not satisfy those requirements, the consumer has alleged a concrete informational injury." *Thomas*

---

adequately stated a claim for a relief on that basis.")*; Dreher v. Experian Info. Solutions, Inc.*, 71 F. Supp. 3d 572, 580 (E.D. Va. 2014) ("*Dreher III*") ("Although gifted legal minds can create myriad interpretations for how many sources or what kinds of sources should be included in the disclosure, the term 'sources' clearly includes, *at the very least*, the entity that gives that information *directly* to the consumer reporting agency.") (emphasis added).

*v. FTS USA, LLC*, 2016 WL 3653878 at *10 (E.D. Va. June 30, 2016) (Payne, J.). Applying those principles here makes clear that Plaintiff has Article III standing.

Second, Trans Union prematurely moves the Court to strike the class allegations in the First Amended Complaint ("Complaint"), raising multiple challenges to nearly every element of Rule 23. Trans Union's arguments are procedurally improper, substantively erroneous, and borderline *frivolous*. Of course, motions to strike are "generally looked upon with disfavor," but a "motion to strike class allegations is even more disfavored because it requires a reviewing court to preemptively terminate aspects of … litigation, solely on the basis of what is alleged in the complaint and before plaintiffs are permitted to complete the discovery to which they would otherwise be entitled on questions relevant to class certification." *Mayfield v. Asta Funding, Inc.*, 2015 WL 1501100, at *6 (S.D.N.Y. Mar. 31, 2015). For procedural reasons alone, the motion should be denied.

Trans Union's motion is not only premature, but its hypothetical arguments against class certification are patently incorrect even at this early stage. This case presents an ideal scenario for class certification because Plaintiff and the putative class members' claims arise from Trans Union's adoption and use of uniform policies that are unlawful under the FCRA. Some class cases are more challenging than others. Procedures may vary over time or by consumer. But not this case—Trans Union has always omitted LexisNexis as a source of information even after the *Dennis* decision. Trans Union's conduct was uniform, unvaried and the same for each class member. Accordingly, the Court should deny Trans Union's motion to strike the class allegations.[2]

---

[2] Trans Union's method of argument offers selective quotes of decisions that fit its world view. Ordinarily, a responding party would simply say, "No, that is not the law" or "That case does not hold as the Defendant claims", and of course Plaintiff argues as much herein. But in this instance, it really appears that Trans Union—the most often sued FCRA defendant in the statute's history

## <u>ARGUMENT</u>

### I.   **Statutory Framework and Purpose.**

"Congress enacted FCRA in 1970 out of concerns about abuses in the consumer reporting industry." *Dalton v. Capital Associated Indus., Inc.*, 257 F.3d 409, 414 (4th Cir. 2001). "Congress found that in too many instances [consumer-reporting] agencies were reporting inaccurate information," often without consumers' knowledge. *Id.*; *see* S. Rep. No. 91-157, at 3-4 (1969) (describing "inability" of consumers to discover errors). With the FCRA, Congress sought to change this. Recognizing the "vital role" that consumer-reporting agencies play in the modern economy, Congress determined that they must "exercise their grave responsibilities" in a way that "ensure[s] fair and accurate credit reporting." 15 U.S.C. § 1681(a); *Robinson v. Equifax Info. Servs., LLC*, 560 F.3d 235, 239 (4th Cir. 2009). The FCRA thus contains "a variety of measures designed to insure that agencies report accurate information." *Dalton*, 257 F.3d at 414–15.

The FCRA's notice provisions, including § 1681g(a), are the foundation of consumer oversight on which FCRA compliance is built. One of these is the requirement that reporting agencies "clearly and accurately disclose to the consumer . . . [a]ll information in the consumer's file at the time of the request," as well as "[t]he sources of the information." 15 U.S.C. § 1681g(a)(1) & (2). By giving consumers the right to access the information in their files—and to know where it came from—this requirement serves two important purposes: it allows consumers to confirm that the information is accurate, and it tells them who to contact if it's not. Indeed, Congress "felt that it was necessary to give consumers a specific statutory right to acquire such information on sources" because in some cases it "may be the only way in which the consumer

_____

and the subject of the largest jury verdicts, appellate losses and class action outcome—believes its theory of the law even in the face of its rejection in nearly every court to consider same.

can effectively" correct mistakes. 116 Cong. Rec. 35,940 (1970); *see also Gillespie v. Equifax Info. Servs., L.L.C.* 484 F.3d 938, 941 (7th Cir. 2007) ("A primary purpose of the statutory scheme provided by the disclosure in § 1681g(a)(1) is to allow consumers to identify inaccurate information in their credit files and correct this information *via* the grievance procedure established under § 1681i.").

## II.   The Court Has Subject-Matter Jurisdiction Over This Case.

Contrary to Trans Union's position, *Spokeo* did not change the basic requirements of standing.[3] Indeed, the Supreme Court reaffirmed that a plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant; and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo*, 136 S. Ct. at 1547 (*citing Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992)); *see also Thomas,* 2016 WL 3653878, at *4.[4] Before getting into the heart of the issue, the Court should understand the divide between Trans

---

[3] Trans Union drastically exaggerates the impact of *Spokeo*, which Trans Union contends "constitutes a substantial change in the law." (Def.'s Mem. at 10). Both commentators and courts have recognized that none of the principles set forth in *Spokeo* are new.  *In re Nickelodeon Consumer Privacy Litig.*, ___ F.3d ___, 2016 WL 3513782, at *7 (3d. Cir. June 27, 2016) (noting that *Spokeo* did not change Article III standing analysis); *Thomas,* 2016 WL 3653878, at *5 ("*Spokeo* did not change the basic requirements of standing."); *Mey v. Got Warranty, Inc.*, 2016 WL 3645195, at *2 (N.D.W. Va. June 30, 2016) ("*Spokeo* appears to have broken no new ground."); *see also*, Amy Howe, *Opinion analysis: Case on standing and concrete harm returns to the Ninth Circuit, at least for now*, SCOTUSblog (May 16, 2016), available at http://bit.ly/1TB3vd1 (describing *Spokeo* as a "narrow" decision); Daniel J. Solove, Spokeo, Inc. v. Robins: *When Is a Person Harmed by a Privacy Violation?*, Geo. Wash. L. Rev. On the Docket (May 19, 2016), available at http://bit.ly/20fyAmS.

[4] Trans Union criticizes this Court's thorough decision in *Thomas*, which it declares "legally erroneous" because, Trans Union asserts, "Thomas v. FTS fails to conduct the harm and risk analysis required by Spokeo, and instead relies erroneously on pre-Spokeo authorities to reach an incorrect conclusion."  (Def. Mem., n.6).  Certainly this Court will read *Thomas*. If Trans Union's characterization of the decision as anemic and lacking an analysis of the "harm and risk analysis" is accurate, Trans Union should win this argument. But if not, the Court could fairly doubt Defendant's case summaries going forward.

Union and Plaintiff (as well as the 90% of post-*Spokeo* decisions that have rejected Trans Union's view).  Both sides agree that a plaintiff must show that they suffered a "concrete injury" and that this means that a consumer must show that the violation has caused them "harm" or "risk of harm." It is at that point that the understandings depart. For Trans Union, "harm" means the same thing as "actual damages." In other words, Trans Union believes that *Spokeo* means that a consumer must show actual damages from the violation. In this instance, that the consumer could have corrected inaccurate information but for the violation.

But no court has agreed with Defendant. The handful of post-*Spokeo* cases it does offer do not hold as Trans Union argues.[5] Only 1 of the 7 cases cited by Trans Union involved the FCRA.

---

[5] Trans Union cites 7 cases that it contends support its view of *Spokeo*. Each of these cases is easily distinguishable. For example, the outcome in *Smith v. Ohio State Univ.* (the only FCRA case cited by Trans Union) should have been expected. 2016 WL 3182675 (S.D. Ohio. June 8, 2016). The plaintiff in that action never briefed *Spokeo* after it was decided, and its earlier argument was based entirely on the basis that "proof that the law was broken is all that is needed to create injury." *Smith*, Case No. 2:15-cv-3030 (Dkt. 18) (Pls.' Opp. to Mot. Dismiss) (filed on Jan. 18, 2016). And with all due respect to the *Smith* court, who did not have any briefing post-*Spokeo*, it failed to apply the guidance from *Spokeo* or explain why the absence of "consequential damages" warranted dismissal of the lawsuit. *Id.* Literally, *Smith* provides no analysis to support its dismissal, and it completely ignored the reaffirmed principle from *Spokeo* that "intangible injuries can nevertheless be concrete." *Spokeo*, 136 S. Ct. at 1549. *Smith*'s analysis is so thin (merely two sentences) that it makes it nearly impossible to understand the basis of the court's decision. However, it appears *Smith* presumes that monetary damages are a prerequisite for Article III standing. But this proposition is incorrect and *Spokeo* teaches precisely otherwise. The other cases cited by Trans Union fare no better. *See Jamison v. Bank of America, N.A.*, 2016 WL 3653465, at *4 (E.D. Cal. 2016) (dismissing the complaint with leave to amend and explaining that a violation does not cause concrete harm "if the lender provides the omitted information through other means"); *Sartin v. EKF Diagnostics, Inc.*, 2016 WL 3598297, at *3 (E.D. La. 2016) (dismissing a TCPA case without prejudice and with leave to amend where plaintiff only made a "bare assurance that an unspecified injury exists"); *Davis Neurology v. DoctorDirectory.com LLC*, 2016 U.S. Dist. LEXIS 84391, at *1 (E.D. Ark. 2016) (remanding a TCPA to state court in one-page order after the plaintiff conceded no standing exists); *Wall v. Michigan Rental*, 2016 WL 3418539, at *3 (dismissing a violation of the Michigan statute regulating security deposits because "the statute does not give a tenant a right to damages for a violation."); *Gubala v. Time Warner Cable, Inc.*, 2016 WL 3390415, at *4 (E.D. Wis. 2016) (finding no concrete harm existed under the Cable Communications Policy Act where a defendant retained information but did not publish or make that information available to a third-party); *Khans v. Children's Nat'l Health Sys.*, 2016 WL 2946165, at * 4 (D. Md. May

By contrast, a majority of the other cases[6]—where *Spokeo's* guidance was actually considered—follow the same reasoning of this Court in *Thomas*—in order for a statutory violation of a procedural requirement to be "substantive," Congress or common law has to have recognized the

---

19, 2016) (remanding a data breach case to state court where plaintiff's alleged harm was an increased risk of identity theft based on common law claims and claims brought pursuant to state consumer protection statutes).

[6] *Dickens v. GC Servs. Ltd. P'ship*, 2016 WL 3917530, at *2 (M.D. Fla. July 20, 2016) ("When the plaintiff alleged that the defendant failed to provide information she was entitled to receive, the Court concluded, she alleged a congressionally elevated cognizable injury. She alleged, in other words, a concrete injury." (internal citations omitted); *Church v. Accretive Health, Inc.*, 2016 WL 3611543, at *3 (11th Cir. July 6, 2016) ("Thus, Church has sufficiently alleged that she has sustained a concrete—*i.e.*, 'real'—injury because she did not receive the allegedly required disclosures. The invasion of Church's right to receive the disclosures is not hypothetical or uncertain; Church did not receive information to which she alleges she was entitled."); *McLaughlin v. Wells Fargo Bank, NA*, 2016 WL 3418337, at *5 (N.D. Cal. June 22, 2016) ("The inaccuracy here is in no way akin to an inaccurate zip code. The bank's effort to downplay the harm done by an inaccurate payoff statement is unconvincing."); *Guarisma v. Microsoft Corporation*, 2016 WL 4017196, at *4 (S.D. Fla. July 26, 2016) ("Because: (1) the FACTA created a substantive legal right for Guarisma and other consumers to receive printed receipts truncating their personal credit card numbers, and thus protecting their financial information; and (2) Guarisma personally suffered a concrete harm in receiving a receipt that violated this statute, Guarisma has sufficiently alleged an injury-in-fact so as to confer standing."); *Altman v. White House Black Mkt., Inc.*, 2016 WL 3946780, at *5 (N.D. Ga. July 13, 2016); *In re Nickelodeon Consumer Privacy Litig.*, 2016 WL 3513782, at *7 (3d Cir. June 27, 2016); *Lane v. Bayview Loan Servicing, LLC*, 2016 WL 3671467, *4 (N.D. Ill. July 11, 2016) ("The information-access cases cited by *Spokeo* suggest that, in this case, Lane has alleged a sufficiently concrete injury because he alleges that Bayview denied him the right to information due to him under the FDCPA."); *Jaffe v. Bank of Am., N.A.*, 2016 WL 3944753, at *4 (S.D. N.Y. July 15, 2016) ("The State Legislature has provided a private right of action and a heuristic for quantifying damages, possibly in recognition of both the concreteness of this harm and the difficulty in otherwise measuring damages. The types of harm the statutes protect against are real. Because to the public, these mortgages appeared not to have been satisfied, plaintiffs could have realized that harm if they had, for example, tried to sell or encumber the subject property, or tried to finance another property and been subjected to a credit check. Through no fault of their own, plaintiffs would have faced unnecessary obstacles to their goals. Whether such harm actually was realized is of no moment, because a plaintiff 'need not allege any additional harm' beyond the violation of the statutory right."); *Mey*, 2016 WL 3645195, at *8; *Rogers v. Capital One Bank, N.A.*, 2016 WL 3162592 (N.D. Ga. June 7, 2016);

violation of such a procedural requirement to have substantive import. Thus, as explained more competently by Judge Payne in *Thomas*, Congress recognized several "harms" that occur when a FCRA requirement is violated. A consumer need not prove any more harm than that. Congress has determined that a consumer is harmed when they do not receive the source of a CRA's credit report information. **That** is the harm. As *Thomas* explained:

> At the same time, the Court observed that, in cases where "harms may be difficult to prove or measure[,]" "the violation of a procedural right granted by statute can be sufficient. . . [and] a plaintiff in such a case need not allege any additional harm beyond the one Congress has identified." As one commentator has put it:

>> In these situations, legal rights reflect social judgments about where harm has and has not occurred. Often, these kinds of injuries exist where we think the harm is in the act itself. The public disclosure of private information or defamatory falsehoods does not need downstream consequences to be hurtful; neither does differential treatment on the basis of race. Procedural wrongs are an oft-seen category where the distinction between the legal violation and the injury may be so thin as to be essentially nonexistent. Proving the injury in many of these cases just entails proving the violation itself—that certain words were spoken, certain information disclosed, or certain procedures flouted. As a result, requiring some sort of additional indicia of harm beyond the violation itself ignores the nature of the injury and the reason for the remedy.

> In sum, then, the proposition that "[t]he... injury required by Article III may exist solely by virtue of 'statutes creating legal rights, the invasion of which creates standing'" survives *Spokeo* subject to qualification, depending on the facts of each case and the considerations articulated above, but nevertheless intact. These fundamental principles guide the analysis of the standing questions raised in Defendants' motion. With those principles in mind, it is necessary, as *Spokeo* instructs, to look to the common law and to the judgment of Congress, as reflected in the FCRA, to determine whether the violations of that statute alleged by Thomas constitute concrete injuries that satisfy the case or controversy requirement.

2016 WL 3653878, at *5–6 (internal citations omitted).

Despite Trans Union's best effort to quote the decision out of context, *Spokeo* has done very little to change the law; it simply summarizes the standing doctrine and provides examples of injuries that might (or might not) constitute sufficiently concrete harms. More importantly, *Spokeo*

unquestionably supports Plaintiffs as *Spokeo* expressly recognized that the deprivation of information subject to disclosure under a federal statute "constitutes a sufficiently distinct injury to provide standing to sue." *Spokeo*, 136 S. Ct. at 1549 (citing *Public Citizen*, 491 U.S. at 449; *Akins*, 524 U.S. at 24-25 (1998)); *see also* Cass R. Sunstein, *Informational Regulation and Informational Standing: Akins and Beyond*, 147 U. Penn. L. Rev. 613 (1999).

### B.    Plaintiff Suffered Informational Injuries.

Long before *Spokeo* expressly reaffirmed that informational injuries constitute a sufficient "injury in fact" for the purposes of standing, the doctrine of informational injury was already well established in Supreme Court precedent and the federal circuits. The Supreme Court, the Fourth Circuit, and other circuit courts have uniformly held that a deprivation of information is a sufficient injury for standing purposes. These holdings have arisen in a wide variety of statutory contexts, from government-sunshine and election law to health, safety, and environmental regulation. *See Havens Realty Corp v. Coleman*, 455 U.S. 363, 373 (1982); *Doe v. Pub. Citizen,* 749 F.3d 246, 263 (4th Cir. 2014) (observing that "[t]he Supreme Court consistently has held that a plaintiff suffers an Article III injury when he is denied information that must be disclosed pursuant to a statute"); *Charvat v. Mut. First*, 725 F.3d 819, 823 (8th Cir. 2013), *cert. denied*, 134 S. Ct. 1515 (2014) (finding Article III standing where the plaintiff deprived of mandatory disclosure on automatic teller machine); *Grant v. Gilbert*, 324 F.3d 383, 387 (5th Cir. 2003) (finding a nursing home resident demonstrated Article III standing through a "concrete and palpable" injury when he was deprived of required disclosure); *Heartwood v. U.S. Forest Serv.*, 230 F.3d 947, 952 n.5 (7th Cir. 2000) (finding "cognizable injury-in fact" for plaintiffs who were deprived of information required to be disclosed by statute); *Pub. Citizen v. FTC*, 869 F.2d 1541, 1543 (D.C. Cir. 1989) (finding Article III standing where consumers were "not receiving the information in the manner

in which they claimed they were legally entitled to receive it"); *Alvarez v. Longboy*, 697 F.2d 1333, 1338 (9th Cir. 1983).

That is exactly what happened here. Congress, through the FCRA, decided that consumer reporting agencies like the defendant must "clearly and accurately" disclose to consumers "[t]he sources of information" in their credit files. 15 U.S.C. § 1681g(a)(2). Put simply, a consumer has a statutory right to know who provided information about them to a consumer reporting agency. Plaintiff's "inability to obtain [that] information" is therefore "a sufficient injury in fact to satisfy Article III." *Spokeo*, 136 S. Ct. at 1549.

Trans Union's argument that Plaintiff has not suffered a concrete harm depends on a fatally flawed premise: that a consumer must suffer an *additional* harm beyond the deprivation of information. (Def.'s Mem. at 15) ("The Plaintiff must still show how the deprivation of information had a 'concrete' impact on her."). Far from it—Trans Union's violation resulted in precisely the type of informational injury specifically recognized by the Supreme Court in *Spokeo* and other cases, such as *Havens*. 455 U.S. at 363.

*Havens* demonstrates the flaws with Trans Union's argument that Ms. Clark must show how the deprivation of information impacted her. In *Havens*, the Supreme Court held that a housing-discrimination "tester" had standing based on a violation of "[his] statutorily created right to truthful housing information." *Id.* Although the tester had no "intention of buying or renting a home" and "fully expect[ed] that he would receive false information," *id.* at 373–374, the Court held that "[a] tester who has been the object of a misrepresentation made unlawful under [the statute] has suffered injury in precisely the form the statute was intended to guard against, and therefore has standing." *Id.* Relying on *Havens* within the context of post-*Spokeo* informational injury case, *Thomas* explained:

The Supreme Court held that, regardless of the plaintiffs' motives, Congress had created "an enforceable right to truthful information concerning the availability of housing," and that a "tester who has been the object of a misrepresentation made unlawful under [the Fair Housing Act] has suffered injury in precisely the form the statute was intended to guard against, and therefore has standing to maintain a claim for damages under the Act's provisions." *Id.*

In the wake of *Havens*, *Akins*, and *Public Citizen*, it is well-settled that Congress may create a legally cognizable right to information, the deprivation of which will constitute a concrete injury. By extension, it is well within Congress' power to specify the form in which that information must be presented. Many courts, including this one, have explicitly or implicitly recognized this point.
…
In the FCRA, Congress has provided that an applicant for employment must receive notice that an employer seeks to procure the applicant's consumer report, and has specified that that notice must be "clear," "conspicuous," and "in a document consisting solely of the disclosure." In Congress' legislative judgment, where disclosure does not satisfy these requirements, the consumer has the been deprived of a fully appreciable disclosure to which he or she is entitled under the FCRA. Therefore, where a consumer alleges, as Thomas has here, that he or she has received a disclosure that does not satisfy those requirements, the consumer has alleged a concrete informational injury.

*Thomas*, 2016 WL 3653878, at \*9; *see also Church*, 2016 WL 3611543, at \*3 ("Thus, Church has sufficiently alleged that she has sustained a concrete—*i.e.*, "real"—injury because she did not receive the allegedly required disclosures. The invasion of Church's right to receive the disclosures is not hypothetical or uncertain; Church did not receive information to which she alleges she was entitled."); *Jaffe*, 2016 WL 3944753, at \*4 ("Whether such harm actually was realized is of no moment, because a plaintiff 'need not allege any additional harm' beyond the violation of the statutory right.") (quoting *Spokeo*, 136 S. Ct. at 1549).

Like the "tester" in *Havens* or the potential employee in *Thomas*, Plaintiff suffered the type of injury the FCRA "was intended to guard against." *Id.*[7] To hold otherwise would defy

---

[7] The Supreme Court's landmark decision in *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 53 (2007), is further instructive. In *Safeco*, the violation at issue was an insurer's failure to provide a consumer with notice that it had used information in a consumer report to increase the consumer's insurance rates in violation of §1681m(a). The Supreme Court's decision reached the merits of the issue, and

*Havens*, *Thomas*, and even *Spokeo*, which unquestionably recognized that the deprivation of information subject to disclosure under a federal statute "constitutes a sufficiently distinct injury to provide standing to sue." *Spokeo*, 136 S. Ct. at 1549 (citing *Public Citizen*, 491 U.S. at 449; *Akins*, 524 U.S. at 24-25 (1998)).[8]

### C.      A "Risk of Real Harm" Satisfies Article III's Injury-in-Fact Requirement.

*Spokeo* further recognized that "the risk of real harm" can be enough, on its own, to satisfy the concreteness requirement. 136 S. Ct. at 1549. In particular, where Congress has found that a violation of a statutory right poses a "material risk of harm," a plaintiff "need not allege any *additional* harm beyond the one Congress has identified." *Id.* at 1549–50; *see also id.* at 1553 (Thomas, J., concurring) ("A plaintiff seeking to vindicate a statutorily created private right need not allege actual harm beyond the invasion of that private right.").

---

thereby implicitly recognized that the informational injury at issue was sufficient to confer standing, which is an issue the Court is "obliged to examine *sua sponte* where standing has erroneously been assumed below." *Adarand Constructors, Inc. v. Mineta*, 534 U.S. 103, 110 (2001) (citing *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 95 (1998) (" '[I]f the record discloses that the lower court was without jurisdiction this court will notice the defect, although the parties make no contention concerning it' "). If the deprivation of information, standing alone, was insufficient to confer standing then the Supreme Court would not have decided *Safeco* on the merits.

[8] The informational injury alleged here is also far more concrete than those recognized in *Spokeo*. In *Public Citizen* and *Akins*, the plaintiffs alleged that they had been deprived of information concerning *other* entities—for instance, "the names of candidates under consideration by the ABA Committee, reports and minutes of the Committee's meetings, and advance notice of future meetings"—to which they were entitled under federal law. *Pub. Citizen*, 491 U.S. at 449; *Akins*, 524 U.S. at 21 (seeking "lists of AIPAC . . . and campaign-related contributions and expenditures"). Here, by contrast, Plaintiff was deprived of information concerning *herself* and her *consumer report. See Lane*, 2016 WL 3671467 at *4 (Post-*Spokeo* case recognizing that "the right to get information to verify a debt is arguably *more* concrete than the right to obtain government records.").

That principle governs here. "Congress enacted FCRA in 1970 out of concerns about abuses in the consumer reporting industry." *Dalton*, 257 F.3d 409 at 414 (citing S. Rep. No. 91–517, at 3 (1969)). As one legislator remarked, "with the trend toward . . . the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal 'blips' and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable." 116 Cong. Rec. 36570 (1970). Thus, aware that "in too many instances agencies were reporting inaccurate information that was adversely affecting the ability of individuals to obtain employment . . . Congress adopted a variety of measures designed to insure that agencies report accurate information." *Id.* at 414–15. Among the chief concerns that Congress specifically recognized was consumers' lack of access to the information that consumer reporting agencies were automatically associating with consumers. *See* Senate Report at 3 (noting the "inability at times of the consumer to know he is being damaged"). Congress thus enacted section 1681g because in some cases it "may be the only way in which the consumer can effectively" correct mistakes. 116 Cong. Rec. 35,940 (1970). Indeed, *Spokeo* itself referenced the FCRA in describing the risk-of-harm principle, explaining that when Congress passed the statute it identified an important injury—"the dissemination of false information"—and "plainly sought to curb" the harm flowing from that injury "by adopting procedures designed to decrease th[e] risk" of dissemination. 136 S. Ct. at 1550.

Section 1681g(a)(2) is one of the cornerstone provisions of the FCRA that Congress designed to lower the prevalence of inaccurate information. The facts of this case symbolize how those risks become reality in the absence of compliance with the FCRA. Had Trans Union disclosed that LexisNexis was the source of the information, Plaintiff could have contacted the source, LexisNexis, to get the problem fixed. Instead, both in her disclosure and throughout the

dispute process, Trans Union continually identified the Henrico County General District Court, who was, of course, unable to correct the Plaintiff's credit report or explain why the judgment was reporting as outstanding. If Trans Union had provided Ms. Clark with the information required by Congress, she would have been able to take additional steps to correct the information with the actual person who provided it to Trans Union. [9]

Trans Union makes an argument that it would not have mattered if a consumer had contacted LexisNexis because that company also would have refused to correct inaccurate information. But the disclosure of LexisNexis' involvement would have also empowered consumers to understand that this credit information furnisher was involved and enabled direct disputes to LexisNexis governed by 15 U.S.C. § 1681s-2(a), damages lawsuits under § 1681s-2(b) and complaints to the Consumer Financial Protection Bureau or other agencies necessary to correct the problem. Additionally, if LexisNexis were not insulated from these risks and obligations by Trans Union's joined effort to hide its responsibility, the furnisher would likely have taken more diligent actions to avoid the inaccuracies it so often causes.

## III.   The Court Should Deny Trans Union's Motion to Strike.

### A.   Legal Standard for Motion to Strike

---

[9] Trans Union's reinvestigation policy further demonstrates the importance of identifying the source of the information. As detailed in numerous other cases, Trans Union does not conduct an independent investigation of a dispute and merely "parrots" the response it receives from the source of the information. *See, e.g., Saenz v. Trans Union, LLC*, 621 F. Supp. 2d 1074, 1083 (D. Or. 2007) (explaining that § 1681i imposes something more than Trans Union's policy of parroting information from its sources); *Dixon-Rollins v. Experian Info. Solutions, Inc.*, 753 F. Supp. 2d 452 (E.D. Pa. 2010) ("As discussed earlier, Trans Union had been warned repeatedly that its reinvestigation obligation in verifying a disputed account requires more than parroting the original source's response. Nevertheless, it continues to ignore these judicial edicts and refuses to change the way it does business. Indeed, Steve Newnom testified that, as a matter of policy, Trans Union will not go beyond the original source to verify any dispute."). Thus, disclosure of the sources of the information is often the best—*and the only*—way for consumers to effectively correct mistakes in their Trans Union credit reports.

Rule 12(f) allows a court to strike from a pleading "an insufficient defense or any redundant, immaterial, impertinent or scandalous matter." Fed. R. Civ. P. 12(f). In general, "Rule 12(f) motions are generally viewed with disfavor 'because striking a portion of a pleading is a drastic remedy and *because it is often sought by the movant simply as a dilatory tactic*.'" *Flame S.A. v. Indus. Carriers, Inc.*, 2014 WL 2871432, at *1 (E.D. Va. June 24, 2014) (emphasis added) (quoting *Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 347 (4th Cir. 2001)). A Rule 12(f) motion "imposes *a sizable burden* on the movant[.]" *Lopez v. Asmar's Mediterranean Food, Inc.*, 2011 WL 98573, at *1 (E.D. Va. Jan.10, 2011) (emphasis added) (internal quotations omitted). "A motion to strike class allegations is even more disfavored because it requires a reviewing court to preemptively terminate aspects of… litigation, solely on the basis of what is alleged in the complaint and before plaintiffs are permitted to complete the discovery to which they would otherwise be entitled on questions relevant to class certification." *Mayfield*, 2015 WL 1501100 at *6; *see also Smith v. Washington Post Co*., 962 F. Supp. 2d 79, 90 (D.D.C. 2013) ("This Court is hesitant to delve deep into the merits of the plaintiff's class allegations. There has been no discovery whatsoever in this matter. The Court should not 'litigate prematurely the sufficiency of the complaint and the appropriateness of class certification.'").

In order to grant a motion to strike class allegations at a Rule 12 posture, Trans Union must "demonstrate from the face of the Complaint that *it would be impossible* to certify the alleged class regardless of the facts Plaintiff[] may be able to obtain during discovery." *Mayfield*, 2015 WL 1501100 at *6 (emphasis added) (citing *Bryant v. Food Lion, Inc.*, 774 F.Supp. 1484, 1495 (D.S.C.1991)); *see also McPeak v. S–L Distribution Co., Inc.*, 2014 WL 4388562 at *4 (D.N.J. Sept. 5, 2014) ("It is only when no amount of discovery or time will allow for plaintiffs *to resolve deficiencies in class definitions* under Rule 23, that a motion to strike class allegations should be

granted.") (emphasis added); *Smith*, 962 F. Supp. 2d at 84 ("Thus, absent a strong reason for so doing, courts will generally not tamper with pleadings.").

**B.     Trans Union's Motion to Strike is Premature.**

Trans Union prematurely argues that the Court should strike the class allegations because in its defense view there is no plausible basis for class certification. As explained above, Trans Union's standing argument mischaracterizes *Spokeo* and ignores controlling precedent. Aside from its standing challenges, Trans Union raises several erroneous arguments that read more like an opposition to a motion to class certification than a motion to dismiss. Trans Union's arguments are procedurally improper and contrary to the well-settled principle that motions to strike class allegations "should be done rarely and that the better course is to deny such a motion because the shape and form of a class action evolves only through the process of discovery." 2006 WL 3751210 at *4 (declining to strike class allegations because discovery had not yet commenced and observing that most courts deny such motions if brought prior to discovery); *Smith v. Washington Post Co.*, 962 F. Supp. 2d 79, 90 (D.D.C. 2013). ("courts rarely grant motions to dismiss or strike class allegations before there is a chance for discovery."). *Myers* and *Smith* are just two of a long line of cases establishing this principle.[10] Consistent with the sound reasoning of the overwhelming

---

[10] *See, e.g.*, *Paikai v. Gen. Motors Corp.*, 2009 WL 275761, at *11 (E.D. Cal. Feb. 5, 2009) (stating that "the very purpose of allowing separate class certification proceedings" is to defer addressing potential problems with a proposed class to a later date); *In re Bessette*, 279 B.R. 442, 451 (Bankr. D.R.I. 2002); *In re Ford Motor Co. Ignition Switch Prods. Liab. Litig.*, 174 F.R.D. 332, 338 (D.N.J.1997); *Abdallah v. Coca-Cola Co.*, 1999 U.S. Dist. LEXIS 23211 (D. Ga. July 16, 1999)); *Speers v. Pre-Employ.com, Inc.*, 2014 WL 2611259, at *1 (D. Or. May 13, 2014); *Newport v. Dell Inc.*, 2009 WL 1636248, at *13 (D. Ariz. June 8, 2009); *Friedman v. Dollar Thrifty Auto. Grp., Inc.*, 2013 WL 5448078, at *2 (D. Colo. Sept. 27, 2013); *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 258 F.R.D. 167, 175 (D.D.C.2009); *Buonomo v. Optimum Outcomes, Inc.*, 301 F.R.D. 292, 299 (N.D. Ill. 2014); *Goodman v. Schlesinger*, 584 F.2d 1325, 1332 (4th Cir. 1978).

majority of cases on this issue, Trans Union's motion should be denied as premature. Out of caution, Plaintiff addresses Trans Union's arguments.

### C.     Standing of the Putative Class Members.

Largely regurgitating its argument regarding the Plaintiff's standing, Trans Union first argues that the Court should strike the class allegations because the putative class members lack standing as well. (Def.'s Mem. at 17). As explained above, Trans Union mischaracterizes *Spokeo* and conflates standing with actual damages. Like Plaintiff, every member of the class, by definition, is alleged to have suffered the same concrete and particularized injury: the denial of specific information to which they were entitled under the FCRA and the "risk of real harm" that they would be unable to get mistakes corrected in their report. As explained by this Court in a nearly identical § 1681g(a)(2) class action:

> Here, under the Act, consumers have the right to receive certain information from consumer reporting agencies, including the sources of information on their credit reports. The alleged failure of Experian to provide the sources of information violated that right. That is enough to satisfy the injury-in-fact requirement of constitutional standing.

*Dreher III*, 71 F. Supp. 3d at 577.

Moreover, Defendant misstates the law regarding the issue generally. Although the Fourth Circuit has yet to directly address this question, "courts in nearly every circuit have held that the standing issue focuses on whether the class representative (or named plaintiff) is properly before the court, not whether represented parties or absent class members are properly before the court." Newberg on Class Actions § 2:3 (5th ed.). Still, the Court of Appeals analysis of standing in class certification cases has always been based only upon the standing of the class representative or plaintiff. *See, e.g., Cent. Wesleyan Coll. v. W.R. Grace & Co.*, 6 F.3d 177, 187–88 (4th Cir. 1993).

The leading Circuit case on this question *Neale v. Volvo Cars of N. Am., LLC*, , which explicitly stated, "We now squarely hold that unnamed, putative class members need not establish Article III standing. Instead, the 'cases or controversies' requirement is satisfied so long as a class representative has standing, whether in the context of a settlement or litigation class. This rule is compelled by *In re Prudential* and buttressed by a historical review of representative actions." 794 F.3d 353, 362 (3d Cir. 2015).[11]  Trans Union's brief is puzzling as it relies on decisions from the Ninth and Second Circuit that (a.) don't really hold in the manner Trans Union suggest, but instead just state an unexplained conclusion; and (b.) are both contrary to very recent and very explicit decisions from those same respective Circuits.   For example, in the Ninth Circuit (Defendant cites a 2012 case), the court expressly "adopt[ed]" the Plaintiff's "approach," which it noted had "embraced several times (though not always) by the Supreme Court, and is the one adopted by 'most' other federal courts to have addressed the issue."   *Melendres v. Arpaio*, 784 F.3d 1254, 1262 (9th Cir. 2015), *cert. denied sub nom. Maricopa Cty., Ariz. v. Melendres*, 136 S. Ct. 799, 193 L. Ed. 2d 711 (2016).  Similarly, in citing a Second Circuit decision from 2006, Trans Union fails to disclose multiple Second Circuit cases directly contradicting the proposition asserted by Trans Union. *See, e.g. Shahriar v. Smith & Wollensky Rest. Group, Inc*., 659 F.3d 234, 253 (2d Cir. 2011) (evaluating named plaintiffs' adequacy under Rule 23(a)(4); " 'only one of the named Plaintiffs is required to establish standing in order to seek relief on behalf of the entire class' " (citation omitted)).  In fact, the Second Circuit decision Trans Union's argument is built on is useful only to the extent the Court relies on a single out of context sentence in the case:

> Most courts that express this certification concern quote to one sentence in a 2006
> Second Circuit decision stating that "no class may be certified that contains

---

[11] The Third Circuit's detailed and well-analyzed support for this conclusion has to be read within the case as it includes the full string of cases on this question and the full procedural and constitutional basis for this result.

> members lacking Article III standing." While the case did contain that sentence, it was embedded in a paragraph that also stated, quoting this Treatise, that: "[P]assive members need not make any individual showing of standing, because the standing issue focuses on whether the plaintiff is properly before the court, not whether represented parties or absent class members are properly before the court." And the court in that case held that standing existed. Yet, the sentence is oft-quoted for the proposition that a class cannot be certified unless each class member has suffered injuries sufficient to sustain convention individual standing.

Newberg on Class Actions § 2:3, n.16 (5th ed.) (referencing *Denney v. Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006)).

Trans Union ignores decisions from other circuits as well. See e.g. *Gooch v. Life Investors Ins. Co. of Am.,* 672 F.3d 402, 422 (6th Cir. 2012) (quoting *Fallick v. Nationwide Mut. Ins. Co*., 162 F.3d 410, 423 (6th Cir. 1998) ("Once his standing has been established, whether a plaintiff will be able to represent the putative class, including absent class members, depends solely on whether he is able to meet the additional criteria encompassed in Rule 23.")).

The point of all of these cases is that the question of standing is a question addressed only to the individual plaintiff because putative class members are not actually "parties" in the case. The plaintiff's case is determined to be representative of the class as a whole. And that question – whether the plaintiff's case is representative – is addressed by Rule 23. As the Supreme Court long ago explained:

> A named plaintiff in a class action must show that the threat of injury in a case ... is "real and immediate," not "conjectural" or "hypothetical." ... This conclusion [that plaintiff had **standing**] does not automatically establish that appellant is entitled to litigate the interests of the class she seeks to represent, but it *does shift the focus* of examination from the elements of justiciability to the ability of the named representative to "fairly and adequately protect the interests of the class."

*Sosna v. Iowa*, 419 U.S. 393 (1975) (emphasis added, citations and internal quotation marks omitted); *see also Gen. Tel. Co. of Sw. v. Falcon,* 457 U.S. 147, 155–61, (1982) (treating

dissimilarities in injuries between named and unnamed plaintiffs as a Rule 23 question rather than of putative class member standing).

### D.      Trans Union's Challenge to Commonality is Improper and Incorrect.

Trans Union's commonality argument is also incorrect. Again, Trans Union incorrectly characterizes the Supreme Court's decision in *Dukes*, suggesting without a basis that the decision requires a common issue to prove that "Trans Union violated Section 1681g(a)(2) in one stroke." Instead, all that Rule 23(a)(2) requires is that there be *a* common question of law or fact. *Souter v. Equifax Info. Servs., LLC*, 307 F.R.D. 183, 199 (E.D. Va. 2015) ("To satisfy this requirement, there need be only a single issue common to the class."). Recently, the Fourth Circuit restated the standard for commonality, based upon the Supreme Court's clarification of the concept in *Dukes*:

> Commonality is generally established when a Plaintiffs' claims have "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). As the Supreme Court recently clarified, in order to satisfy the commonality requirement, the plaintiff must "demonstrate that the class members 'have suffered the same injury,' " *Wal–Mart Stores, Inc., v. Dukes,* ——U.S. ——, ——, 131 S. Ct. 2541, 2551, 180 L.Ed.2d 374 (2011) (quoting *Gen. Tel. Co. of Southwest v. Falcon,* 457 U.S. 147, 156, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982)), and that the claim "depend[s] upon a common contention" that "is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke," *id.*

*Gray v. Hearst Communications, Inc.*, 444 F. App'x 698, 700-01 (4th Cir. 2011).

While ignoring these case, Trans Union argues that *Dukes* requires that the common contention must be of such a nature that it is capable of classwide resolution "in one stroke." *Id*. In other words, Trans Union contends that a class action may only be certified when the claim rises or falls on the answer to one question. *Dukes* does not stand for this proposition. In rejecting this exact argument, Judge Payne recently explained:

> This does *not* mean, of course, that the entire *case* must be decided by a single issue. *Wal–Mart* does not, as Equifax seems to think, require that a common fact be one upon which the entire case be decided "in one stroke." Such a requirement would

render the predominance inquiry under Rule 23(b)(3) entirely meaningless. Rather, "[a] single common question will suffice [if] it [is] of such a nature that its determination 'will resolve *an issue* that is central to the validity of each one of the claims in one stroke.' " *EQT,* 764 F.3d at 360 (internal citations omitted) (emphasis added); *see also Wal–Mart,* 131 S.Ct. at 2556 ("We quite agree that for purposes of Rule 23(a)(2) even a single common question will do.") (internal quotation marks and brackets omitted). Put simply, if common evidence will generate a common answer to help resolve an element within the class' common claim, then *Wal–Mart's* "one stroke" demand is satisfied.

*Soutter III*, 307 F.R.D. at 200 (emphasis in original).[12]

Unlike in *Dukes*, where there was no common policy or course of conduct—the common fact was simply that female employees at Wal-Mart had been treated differently than men—this case presents a single factual and legal basis. One procedure violated one provision of law. Every single material issue is this case is common between the Plaintiff and the class members. The truly dispositive questions in this case are: (1) whether Trans Union violated § 1681g(a)(2) when it failed to clearly and accurately disclose LexisNexis as a source of information; and (2) whether Trans Union's FCRA violations were willful. These questions are the similar to the common questions in three class cases recently certified by this Court, including in § 1681g(a)(2).[13] Further,

---

[12] Ironically, Trans Union cites the Fourth Circuit's December 3, 2012 ruling in *Soutter* reversing this Court's class certification ruling as support for its commonality argument. (Def.'s Mem. at 21) (citing *Soutter v. Equifax*, 498 F. App'x 260 (4th Cir. 2012). To that end, Trans Union argues that the same defects in this case exist. However, Trans Union fails to inform the Court that after *Soutter* was remanded, a new class was certified and the Fourth Circuit denied Equifax's appeal. *See generally Soutter III*, 307 F.R.D. at 196; *Equifax Info. Servs v. Soutter*, Case No. 15-172 (4th Cir. June 15, 2015) (order denying permission to appeal).

[13] As the Fourth Circuit explained in its post-*Dukes* summary of its earlier FCRA *Stillmock* decision, "The qualitatively overarching issue by far is the liability issue of the defendant's willfulness, and the purported class members were exposed to the same risk of harm every time the defendant violated the statute in the identical manner, the individual statutory damages issues are insufficient to defeat class certification under Rule 23(b)(3)." 385 Fed.Appx. at 273." *Ealy v. Pinkerton Gov't Servs., Inc.*, 514 F. App'x 299, 305 (4th Cir. 2013); *see also Soutter III,* 2015 WL 1787236, at *18 ("[C]ommon evidence applicable across all class members regarding willfulness will resolve a common contention and drive the litigation forward by common answers."); *Milbourne v. JRK Residential Am., LLC*, 2014 WL 5529731, at *5 (E.D. Va. Oct. 31, 2014) ("JRK

even damage remedies in this case present common questions: What is the proper measure of statutory damages and punitive damages pursuant to 15 U.S.C. § 1681n?

Like its standing argument, Trans Union's argument is explicitly premised on the false assumption that a prerequisite to a § 1681g(a)(2) claim is that there was inaccurate information in the consumer's file related to the public record. This is not a "prerequisite" in the statute and it is not an element of such a claim. All consumers have the same right to know what is in their consumer file and who furnished it. *See* 15 U.S.C. § 1681g(a)(2). Trans Union not only disregards the statutory text of § 1681g(a)(2), but it further disregards on point case law in this Court rejecting such "read between the lines" accuracy arguments. For example, in a § 1681k notice case, this Court explained:

> LexisNexis argues that both § 1681i and § 1681k require inaccuracy as a threshold matter. That would require, says LexisNexis, inquiry into whether each individual class members' inquiry was, in fact, inaccurate. Therefore, argues LexisNexis, those individual inquiries will predominate over common issues. The argument is incorrect. ... In the § 1681k claims here, by contrast, plaintiffs are claiming that LexisNexis' notice was improper. The claim therefore is entirely ***independent of the accuracy of the report***.

*Williams v. LexisNexis Risk Mgmt. Inc.*, 2007 WL 2439463, at *6 (E.D. Va. Aug. 23, 2007) (emphasis added); *see also Dreher v. Experian Info. Solution*, 2014 WL 2800766, at *2 (E.D. Va. 2014) ("*Dreher II*") ("Apparently, many consumers with old Advanta accounts requested reports from Experian, and all of the reports listed Advanta, not CardWorks, as the source of the information about the old Advanta accounts.").

---

has admitted that it has used a standardized waiver and disclosure form for all class members, including Milbourne. Thus, if Milbourne is able to establish that JRK's waiver did not satisfy Section 1681b(b)(2)'s requirements this issue will be resolved not only in Milbourne's favor, but in the favor of all class members."); *Dreher II,* 2014 WL 2800766, at *1 (E.D. Va. June 19, 2014) ("[T]he class meets the commonality requirement. The common factual and legal issues include: (1) … (2) whether Experian's failure to list "Cardworks" as a source of information violated § 1681(g)(a)(2); and finally, (3) whether Experian's violation of that statutory section was willful.").

**E.      Trans Union's Challenges to Typicality and Adequacy are Incorrect.**

Trans Union also contrives typicality and adequacy challenges. (Def.'s Mem. at 23). Trans Union seems to believe that the rights and remedies for consumers under § 1681g(a)(2) are somehow dependent upon the nature of an inaccuracy in the consumer's credit report.  This was the exact same argument raised by another CRA before Judge Payne in *Williams* and rejected then as they should be here. 2007 WL 2439463, at *6 (E.D. Va. Aug. 23, 2007). As is obvious from the text of the statute, accuracy of the underlying information is not an element of a § 1681g(a)(2) claim. Consumers are entitled to have Trans Union tell them the truth about the sources of the information regardless of whether the underlying information is accurate.[14] In fact, this Court considered the Trans Union "accuracy is an implied element" argument in *Williams* regarding claims under §§ 1681k(a) and 1681i. *Williams v. LexisNexis Risk Mgmt. Inc.*, 2007 WL 2439463, at *6 (E.D. Va. Aug. 23, 2007). Both of these claims are much more tied to accuracy and dispute rights than the claim at bar.

As long as the class representative's claim is proven with the same facts and elements as the claim asserted on behalf of the class, it does not matter that the specific facts bringing the various class members into contact with the defendant differ somewhat. *Ealy*, 514 F. App'x 299, 304-05 (4th Cir. 2013) ("Although a representative's claims and the claims of other members of the class need not be 'perfectly identical or perfectly aligned[.]'") (citing *Deiter v. Microsoft Corp.*, 436 F.3d 461, 466 (4th Cir.2006).

Trans Union's status distinction highlights a fact immaterial to the claim, just as is the fact that the Plaintiff's name, address or age may be different from other class members. Trans Union

---

[14] Trans Union's position also ignores the fact that every single public record it reports was inaccurate – in each record, Defendant claimed that it had been actively reported to Trans Union by the respective court.  That fact—that the court reported anything—was objectively false.

does not offer any substantive explanation as to how or why a class member's request for a complete copy of her consumer file disclosure claim would be different from Plaintiff's *prima facie* case. *See Souter II*, 498 F. App.'x at 265 ("[T]ypicality requires the Court to 'compare [Plaintiff's] claims and [the] defenses to [those] claims' of the absent class members 'by reviewing the elements of [Plaintiff's] prima facie case.'").

At best, what Trans Union is implicitly arguing is that the *effect* or *impact* of the violation would be different for one consumer versus another. In other words, a consumer with an underlying inaccuracy may have more value in knowing the source. But these issues are exclusively "actual damages" differences and Plaintiff seeks statutory damages. [15]  To that end, the "statutory damages analysis… does not focus on the plaintiff's injuries (or very possibly, lack thereof). If a plaintiff can demonstrate an actual injury attributable to the violation, he is free to seek recovery under the 'actual damages' prong of the statute, unrestrained by any cap on recovery. If, however, the plaintiff cannot or chooses not to plead actual damages, the FCRA offers a second, tightly constrained remedy." *Dreher II*, 2014 WL 2800766 at *4.

Trans Union also asserts—based apparently solely upon a sentence it found in a 2011 Pennsylvania case—that Plaintiff faces an "inherent conflict" because she "pursu[es] both individual and class claims in the same action." (Def.'s Mem. at 4). "The burden is on the defendant[] to demonstrate that the representation will be inadequate." *Johns v. Rozet*, 141 F.R.D. 211, 217 (D.D.C. 1992); *see also In re Southeast Hotel Properties Ltd. P'ship Investor Litig.*, *supra* at 607; *Lewis v. Curtis*, 671 F.2d 779, 788 (3rd Cir. 1982); *Trautz v. Weisman,* 846 F. Supp.

---

[15] Trans Union's argument also centers on an incorrect factual premise. As observed by this Court: "it would hardly hurt to learn the name of an entity primarily responsible for the presence of certain credit information, whether favorable or unfavorable. Consumer unquestionably want to know whom they can hold ultimately accountable for the content of their credit reports." *Dreher v. Experian Info. Solutions, Inc.*, 2013 WL 2389878 at *6 (E.D. Va. 2013) ("*Dreher I*").

1160, 1167 (S.D.N.Y. 1994).  To defeat the adequacy requirement of Rule 23, a conflict "must be more than merely speculative or hypothetical." *Gunnells v. Healthplan Services, Inc.,* 348 F.3d 417, 430 (4th Cir. 2003) (citing 5 Moore's Federal Practice § 23.25[4][b][ii] (2002)).

Again, Trans Union continues its pattern of ignoring on point law in this District and Circuit that rejects such a challenge. The Court has already rejected the exact same adequacy argument.  *Williams* 2007 WL 2439463, at *4–5 ("LexisNexis [argues that plaintiffs are inadequate] because the class representatives, with class counsel as their individual attorneys, have also asserted a claim against LexisNexis as individuals for violations of § 1681e(b). [The] interest of the representatives and the absent class members merely must be coextensive."); *see also First Am. Corp. v. Foster*, 51 F.R.D. 248, 250 (N.D. Ga. 1970) ("[T]he fact that individual plaintiffs may have interests which go beyond the interest of the class, but are at least co-extensive with the class interest, will not defeat the class."); *accord*, *Gunnells,* 348 F.3d at 430-31.

## G.     Trans Union's Predominance Challenge Suffers from the Same Flaws as Its Other Arguments.

Trans Union urges the Court to strike the class allegations because determining which consumers were "harmed" and to what degree will predominate over common issues. (Def.'s Mem. at 24). Trans Union's *Spokeo* predominance argument is just as wrong as its arguments regarding standing, commonality and typicality. Accuracy or inaccuracy—is neither a textual element of the claim nor a requirement for class membership. Determining the membership of the class merely requires an affirmative answer to three objective questions: (1) Did Trans Union furnish the consumer a § 1681g(a) disclosure? (2) Did the disclosure contain a public record? (3) Did the consumer's disclosure identify LexisNexis as a source of the public record information? Answers to the first two questions are particularly well-suited to a database business like Defendant's, whose very purpose is to gather, distill, and report information. *Dreher II*, 2014 WL

2800766 at *4 (explaining that " 'individual question' of statutory damages, then, is reduced to mouse-clicking simplicity. . . anyone can find the number of consumer reports each class member received after August 1, 2010."). Furthermore, the answer to the third question will *always* be "yes" because Trans Union intentionally omits this information.

Trans Union's predominance argument also ignores binding precedent from the Fourth Circuit. In *Stillmock v. Weis Markets, Inc.*, the Fourth Circuit expressly held that any individual questions presented in determining a specific class member's entitled amount of statutory damages would not predominate over other common issues. 385 F. App'x 267, 273 (4th Cir. 2010). Instead, "the qualitatively overarching issue by far is the liability issue of the defendant's willfulness, and the purported class members were exposed to the same risk of harm every time the defendant violated the statute in the identical manner, the individual statutory damages issues are insufficient to defeat class certification under Rule 23(b)(3)." *Id.* (citing *Murray v. GMAC Mortg. Corp.,* 434 F.3d 948, 953 (7th Cir.2006); *Smilow v. Southwestern Bell Mobile Systems, Inc.,* 323 F.3d 32, 40 (1st Cir.2003) ("The individuation of damages in consumer class actions is rarely determinative under Rule 23(b)(3). As the Court of Appeals held, "Under these circumstances, it strains credulity to conclude that the individual damages issues presented by the purported [FCRA] class which Plaintiffs seek to certify would be anything other than simple and straightforward. Pragmatically, the only substantive difference between putative class members for purposes of affixing the statutory damages figure within the statutory damages range of $100 to $1,000 or in awarding punitive damages is the number of [violations suffered] by a single class member during the approximately eighteen months at issue." *Id.* The Court of Appeals more recently made this point

even clearer, explaining that, "When it comes to statutory damages under the FCRA, what matters is the conduct of the *defendant.*" *Berry v. Schulman*, 807 F.3d 610 (4th Cir. 2015).[16]

### H.      The *Souter* Settlement Did Not Release § 1681(g)(a)(2) Claims.

Finally, Trans Union argues that the Court should strike the class action because "the claims substantially overlap with claims released in the Souter v. TU settlement." (Def.'s Mem. at 28). Trans Union's representation is entirely false.[17]  *Souter* never involved a claim that Trans Union violated § 1681(g)(a)(2). Instead, as explained in the recital of the class settlement agreement, *Souter* alleged:

> Trans Union's procedures for obtaining information from Virginia General District Court or Virginia Circuit Court civil court records did not adequately capture information about events subsequent to a judgment, such as satisfaction or dismissal of the judgment. As a consequence, Plaintiff alleges Trans Union issued inaccurate credit reports about certain Virginia consumers, supposedly in violation of Sections 1681e(b), 1681i, 1681n and 1681o of the FCRA.

(Dkt. 24-1, Souter Class Settlement Agreement dated December 5, 2013 at 1). To that end, the Class Settlement Agreement defines the "Released Claims," in pertinent part, as all claims:

> [T]hat were alleged (or that could have been alleged based on the same facts and circumstances) in the Action, the Amended Complaint or any other complaints or other papers filed or to be filed in the Action or any similar or related litigation, ***and*** that involved a Virginia General District Court or Virginia Circuit Court judgment on a TransUnion consumer report or File disclosure, or a consumer report or File disclosure created from data provided by TransUnion, ***wherein such data***

---

[16] In *Souter*, the Fourth Circuit majority panel noted that "statutory damages … typically require an individualized inquiry." *Souter v. Equifax Info. Servs., LLC*, 498 F. App'x 260, 265 (4th Cir. 2012). This conclusion is consistent with *Stillmock* and *Berry* as the individualized question remains – the exposure to defendant's conduct, *i.e.*, the number of violations.  But the Court of Appeals has never held that statutory damages considered individual facts unique to the consumer and not determined solely by the conduct of the defendant.  The leading authority on the elements of statutory damages to include in a jury instruction remains *Ashby v. Farmers Ins. Co. of Oregon*, 592 F. Supp. 2d 1307, 1317–18 (D. Or. 2008).  The instructions provided by Judge Gibney in *Dreher* and Judge Payne in *Thomas* largely tracked the Ashby instruction.

[17] Defendant's contention is that much more remarkable as the *Souter* settlement was negotiated between the same counsel teams now at odds in this case.

> **inaccurately stated or suggested that such judgment was valid and had not been paid or satisfied.**

*Id*. at 6. The Final Approval Order mirrors this language. (June 4, 2014 Final Order at ¶ 10).

Trans Union's broad and self-serving interpretation of *Soutter* is not supported by the text of the Class Settlement Agreement or the Final Order. The plain language of the agreement reflects that Trans Union was released for alleged violations of §§ 1681e(b) and 1681i in cases where its credit reports "inaccurately stated or suggested that [a] judgment was valid and had not been paid or satisfied." (Dkt. 24-1, at 6). The limiting phrase "wherein such data inaccurately stated or suggested that such judgment was valid and had not been paid or satisfied" could hardly be more clear-cut or categorical. *Soutter* alleged violations of §§ 1681e(b) and 1681i for Trans Union's failure to update judgments which were paid or satisfied; and the language of the release only extends as far as claims that a credit report inaccurately stated or suggested that a judgment was still valid (*i.e.*, outstanding). There is no such all-encompassing language in the Class Settlement Agreement that extends to "all FCRA claims relating to public record data" as posited by Trans Union. (Def.'s Mem. at 11) (citing June 4, 2014 Final Order at ¶ 10).

## IV.    Rule 23(b)(2) Certification Would Be Appropriate in this Case.

Finally, it is important to note that Trans Union's arguments ignore that this case presents an ideal scenario for Rule 23(b)(2) certification as well. Under Rule 23(b)(2), a class action may be maintained if all of the Rule 23(a) elements are satisfied and if a defendant "has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole[.]" Fed. R. Civ. Pro. 23(b)(2). Trans Union only half-heartedly presses this challenge. And certainly this component of the complaint should be determined later in the case, on class certification or against summary

judgment. And Trans Union's position should be pressed with substantive argument in its opening brief—lacking here—rather than a later reply.

But there are several points that should now be made.  First, while defendant is correct in its statement of the self-evident fact that Plaintiff "seeks monetary damages," its analysis of the relevance of this fact is overly simplistic. There is not a general prohibition on Rule 23(b)(2) certification in every case in which a plaintiff seeks money damages.  Instead, the precise legal rule was recently summarized in the Fourth Circuit's affirmance of a Rule 23(b)(2) FCRA class settlement in *Berry v. Schulman*, previously cited.  807 F.3d 600, 609 (4th Cir. 2015). The Fourth Circuit held:

> Federal circuits, including ours, have held that mandatory Rule 23(b)(2) classes may be certified in some cases even when monetary relief is at issue. *See Thorn,* 445 F.3d at 331; *Allison,* 151 F.3d at 413–14. Where monetary relief predominates, Rule 23(b)(2) certification is inappropriate. *Thorn,* 445 F.3d at 331–32. But where monetary relief is "incidental" to injunctive or declaratory relief, Rule 23(b)(2) certification may be permissible. *Allison,* 151 F.3d at 415; *see also Dukes,* 131 S.Ct. at 2560 (discussing Allison).

*Berry v. Schulman*, 807 F.3d 600, 609 (4th Cir. 2015). FCRA statutory damages were permitted in a Rule 23(b)(2) settlement because by their nature they were "not the kind of individualized claims that threaten class cohesion and are prohibited by *Dukes. Berry*." 807 F.3d at 609.[18]

Second, Defendant also ignores the fact that a plaintiff may seek Rule 23(b)(2) certification in order that the court enter a class-wide declaration as to liability only. *See, e.g., In re Dalkon Shield Punitive Damages Litig.*, 613 F. Supp. 1112, 1113 (E.D. Va. 1985).[19]

---

[18] Defendant's failure to even mention *Berry* – binding on point authority – on this point as well is troubling.

[19] Trans Union makes a quick mention in passing its belief that injunctive relief may not be available under the FCRA. Def. Mem., n.9. Trans Union has the majority view here.  But the law is far from settled.  *Harris v. Experian Info. Sols., Inc.*, 2007 WL 1863025, at *3 (D.S.C. June 26, 2007).  Plaintiff *sub judice* may lose this argument.  However, they ask the Court to defer the

## CONCLUSION

For the foregoing reasons, Defendant Trans Union, LLC's motion should be denied.

Respectfully Submitted,
**CAROLYN CLARK**

By:_____/s/_____
        Counsel

Kristi Cahoon Kelly, VSB #72791
Andrew J. Guzzo, VSB #82170
KELLY & CRANDALL, PLC
4084 University Drive, Suite 202A
Fairfax, Virginia 22030
(703) 424-7576 Telephone
(703) 591-9285 - Facsimile
E-mail: kkelly@kellyandcrandall.com
E-mail: aguzzo@kellyandcrandall.com

Leonard A. Bennett, Esq., VSB #37523
Susan M. Rotkis, Esq., VSB#40693
Consumer Litigation Associates, P.C.
763 J. Clyde Morris Blvd, Ste 1-A
Newport News, VA  23601
Telephone:  (757) 930-3660
Facsimile:   (757) 930-3662
Email:  lenbennett@clalegal.com
Email: srotkis@clalegal.com

Matthew J. Erausquin, VSB No. 65434
Casey S. Nash, VSB No. 84261
Consumer Litigation Associates, P.C.
1800 Diagonal Road, Suite 600
Alexandria, VA 22314
Telephone:    (703) 273-7770
Facsimile:     (888) 892-3512
Email: matt@clalegal.com
Email: casey@clalegal.com

James A. Francis, Esq. (admitted *pro hac vice*)

---

question to a more developed posture rather than consider it via limited briefing and a footnote by
Defendant.

John Soumilas, Esq. (admitted *pro hac vice)*
FRANCIS & MAILMAN, P.C.
Land Title Building, 19th Floor
100 South Broad Street
Philadelphia, PA 19110
(215) 735.8600 (Telephone)
(215) 940.8000 (Facsimile)
jfrancis@consumerlawfirm.com
jsoumilas@consumerlawfirm.com

*Counsel for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 1st day of August, 2016, I will electronically file the foregoing with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Michael R. Ward
Gibson S. Wright
Morris & Morris, P.C.
P.O. Box 30
Richmond, VA 23218
Phone: 804-344-8300
Fax: 804-344-8359
mward@morrismorris.com
gwright@morrismorris.com

Stephen Julian Newman  (pro hace vice)
Stroock & Stroock & Lavan LLP (CA NA)
2029 Century Park East
Ste 1600
Los Angeles, CA 90067-3086
 (310) 556-5982
Fax: (310) 556-5959
Email: snewman@stroock.com

*Counsel for Trans Union, LLC*

_____/s/_____
Kristi Cahoon Kelly, VSB #72791
KELLY & CRANDALL, PLC
4084 University Drive, Suite 202A
Fairfax, Virginia 22030
(703) 424-7576 Telephone
(703) 591-0167 - Facsimile
E-mail:  kkelly@kellyandcrandall.com
*Counsel for Plaintiff*