EXHIBIT A

```
 1                UNITED STATES DISTRICT COURT

 2                          FOR THE

 3                EASTERN DISTRICT OF VIRGINIA

 4                        ---oOo---

 5   CAROLYN CLARK, et al.,

 6        Plaintiff,

 7   vs.                              No. 3:15-CV-00391-MHL

 8   TRANSUNION, LLC,

 9        Defendants.

10   _____/

11

12

13

14              DEPOSITION OF VICTOR STANGO

15

16

17

18           Taken before NICOLE HATLER

19                CSR No. 13730

20              December 2, 2016

21

22

23

24

25
```

**VICTOR STANGO on 12/02/2016**

Page 2

```
 1
 2                    I N D E X
 3                                         PAGE
 4   EXAMINATION BY MR. BENNETT            6
 5
 6
 7
 8           (No exhibits were marked.)
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1   For the Defendant:
 2       STEPHEN J. NEWMAN
         Stroock & Stroock & Lavan LLP
 3       2029 Century Park E
         Los Angeles, CA 90067-3086
 4       (310) 556-5800
         SNewman@Stroock.com
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1              DEPOSITION OF VICTOR STANGO
 2
 3
 4        BE IT REMEMBERED, that pursuant to Notice, and on
 5   the 2nd day of December 2016, commencing at the hour of
 6   10:54 a.m., in the offices of Regus Business Center, 71
 7   Stevenson Street, Suite 400, San Francisco, California
 8   94105, before me, NICOLE HATLER, a Certified Shorthand
 9   Reporter, State of California, personally appeared
10   VICTOR STANGO, produced as a witness in said action, and
11   being by me first duly sworn, was thereupon examined as
12   a witness in said cause.
13                    ---oOo---
14   APPEARANCES
15   For the Plaintiffs:
16       LEONARD BENNETT, teleconference
         MATTHEW ERAUSQUIN, telephonically
17       ELIZABETH HANES, teleconference
         Consumer Litigation Associates, P.C.
18       763 J Clyde Morris Boulevard, Suite 1A
         Newport News, VA 23601
19       (757) 930-3660
         Leonard@clalegal.com
20
         ANDREW J. GUZZO
21       Kelly & Crandall, PLC
         4084 University Drive, Suite 202A
22       Fairfax, VA 22030
         (703) 424-7572
23       Aguzzo@kellyandcrandall.com
24
25
```

Page 5

```
 1        THE VIDEOGRAPHER:  Good morning, this is the
 2   beginning of media one in the deposition of Victor
 3   Stango in the matter of Carolyn Clark versus TransUnion,
 4   LLC.  The cause number is 315-cv-391.  Today's date is
 5   October -- I'm -- is December 2nd, 2016, and the time is
 6   10:54 a.m.
 7        My name is Terrell Suszckiewicz, I'm the
 8   videographer, and the court reporter is Nicole Hatler.
 9   We're both here representing the Maxene Weinberg Agency.
10        Counsel, would you please identify yourself for
11   the record and then the court reporter will swear in the
12   witness.
13        MR. NEWMAN:  Steven --
14        MR. BENNETT:  This is Leonard Bennett.  I'm
15   appearing by videoconference from Newport News,
16   Virginia, on behalf of the plaintiffs and trying to be
17   on behalf of the punitive class.  We also have appearing
18   remotely Elizabeth Haynes and Matt Erausquin, with my
19   office; and Andrew Guzzo with Kelly & Crandall, all on
20   behalf of the plaintiff.
21        MR. NEWMAN:  Steven Newman for defendant and the
22   witness.
23        THE VIDEOGRAPHER:  And on the phone.
24        MR. BENNETT:  I've covered them all.
25        THE VIDEOGRAPHER:  Okay.  Then the court
```

**VICTOR STANGO on 12/02/2016**

Page 6

1  reporter may swear in the witness.
2                    VICTOR STANGO
3                 sworn as a witness
4                 testified as follows:
5  EXAMINATION BY MR. BENNETT:
6      Q.  Sir, can you please state your full name for the
7  record?
8      A.  Victor Ereste Stango III.
9      Q.  And how much are you getting paid to appear here
10  today?
11     A.  My compensation has two components, one is an
12  hourly rate of 950, which I bill as my standard rate.  I
13  also receive a certain percentage of billings that
14  Cornerstone Research incurs as part of their assistance
15  to me in cases like this.
16     Q.  And how much money have you made because of the
17  work that you've done for and with Steven Newman,
18  TransUnion's lawyer here today all total?  Not just this
19  case, but all total.
20     A.  I'm not quite sure of the exact number because
21  this is not the only case on which I've worked.
22     Q.  Really?  How many cases has Mr. Newman paid you
23  for your opinion?
24     A.  I would --
25          MR. NEWMAN:  Objection; argumentative.

Page 7

1          You can answer.
2          THE WITNESS:  I would take issue with a premise
3  of your question, which is that I've been paid for my
4  opinion.  My opinions are my own in this case and every
5  other case in which I've testified.  That said, I
6  believe that this is the fourth case with which I've
7  worked with Steve Newman.
8  BY MR. BENNETT:
9      Q.  I'm sorry.  How much?
10          MR. NEWMAN:  The question is, can -- the
11  question is:  Can you estimate what your fees have been
12  in matters where you've worked with me?
13          THE WITNESS:  I'm sorry.  I thought you asked me
14  how many cases I've worked on.  As to the total billings
15  I've submitted, I can't recall exactly.
16  BY MR. BENNETT:
17     Q.  I'm sorry.  And how many cases have you been
18  paid by Mr. Newman or his client for Mr. Newman's case?
19     A.  This is the fourth.
20     Q.  The fourth.  And those were all in causes of
21  action in which you sent your bill to TransUnion, the
22  defendant in this case?
23     A.  Yes, as I recall.
24     Q.  Do you get paid nine -- $950 for every hour you
25  work with the University of California?

Page 8

1      A.  No.
2      Q.  No?  How many cases have you been paid -- how
3  many court cases in -- how many court cases have you
4  been paid $950 an hour or more to serve as an expert
5  witness?
6      A.  I can't recall the exact number.  I -- to the
7  best of my recollection, I have worked on perhaps ten
8  cases, but I can't be positive of that number, as I sit
9  here right now.
10     Q.  And did you -- were you able to bill your paying
11  client $950 an hour for the work in all ten of those
12  cases?
13     A.  To the best of my recollection, yes.  That is my
14  standard rate.
15     Q.  Okay.  How did you determine your standard rate?
16     A.  A number of factors went into it, including how
17  I value my own time.
18     Q.  What other factors besides how you value your
19  own time went into setting your $950 an hour rate for
20  testimony on behalf of TransUnion and other customers?
21     A.  I think the best way to put it would be that, I
22  sent my hourly rate based on my assessment of the effort
23  that I will incur and how I value it.
24     Q.  When was the first -- in what year was the first
25  case that you ever got paid as an expert witness?

Page 9

1      A.  I can't recall.
2      Q.  Do you know if it was before 2014?
3      A.  Yes.  It was before 2014.
4      Q.  Do you know if it was before 2013?
5      A.  Yes.  I believe so.
6      Q.  Do you know if it was before 2012?
7      A.  Yes.  Although, as we go further back, my memory
8  is getting fuzzier on exact dates.
9      Q.  Do you know if it was before 2011?
10     A.  I believe so.
11     Q.  Do you know if it was before 2010?
12     A.  I can't be sure.
13     Q.  So you would think it's probably some time
14  around 2009, 2010, 2011 that you first were hired to
15  provide expert opinions or testimony in court cases,
16  right?
17     A.  That seems about right, given my memory, as I
18  sit here today.  Yes.
19     Q.  Well, you know, I -- of course, you have
20  rendered an opinion that relies on research that goes --
21  your research, I gather, that goes back well before
22  2009, right?
23          MR. NEWMAN:  Objection; vague and ambiguous.
24          You can answer.
25  //

VICTOR STANGO on 12/02/2016

Page 10

1  BY MR. BENNETT:
2      Q.  I'm just trying to figure out is -- is it too
3  generally that you can't remember things more than six
4  years old or is it that you just can't remember when you
5  first testified?
6          MR. NEWMAN:  Objection.
7  BY MR. BENNETT:
8      Q.  Is that a unique memory problem?
9          MR. NEWMAN:  Objection; argumentative.
10         Go ahead.
11         THE WITNESS:  I'm telling you what I can
12 remember to the best of my abilities.  I wouldn't make a
13 general statement --
14 BY MR. BENNETT:
15     Q.  Okay.
16     A.  -- about my memory.
17     Q.  So you have, roughly -- you've testified,
18 roughly, ten cases, four of which were TransUnion --
19         MR. NEWMAN:  Objection; misstates testimony.
20         MR. BENNETT:  I'm sorry.  What was misstated,
21 Mr. Newman?
22         MR. NEWMAN:  He didn't testify in all those
23 cases.
24 BY MR. BENNETT:
25     Q.  Okay.  You've been paid by someone in ten cases.

Page 11

1  You've been paid -- in four of those ten cases you were
2  paid by TransUnion.  That would leave six cases, right?
3      A.  Roughly speaking, yes.
4      Q.  Roughly speaking.
5          So can you tell me the names of the party on
6  whose behalf you issued an expert opinion or provided
7  testimony for those other six?
8          MR. NEWMAN:  And -- and I would caution the
9  witness that to the extent were you engaged solely as a
10 consulting expert and did not testify or provide a
11 report, that I would expect those clients should not be
12 disclosed, but go ahead with the question as best you
13 can.
14 BY MR. BENNETT:
15     Q.  And let me start there.  Let me stop real quick,
16 because I want to make sure that we're all clear on
17 this.  Do you have a lawyer who represents you, who's
18 your lawyer, in that room with you today?
19     A.  Not --
20         MR. NEWMAN:  I --
21         THE WITNESS:  -- as I understand thing.  No.
22 BY MR. BENNETT:
23     Q.  Okay.
24         MR. BENNETT:  Okay.  So Mr. Newman, please don't
25 caution and give unsolicited legal advice to somebody

Page 12

1  who's not your client.
2  BY MR. BENNETT:
3      Q.  Now, Mr. Stango, can you tell me the names of
4  any other companies or parties on whose behalf you have
5  given any expert opinion or testimony other than
6  TransUnion?
7      A.  Restricting my answer to the set of firms for
8  which I provided an expert report, I believe that the
9  answer is yes.
10     Q.  I'm sorry.  Is what?
11     A.  Yes.  I can tell you.
12     Q.  Okay.  Then, all right.  Who are those other
13 firms to whom you provided or on whose behalf you
14 provided an expert report?
15     A.  The names I can recall, sitting here today, are
16 TransUnion, the Dun & Bradstreet Corporation,
17 CitiMortgage, and Chase Bank.
18     Q.  And that's four.  Do you know how many times you
19 were paid and gave an expert witness report on behalf of
20 Dun & Bradstreet?
21     A.  As I recall, I was retained and submitted a
22 report in one case for Dun & Bradstreet.
23     Q.  And how many cases for CitiMortgage?
24     A.  As I recall, I submitted an expert report in one
25 case for CitiMortgage.

Page 13

1      Q.  And how many for Chase?
2      A.  The number of reports I've submitted for Chase
3  is at least two, that I can recall.  There may be
4  another one that's slipping my mind right now, but I'm
5  not sure.
6      Q.  Okay.  Now, you -- you can agree with me that
7  all four of the expert opinions or reports that you gave
8  regarding TransUnion were about credit reporting and
9  involved credit reporting, correct?
10         MR. NEWMAN:  And -- and objection as to the
11 statement, your number of reports.  In one of the
12 matters he was a consulting expert and the matter has
13 since resolved and no report was delivered.
14         MR. BENNETT:  Thank you.
15 BY MR. BENNETT:
16     Q.  So of the three TransUnion reports where you
17 gave you an ex --  you gave an expert witness report,
18 they all regarded credit reporting, correct?
19     A.  Yes.
20     Q.  Okay.  How many or how many of the Chase reports
21 that you drafted regarded Chase -- or regarded credit
22 reporting?
23     A.  I'm thinking about my answer because those cases
24 involved the terms of consumer credit products which, of
25 course, can be influenced by information in credit

**VICTOR STANGO on 12/02/2016**

1  files, but I would not characterize those cases as being
2  about credit reporting, per se.
3      Q.  What about CitiMortgage?
4      A.  I would not characterize that case as being
5  about credit reporting.
6      Q.  And what about Dun & Bradstreet?
7      A.  That case involved credit reporting in a small
8  business context.
9      Q.  When did you first meet Steve Newman?
10     A.  Yesterday.
11     Q.  When did you first talk to Steve Newman?
12     A.  I can't recall exactly.  A few years ago.
13     Q.  And how did you -- how were you -- how did you
14  become acquainted with Mr. Newman?  In what context?
15  For example, at a conference, or a social, or a hire an
16  expert company, like Cornerstone?
17         MR. NEWMAN:  Objection; argumentative.
18     Go ahead.
19         THE WITNESS:  The first time I spoke to Steve
20  Newman was in connection, as I recall, with a possible
21  expert engagement.
22  BY MR. BENNETT:
23     Q.  And did it come through your agent through
24  Cornerstone?
25         MR. NEWMAN:  Objection; mischaracterizes

1  testimony; argumentative.
2      You can answer.
3         THE WITNESS:  I wouldn't call Cornerstone my
4  agent.  Cornerstone Research is a consulting firm with
5  which I have an affiliation.  But, yes.  As I recall,
6  Cornerstone Research was involved in bringing us
7  together, but I can't remember the details.
8  BY MR. BENNETT:
9      Q.  And do you know the name of the case that -- in
10  which you were first contacted by Mr. Newman?
11         MR. NEWMAN:  It was -- this is not a TransUnion
12  case, and I would object that that calls for
13  confidential information.
14         MR. BENNETT:  Well, we --
15         MR. NEWMAN:  You can describe the nature of the
16  matter generally without indicating the client.
17         MR. BENNETT:  Well, I -- I disagree, because at
18  that point, you had not retained him when you first
19  inquired, so I'm entitled to know that particularly as
20  it's obvious from this line of questioning, in our view,
21  that this witness would say and do about anything that
22  you paid him to say.  So, I'm entitled to learn how you
23  developed that relationship -- that business
24  relationship with your witness.
25         MR. NEWMAN:  Well, I'm --

1         MR. BENNETT:  And at that point, you had not
2  retained him for consulting advice and you had not
3  retained him to provide a 26(a)(2) report or anything
4  comparable.
5         MR. NEWMAN:  But it still -- you know, even
6  then, if I speak to a witness for the purpose of
7  engaging him as an expert or for the purpose of using
8  him as a consulting expert, that communication is -- is
9  privileged.  It's --
10         MR. BENNETT:  But why --
11         MR. NEWMAN:  And my -- and my former client, who
12  is not a party here, who hasn't been given notice to
13  this proceeding holds the privilege.  So he can't tell
14  you who it was.  I represent to you that it was not
15  TransUnion, and it was not related to a Transunion
16  matter.  And you can ask -- and I don't have a problem
17  with him describing the matter in general terms to let
18  you know what it was about, but I -- I -- I object to
19  his revealing who the client was.  The matter has been
20  resolved.  He didn't testify in the matter, and you
21  know, it's privileged.
22         MR. BENNETT:  All right.  Let's start with that
23  offer of compromise here.
24  BY MR. BENNETT:
25     Q.  What was the nature of the matter in which

1  Mr. Newman first contacted you for one of his clients?
2      A.  As I recall, that matter involved a credit card
3  issuer.
4      Q.  Okay.  And what was the nature of the problem
5  that was considered in that litigation?
6         MR. NEWMAN:  You can answer that question.
7         THE WITNESS:  I'm not sure what was important in
8  the litigation, but as I recall, the subject of my
9  possible involvement in the case involved changes in the
10  terms of credit card accounts by this issuer and
11  possible impacts on consumers, but I can't remember much
12  less than that.
13  BY MR. BENNETT:
14     Q.  Do you recall what year that was?
15     A.  No.
16     Q.  When was the first time that Mr. Newman
17  contacted you about a TransUnion case for which you were
18  then later retained?
19     A.  It was a few years ago.  I think in 2012 or '13.
20     Q.  Without revealing the identity of the
21  non-TransUnion clients in which Mr. Newman contacted
22  you, what is your best estimate of the number of
23  different discrete cases in which Mr. Newman has
24  contacted you as an expert?
25     A.  I think I've now told you about them all.  The

**VICTOR STANGO on 12/02/2016**

Page 18

1    first one --
2        Q.  I'm sorry?
3        A.  I think I've now told you about all of them.
4    The first one, in which I was not retained, and the
5    subsequent ones involving TransUnion.
6        Q.  So that would be -- well, let -- let me try it
7    this way:  How many -- how many TransUnion cases -- in
8    how many TransUnion cases have you been retained?
9        MR. NEWMAN:  Asked and answered.
10       Go ahead.
11       THE WITNESS:  This is the fourth.
12   BY MR. BENNETT:
13       Q.  Okay.  So you have been contacted and
14   communicated with Mr. Newman in a role as an expert or
15   potential expert in a total of five cases, correct?
16       A.  I believe that's right.  We had a brief
17   discussion, now that I'm thinking of it, involving one
18   other matter, again, in which I was not retained.
19       Q.  Let me change this -- the -- the topic here a
20   little bit.  I have had an opportunity to read a lot,
21   but not all of your publications, your articles, and
22   your news comments a lot.  You write a lot.  I mean, you
23   write a pretty decent amount, you believe, right?
24       A.  I don't know what you mean by, "decent amount,"
25   but my publications are listed on my curriculum vitae.

Page 19

1        Q.  And if I were to have a Word searchable copy of
2    all of your publications listed on your CV and I were to
3    search for the term, "credit report," in what
4    publications do you recall where I might find that term
5    "used"?
6        MR. NEWMAN:  Objection; argumentative.
7        You can answer.
8        MR. BENNETT:  I'll make it broader.
9    BY MR. BENNETT:
10       Q.  I'll make it broader.  I'll make it:  Credit
11   report, credit reporting, credit reporting agency, Fair
12   Credit Reporting Act.  How about that?
13       MR. NEWMAN:  Object to the form of the question.
14   BY MR. BENNETT:
15       Q.  In which publications would I find any of those
16   terms, in any combination?
17       MR. NEWMAN:  Objection.
18       You can answer if you're able.
19   BY MR. BENNETT:
20       Q.  Because I haven't found it yet.  So I'm still
21   hoping I have not read all of them.
22       MR. NEWMAN:  Objection.
23       Go ahead.
24   BY MR. BENNETT:
25       Q.  You tell me which publications.

Page 20

1        A.  I can't recall every word of my publications, so
2    I'm unable to answer that question.
3        Q.  Well, how about -- how about in the title to any
4    of your publications, and I mean, even articles, even
5    your -- your newspaper duet criticizing CFPB, Truth in
6    Lending Act disclosures.  I mean everything that you've
7    published.
8        MR. NEWMAN:  Objection.
9    BY MR. BENNETT:
10       Q.  Do you have any publication that even has the
11   word, "credit report," or, "credit reporting," in its
12   title?
13       MR. NEWMAN:  Objection.
14       You can answer.
15       THE WITNESS:  Not that I recall.  No.
16   BY MR. BENNETT:
17       Q.  And in fact, it is true that you have never
18   published not one publication besides an expert witness
19   report that considered, evaluated, or advanced the
20   research regarding credit reporting accuracy, right?
21       MR. NEWMAN:  Objection.
22       Go ahead.
23       THE WITNESS:  Again, I can't be 100 percent sure
24   whether none of my publications or some of them contain
25   references to credit reporting accuracy, as I sit here

Page 21

1    today.  My curriculum vitae details my qualifications,
2    as does my report; and they include studies of consumer
3    behavior in a variety of banking markets, studies of
4    consumer behavior in credit markets, the relationship
5    between credit scores and the terms of credit offered to
6    consumers and --
7    BY MR. BENNETT:
8        Q.  Okay.
9        A.  -- interpretations of consumer disclosures.
10       Q.  Do you have your --
11       MR. NEWMAN:  Let him -- let him finish his
12   answers.
13       MR. BENNETT:  Okay.
14       THE WITNESS:  -- and interpretation of
15   disclosures by consumers.
16   BY MR. BENNETT:
17       Q.  Okay.  Do you have your expert witness report in
18   front of you?
19       MR. NEWMAN:  He does.
20       THE WITNESS:  Yes.
21   BY MR. BENNETT:
22       Q.  And do you have appendix A to that, which is
23   your -- your CV?
24       MR. NEWMAN:  Should we mark this as an exhibit
25   to the deposition?  Let's just --

VICTOR STANGO on 12/02/2016

Page 22

```
1         MR. BENNETT:  I'm sorry?
2         MR. NEWMAN:  Let's just mark the report as an
3    exhibit to the deposition before you start asking
4    questions about it.
5         MR. BENNETT:  No.  We don't need to.  No.  I
6    trust that this is his report.  I don't intend to put
7    any exhibits before the court reporter.
8    BY MR. BENNETT:
9         Q.  But if you could take a look at appendix A to
10   your report.
11        A.  I have it in front of me.
12        Q.  So let's -- you see the list of publications, 20
13   journal publications and eight additional publications.
14   Do you see that?
15        A.  Yes.
16        Q.  So let's -- I'm going to -- I want to be able to
17   cross out any that don't have anything to do with this
18   case.
19        MR. NEWMAN:  Objection.
20   BY MR. BENNETT:
21        Q.  So let's go through those.  And if you think it
22   has something to do with the case, then --
23        MR. NEWMAN:  Len, that's not a proper question.
24   Why don't you just -- why don't you just ask some
25   questions --
```

Page 23

```
1         MR. BENNETT:  No.  It doesn't have -- Steve, it
2    does not, and that's nothing pejorative.  It has nothing
3    to do with the case.  The Strategic Incompatibility in
4    ATM Markets has nothing to do with Congress' mandate
5    that TransUnion disclose the source of its public
6    records report.
7         MR. NEWMAN:  It has --
8         MR. BENNETT:  If the witness disagrees, then the
9    witness can explain this, but on the report, Steve --
10        MR. NEWMAN:  There was a question --
11        MR. BENNETT:  -- there's a lot of those --
12        THE REPORTER:  Hold on.  One at a time, please.
13        MR. BENNETT:  I was done.  We can start.
14        MR. NEWMAN:  I -- I --
15        MR. BENNETT:  I'm sorry.
16        MR. NEWMAN:  -- you know.
17        MR. BENNETT:  Say what you want.  Talk all you
18   want.
19        MR. NEWMAN:  There's --
20        MR. BENNETT:  Talk all you want and tell me when
21   you're done.
22        MR. NEWMAN:  There's a time and a place for
23   arguments, Mr. Bennett, and I think you should confine
24   yourself to specific questions to the witness.  You --
25   it's very simple for you to frame your comments in the
```

Page 24

```
1    form of a question to which the witness can give an
2    answer, and I ask that you do that.
3         MR. BENNETT:  Steve, I'm not as good at this as
4    you are, so I'm doing my best to frame my questions.  If
5    you would do it differently, then you can take it up
6    when you're the plaintiff's side lawyer.
7         MR. NEWMAN:  Do you have a question for the
8    witness on publication No. 5?
9         MR. BENNETT:  Yes.
10        MR. NEWMAN:  What's your question on publication
11   No. 5?
12   BY MR. BENNETT:
13        Q.  Mr. Stango -- Mr. Stango, which of these first
14   20 publications have something material to do with the
15   issues in this case?
16        MR. NEWMAN:  Objection; argumentative.
17        Are you able to answer the question?
18        THE WITNESS:  I can try.
19        I'm not sure what you mean by, "material to the
20   issues."  This list of papers describes my peer-reviewed
21   academic publications, which as I said before, pertain
22   to issues involving consumer behavior in banking,
23   involving consumer interpretation of disclosures in
24   banking markets, and which involve relationships between
25   credit scores as reported by consumer reporting
```

Page 25

```
1    agencies --
2    BY MR. BENNETT:
3         Q.  Okay.
4         A.  -- and the terms of credit.
5         MR. NEWMAN:  Let him finish.
6         THE WITNESS:  But I don't know what you mean by,
7    "material to the issues."
8    BY MR. BENNETT:
9         Q.  Okay.  So let's start with No. 1.  Quote,
10   "Borrowing high versus borrowing higher:  Sources and
11   consequences of dispersion in individual borrowing
12   costs," close quote.  Do you see that?
13        A.  Yes.
14        Q.  So what was that about?
15        A.  That study uses a large administrative data set
16   including transaction by transaction credit card account
17   data for a set of consumers numbering, as best I can
18   recall, over a thousand; and the data that we employ in
19   that study also includes credit bureau data from one of
20   the major consumer reporting agencies.
21        What we do in the paper is document dispersion,
22   meaning diversity across consumers, in borrowing costs
23   paid on credit card debt and we explore possible reasons
24   for that dispersion.  I can continue, if you'd like.
25        Q.  Yeah.  Just what does it have to do with the way
```

VICTOR STANGO on 12/02/2016

Page 26

1  consumers make credit reporting disputes to TransUnion
2  or how they remove or learn about public records in
3  their credit files?
4      A.  I've described what the paper is about, and it
5  does not directly address those particular details that
6  you mentioned.  But as I said, it is part of my
7  curriculum vitae that I have submitted as part of my
8  qualifications in this case.  It addressed issues
9  involving consumer behavior, and it addresses issues
10 involving credit scores as reported by credit bureaus.
11 It addresses a number of different issues.  That's the
12 best answer I can give you.
13     Q.  Okay.  Mr. Stango, where were you born?
14     A.  I was born in Philadelphia, Pennsylvania.
15     Q.  And where were you raised as -- up until the
16 point when you went to college?
17     A.  I spent most of my childhood and youth in
18 Boston.
19     Q.  Your second publication is, quote, "Limited and
20 Varying Consumer Attention:  Evidence From Shocks to the
21 Salience of Overdraft Fees."  Do you recall that
22 publication with Mr. Zinman, Z-I-N-M-A-N?
23     A.  Yes.
24     Q.  And what does that have to do with the subject
25 matter of this lawsuit?

Page 27

1          MR. NEWMAN:  Objection.
2          Go ahead.
3          THE WITNESS:  As I said, to the extent that my
4  assignment in this case involved issues of consumer
5  behavior and issues of consumer interpretation of
6  information presented to them in the context of their
7  household financial behavior.  It is, as with the rest
8  of my curriculum vitae, something that I've submitted as
9  part of my qualifications to undertake the assignment in
10 this case.
11 BY MR. BENNETT:
12     Q.  Okay.  What is the primary way in which you
13 communicated with Mr. Newman about this -- the -- the --
14 about this case or in this case?
15         MR. NEWMAN:  The question is how have we
16 communicated.  The question is not about the substance
17 of the communication.  You can answer the question.
18         THE WITNESS:  I would say that --
19 BY MR. BENNETT:
20     Q.  I'm sorry.  Let me -- let me repeat.  What is
21 the manner in which you have communicated or what are
22 the manners in which you have communicated with
23 Mr. Newman in this case?
24     A.  The primary manner in which we have
25 communicated, I would say, is over the phone.  We have

Page 28

1  also communicated in person and via e-mail.
2      Q.  And you retained your e-mail, correct?
3      A.  I wouldn't offer a general characterization of
4  what I do with my e-mail.
5      Q.  You --
6      A.  I have --
7      Q.  You have not deleted your e-mails with
8  Mr. Newman, have you?
9      A.  I don't know which e-mails this would refer to,
10 but in general, I do have a standard practice of
11 disposing of e-mail once it becomes unnecessary to keep
12 it.  This is a personal practice as well as a
13 professional one.
14     Q.  Have you deleted any e-mails received from or
15 sent to anyone in this case?
16     A.  I think that the answer is, almost certainly,
17 yes.
18     Q.  And why are you certain that you would have
19 deleted e-mails in this case?
20     A.  As I said, as part of my standard practice, once
21 e-mails are no longer necessary for the continuation of
22 whatever business I'm involved in, I will often delete
23 them.  An example would be something like an e-mail
24 arranging a time for a phone call.
25     Q.  What about an e-mail that provided a summary of

Page 29

1  facts regarding this case, would you have deleted that?
2          MR. NEWMAN:  Objection; foundation.
3          You can answer.
4          THE WITNESS:  I don't have a general practice
5  regarding such e-mails, and to the best of my
6  recollection, sent no such e-mails in connection with
7  this case.
8  BY MR. BENNETT:
9      Q.  Well, what's your best guesstimate of how many
10 e-mails Mr. Newman has sent you in this case?
11     A.  I can't recall exactly.  Most of them were
12 associated with arranging times for telephone calls, if
13 I received them from Mr. Newman, rather than from
14 someone else, but I would characterize the number of
15 overall e-mails as not very large.
16     Q.  So who else representing TransUnion, either
17 inside that company or in an outside law firm, has
18 communicated with you regarding this case?
19     A.  I'm not sure whether you mean communicated via
20 e-mail or otherwise.
21     Q.  Right now, any regard, and then I'll focus on
22 e-mail.
23     A.  I've spoken with at least one attorney for
24 TransUnion, and this is also the attorney to whom I
25 e-mail my invoices.

**VICTOR STANGO on 12/02/2016**

**Page 30**

1    Q.  And that's Dan, the in-house lawyer, right?
2    A.  His name is Dan Halvorsen.  Yes.
3    Q.  And now you have to spell it for Nicole.  That's
4  why I just used Dan, but that's okay.  Can you spell it?
5    A.  I'll try.  H-A-L-V-O-R-S-E-N, Halvorsen.
6    Q.  Correct.
7        And what have you spoken to Dan about, the
8  general subject?
9        MR. NEWMAN:  Again, you can't describe the
10  substance of that communication about the case.  But if
11  you can describe the nature of the conversation, you
12  know, generally, such as you did it relating to
13  invoicing -- did it relate -- if you can do that without
14  revealing the substance, because the substance itself is
15  privileged.  Can you answer the question?
16       THE WITNESS:  I think the best answer that I can
17  give is that the subject matter of those phone calls
18  related to the development of the work that I did in the
19  case.  And beyond that, I don't believe I can give you
20  any specifics.
21  BY MR. BENNETT:
22   Q.  And when you mean by, related to the work you
23  did in the case, did any parts of your conversations or
24  communications with Dan enlighten you as to any facts
25  that you considered in coming up with your opinion?

**Page 31**

1        MR. NEWMAN:  That -- that question, as framed,
2  calls for a privilege.
3        To the extent you received information that you
4  relied upon in formulating your opinion, you must
5  disclose those facts, but otherwise, you can't answer
6  the question.
7  BY MR. BENNETT:
8    Q.  Unless it's in writing, in which case privilege
9  has been waived.  So you can ask -- answer it in any
10  documented communications with TransUnion, but yeah,
11  counsel is right that pure nonfact-based communications
12  are under very narrow circumstances privileged.
13       So let's start with, did you have any
14  conversations with Dan that provided you any factual
15  information that you considered in coming up with your
16  opinions in this case?
17       MR. NEWMAN:  Go ahead.
18       THE WITNESS:  I can't recall specifics, but yes,
19  I believe so.  More generally, the information I relied
20  upon in forming my opinion and the facts that I relied
21  upon in forming my opinions are detailed in my report.
22  BY MR. BENNETT:
23   Q.  Well, I understand that you've read other
24  people's research, and that's formed your opinion.
25  That's -- I can see in your BB report.  But I'm trying

**Page 32**

1  to focus now on Dan's conversations with you.  Did
2  you -- did you exchange e-mails with Dan?
3    A.  As I recall, my e-mail correspondence with him
4  is confined to matters involving invoices, and perhaps,
5  arranging a time for a phone call.
6    Q.  Do you have a contract with TransUnion?
7    A.  I have an engagement letter.  Yes.
8    Q.  Okay.
9    A.  I don't --
10   Q.  Did you receive the subpoena that we served in
11  this case to you?
12   A.  Yes.  I've seen it.
13   Q.  When's the first time you saw it?
14   A.  I think the first time I saw it was earlier this
15  week.
16       And you received it from Mr. Newman or from his
17  firm?
18   A.  No.  I received it from someone at Cornerstone
19  Research.
20   Q.  And did you produce or provide any documents in
21  response to that subpoena?
22   A.  Yes.
23   Q.  To whom did you provide those documents?
24   A.  As I recall, I sent a file containing some of my
25  publications to someone at Cornerstone Research.

**Page 33**

1    Q.  Who is that person?
2    A.  His name is Dan Schmierer.
3    Q.  Can you spell it?
4    A.  S-C-H-M-I-E-R-E-R.
5    Q.  And what is his job at Cornerstone?
6    A.  Dan's an economist.
7    Q.  So why would you send your publications to Dan,
8  an economist, as opposed to an administrative employee?
9    A.  The question never occurred to me.  Dan is my
10  primary point of contact in this case, so I sent it to
11  him.
12   Q.  Did anyone at Cornerstone -- and I don't mean
13  typing and I don't mean checking for typographic or
14  grammar errors.  I mean, substantively the actual text.
15  Did anyone at Cornerstone, besides yourself, participate
16  in the drafting of your expert witness report in this
17  case?
18       MR. NEWMAN:  Objection; vague and ambiguous.
19       You can answer.
20       THE WITNESS:  Every word in the report is mine.
21  The opinions that I express in the report are mine and
22  mine alone.
23  BY MR. BENNETT:
24   Q.  So I gather then the answer to my question is,
25  yes, other people at Cornerstone, besides yourself,

**VICTOR STANGO on 12/02/2016**

Page 34

1  participated in writing some of the text in your
2  report --
3          MR. NEWMAN:  Objection --
4  BY MR. BENNETT:
5      Q.  -- right?
6          MR. NEWMAN:  Objection; misstates testimony.
7          You can answer.
8  BY MR. BENNETT:
9      Q.  Do you know Mr. Keeley?  Mr. Keeley,
10  K-E-E-L-E-Y, I think his name is?
11      A.  I'm not sure which question I'm supposed to
12  answer.
13          MR. NEWMAN:  The question is:  Do you know
14  Mr. Keeley?
15  BY MR. BENNETT:
16      Q.  Let me ask you this -- yeah.
17      A.  I -- I can't recall the name.  No.
18      Q.  Okay.  Because -- because he works for
19  Cornerstone, too, and he charged Core Logic, roughly,
20  little less than half a million dollars before his
21  report was excluded.  And Mr. Keeley, who I also think
22  is a Ph.D. -- Mr. Keeley uses a couple economists at
23  Cornerstone to help him write his reports.  So I'm
24  trying to understand if that's the thing with
25  Cornerstone or just with Mr. Keeley.

Page 35

1          Are there --
2          MR. NEWMAN:  The witness said he didn't know
3  Mr. Keeley.
4  BY MR. BENNETT:
5      Q.  Are there any people at Cornerstone who helped
6  you write the text that became your expert report?
7      A.  No.  I wrote the report myself.  The words in
8  it --
9      Q.  Okay.
10      A.  -- are my own.
11      Q.  And did Dan provide you any research, any
12  documents to use that you later cite in footnotes in
13  your report?
14          MR. NEWMAN:  And you're referring to Dan
15  Schmierer?
16          MR. BENNETT:  Yes.
17          MR. NEWMAN:  Go ahead.  You can answer.
18          THE WITNESS:  Yes.
19  BY MR. BENNETT:
20      Q.  Okay.  And which particular -- in fact, you have
21  the report in front of you.  So why don't we start
22  there?  The first footnote that I see that cites outside
23  research is at page 3, and it's the Consumer Financial
24  Protection Bureau.  That's the year-end report, footnote
25  1.  Do you see that?

Page 36

1      A.  Yes.
2      Q.  Before I -- I -- before I ask about Dan, the
3  economists role, again, here, you -- you believe that
4  the Consumer Financial Protection Bureau's mandate of
5  consumer disclosures is bad for consumers, right, as a
6  general concept?  That's your -- your professional
7  belief, correct?
8          MR. NEWMAN:  Objection; argumentative; lacks
9  foundation.
10          MR. BENNETT:  No.  It doesn't lack foundation,
11  and it's not argumentative.  There are many people,
12  including current administration, that believe that.  So
13  I'm asking trying to get the baseline for this witness'
14  professional opinions.
15  BY MR. BENNETT:
16      Q.  Do you believe as a general concept that the
17  financial institution and related disclosures that the
18  Consumer Financial Protection Bureau has mandated over
19  the last several years are bad for consumers, as a
20  general concept?
21          MR. NEWMAN:  Objection; vague and ambiguous.
22          You can answer.
23          THE WITNESS:  No.  I wouldn't offer a general
24  statement about that particular question.  To the extent
25  that I have opinions, I research them on an

Page 37

1  issue-by-issue basis.
2  BY MR. BENNETT:
3      Q.  So what consumer disclosures did the Consumer
4  Financial Protection Bureau has mandated do you believe
5  are good for consumers?
6          MR. NEWMAN:  Objection.
7          Go ahead.
8          THE WITNESS:  I'm not sure exactly what you mean
9  by, "good for consumers," and I haven't engaged in any
10  research that would offer a general conclusion about
11  disclosures being overall good for consumers or bad for
12  consumers.
13  BY MR. BENNETT:
14      Q.  Okay.  Do you believe that the -- do you believe
15  that the enactment of Dodd-Frank was good for consumers
16  or bad for consumers, generally?
17          MR. NEWMAN:  Objection; outside the scope.
18          But you can answer.
19          MR. BENNETT:  Well, I mean, I've read a number
20  of the -- of your witness' publications.  So I'm just
21  trying to determine whether he's going to remain
22  consistent to the views taken in the publications.
23          MR. NEWMAN:  I'm not telling him not to answer.
24  I just think you're going pretty far afield what the
25  scope of the deposition is.

**VICTOR STANGO on 12/02/2016**

**Page 38**

1       MR. BENNETT:  Well, no.  If you have a witness
2  who believes that disclosures distort the market and
3  limit consumer choice, that's a certain baseline.
4       MR. NEWMAN:  No.  That's an argument.  That's an
5  argumentative term.
6  BY MR. BENNETT:
7       Q.  Do you believe that consumer disclosures often
8  distort the economic markets and limit consumer choice?
9       MR. NEWMAN:  Objection.
10      You can answer.
11      THE WITNESS:  I would not offer that as a
12  general statement.  No.
13  BY MR. BENNETT:
14      Q.  All right.  So let's look at the footnote to
15  your report.  Cites the Consumer Financial Protection
16  Bureau, December 2012 credit reporting report, and we'll
17  call it the CFPB report.  Do you see that?
18      A.  Yes.
19      Q.  Who gave this report to you for consideration in
20  this project?
21      A.  The background research for this report was
22  undertaken by me and by the staff of Cornerstone
23  Research working under my direction.  I found some of
24  the sources myself, and they provided me with sources
25  based on directions that I provided to them.  This

**Page 39**

1  particular source is one that I cannot definitively
2  identify, as I sit here today, as one provided to me by
3  them or as one that I found myself as part of my own
4  background research.
5       Q.  Okay.  Certainly you would have read this
6  report, the CFPB report, before this case or before the
7  Dennis case, right?
8       A.  I believe --
9       Q.  I'm about to ask you that same question and
10  repeat it saying you understand you're under oath.
11      MR. NEWMAN:  Yeah.  I think the question --
12  BY MR. BENNETT:
13      Q.  So why don't I skip to that and say, are you
14  able to say under oath that you have read and reviewed
15  the CFPB report before you were hired by TransUnion in
16  any of the cases in which Mr. Newman represents it?
17      A.  If the question is about all of the cases on
18  which I've worked with TransUnion, I cannot be
19  100 percent sure, but I don't believe I read this report
20  before I became involved in those cases.  It was
21  something that I found as part of my background research
22  or that Cornerstone, working under my direction, found
23  for me.
24      Q.  Okay.  So let's go back one page or two page --
25  two pages to page 1.  So let's just work through the

**Page 40**

1  report.
2       MR. BENNETT:  And by the way, we've been on the
3  record for a little bit.  Do you want to take a break
4  now?
5       MR. NEWMAN:  Yeah.
6       MR. BENNETT:  I don't need to, but I'm certainly
7  able to, willing to.
8       MR. NEWMAN:  I -- I --
9       MR. BENNETT:  If you don't now, you can --
10      MR. NEWMAN:  I could use a short break, Len, to
11  use the restroom.
12      MR. BENNETT:  All right.
13      MR. NEWMAN:  So if you want to --
14      MR. BENNETT:  Let's go off the record for five
15  minutes.
16      THE VIDEOGRAPHER:  We're off the record at
17  11:55.
18      (A recess was held from 11:55 a.m. to 12:03 p.m.)
19      THE VIDEOGRAPHER:  We are back on the record at
20  12:03.
21  BY MR. BENNETT:
22      Q.  All right.  Mr. Stango, do you have page 1 of
23  your expert witness report in front of you?  At the
24  bottom, it says, page 1.
25      A.  Yes.

**Page 41**

1       Q.  I want to start with paragraph 2.  It says, "I
2  am an expert on consumer behavior and financial service
3  markets."  Do you see that?
4       A.  Yes.
5       Q.  You have never published any research regarding
6  consumer interpretations of their credit reports, right?
7       MR. NEWMAN:  Objection.
8       You can answer.
9       THE WITNESS:  As I said, it's a little bit
10  difficult for me to remember, here, as I sit, every word
11  I've ever published.  I don't recall any studies overall
12  that focused on the specific issue you mention.  But as
13  I said, I have studied, as part of my academic career,
14  consumer behavior and financial services and consumers'
15  interpretation of disclosures.
16  BY MR. BENNETT:
17      Q.  So the answer to my question, you have not done
18  any research on consumer interpretations of their credit
19  report, the answer to that question is, no, you have not
20  done that research, right?
21      MR. NEWMAN:  Objection; argumentative.
22      You can answer.
23      THE WITNESS:  If you're talking about published
24  academic research, as I sit here now, I can't recall.
25  No.

**VICTOR STANGO on 12/02/2016**

Page 42

1  BY MR. BENNETT:
2      Q.  Well, other than anecdotal research with
3  neighbors and friends, have you ever done any research
4  about consumer interpretations of their credit report?
5      A.  Yes.  I did so for the purposes of preparing
6  this report.
7      Q.  Right.  Well, you did, essentially, a book
8  report, right?  You just read other people's
9  publications and you summarized them.  I don't mean
10  that.  I mean actual research where you speak to
11  consumers or gather actual data from consumers.
12          MR. NEWMAN:  Objection; argumentative.
13          You can answer.
14  BY MR. BENNETT:
15      Q.  Let me try it differently.  Have you ever
16  done -- what do you call it in academia?  You call it
17  primary research, right?
18      A.  There is such a term; although, it can vary in
19  meaning across fields and disciplines.
20      Q.  Well, however it varies across disciplines, in
21  your discipline, you have never done primary research of
22  consumer behavior and financial services markets
23  regarding the interpretations of credit files, right?
24      A.  In my academic career, that's true.  I do agree
25  with something that you said, which is that if were --

Page 43

1  one were to study consumer interpretation to
2  disclosures, one would want to involve individual
3  consumers, as many of the studies I cite in my report
4  do.
5      Q.  Well, we'll talk about other people's research,
6  but they're not the expert witnesses here.  I'm trying
7  to understand whether you're qualified, and one of the
8  qualifications you cite is your research.  So I want to
9  know not how good you are at reading.  I'm good at that
10  too.  I'm trying to figure out whether you, besides your
11  expert reading skills, have done research of consumer
12  interpretations of credit reports.
13          MR. NEWMAN:  Object.
14  BY MR. BENNETT:
15      Q.  And the -- the fact, isn't it true, you have
16  never done any primary research of the way that
17  consumers interpret their credit reports or credit file
18  disclosures, right?
19          MR. NEWMAN:  Objection; argumentative.
20          You can answer.
21          THE WITNESS:  I believe I've answered the
22  question and said that while I have not conducted
23  academic published research that directly pertains to
24  what you mentioned, I have published on issues of
25  consumer interpretation of disclosures in financial

Page 44

1  service settings.  I list that in paragraph 2.
2  BY MR. BENNETT:
3      Q.  Okay.  Let's -- then let's focus on that.  Can
4  you tell me and help me identify the specific research
5  projects or publications in which your -- in which you
6  researched consumer interpretations of financial
7  disclosures?
8      A.  I can try.  There have been more than one such
9  projects.
10      Q.  Of course, that is why you claim to be an expert
11  here, right?
12          MR. NEWMAN:  Let him --
13  BY MR. BENNETT:
14      Q.  Because you're an expert on consumer
15  interpretations of financial disclosures?
16          MR. NEWMAN:  Let him -- let him finish his
17  answer to the pending question.
18          MR. BENNETT:  I'm sorry.  Yes.
19          THE WITNESS:  In the paper, Fuzzy Math
20  Disclosure Regulation and Credit Market Outcomes, my
21  coauthors and I discuss consumer interpretation of
22  disclosures from financial institutions.
23  BY MR. BENNETT:
24      Q.  It --
25      A.  We use similar --

Page 45

1          MR. NEWMAN:  Len, he's not --
2          MR. BENNETT:  I'm sorry?
3          MR. NEWMAN:  He hasn't finished his response.
4  BY MR. BENNETT:
5      Q.  Okay.  Go ahead.
6      A.  We use similar data documenting diversity in how
7  consumers interpret terms of consumer loan contracts as
8  presented to them in a survey context in that paper and
9  also in the paper, Exponential Growth Bias and Household
10  Finance.
11          In the papers listed at the top, the most recent
12  papers, both of those use a large data set that, among
13  other things, documents consumer responses, information
14  received from financial institutions, and diversity in
15  such responses, and consumer interpretation of
16  information about the terms of financial service
17  products.
18      Q.  I'm -- I'm confused.  I was asking you about
19  only the publications and research that you've done
20  regarding consumer interpretations of financial
21  disclosures.
22          MR. NEWMAN:  I believe that's the question he
23  answered.
24  BY MR. BENNETT:
25      Q.  Not -- I'm not asking about the claim of having

**VICTOR STANGO on 12/02/2016**

1  some idea about consumer behavior. It's a different
2  topic for a different moment after this one.
3          I'm asking you about the interpretation of
4  financial disclosures, and you said No. 4, the Fuzzy
5  Math, right?
6      A. Yes.
7      Q. And that's the same -- what newspaper did you
8  and Mr. Zinman publish that in, essentially, a lay
9  version of that?
10     A. I don't recall the two of us publishing a lay
11  version of that in a newspaper.
12     Q. Okay.
13     A. If you could be more specific, maybe I can
14  remember it.
15     Q. Sure. Let me go to your website again and get
16  the full name of it. Sorry. The New York Times,
17  March 28, 2010, you and Mr. Zinman, quote, "Argue that
18  the debate over the proposed consumer financial
19  protection agency should be over what the agency does
20  not where it is located and the government's
21  bureaucracy."
22          You wrote that article with Mr. Zinman, right?
23     A. Yes.
24     Q. Okay. Did you write any other New York Times
25  pieces with Mr. Zinman?

1      A. I don't recall any, as I sit here now.
2      Q. And do you recall the subject of that piece in
3  the New York Times?
4          MR. NEWMAN: Objection; the article speaks for
5  itself.
6          But go ahead.
7          THE WITNESS: I believe that the subtitle that
8  you quoted describes it accurately. It was about the
9  consumer protection -- financial protection bureau --
10  excuse me -- Consumer Financial Protection Bureau.
11  BY MR. BENNETT:
12     Q. And in fact, you took the position that the
13  Consumer Financial Protection Bureau should not focus on
14  mandating disclosures which you describe as not coming
15  cheap, mandated disclosures? That's the position you --
16  you believe, right?
17          MR. NEWMAN: Objection.
18          You can answer.
19          THE WITNESS: I don't have the article in front
20  of me. And if I did, I could offer a more precise
21  answer. But my recollection is that we did not advocate
22  against mandated disclosure in that article.
23  BY MR. BENNETT:
24     Q. But you did advocate that mandated disclosure
25  increased the cost of credit, right?

1      A. In that article, we referred to research showing
2  that in some cases mandated disclosure can increase the
3  cost of credit that consumers pay. There's no general
4  statement there. That statement itself is a reference
5  to the research that appears on my curriculum vitae,
6  Fuzzy Math, Disclosure Regulation and Credit Market
7  Outcomes, in which we used data from Truth in Lending
8  reform in the late '70s and early 1980s to assess the
9  impact of that regulation on terms of credit that
10  consumers paid on some of their loans.
11          We documented that there were diverse effects
12  both in terms of how different consumers were affected
13  based on their diverse interpretations of loan terms.
14  We also documented diversity in how financial
15  institutions apparently responded to that reform. The
16  statement in the New York Times piece, as I recall, and
17  it was many years ago, is a reference to that prior
18  work, a specific one.
19     Q. But -- but the research that you summarized in
20  Fuzzy Math, you were summarizing, again, somebody else's
21  primary research, right?
22     A. I wouldn't characterize it that way. No. The
23  research we undertook in that paper --
24     Q. How many consumers --
25          MR. NEWMAN: Let him finish his -- let him

1  finish his answer.
2          THE WITNESS: The research we undertook in that
3  paper was original.
4  BY MR. BENNETT:
5      Q. Okay. Well, all right. So we've got Fuzzy Math
6  out of the way and, also, No. 7, your summer 2009
7  Exponential Growth Bias and Household Finance piece.
8  Which other publications do you contend under oath were
9  focused on or primarily regarded how consumers interpret
10  financial disclosures?
11     A. I believe I listed the top two there as ones
12  that were projects in which we examined and analyzed
13  data regarding how consumers respond to disclosures and
14  communications from financial institutions.
15     Q. Okay. All right. Let's go back up to page 1 of
16  your report.
17          MR. NEWMAN: Page -- page 1 of the report or
18  page 1 of appendix A?
19          MR. BENNETT: Page 1 of the report, and I guess,
20  let's -- might as well skip to page 2 of the report.
21  BY MR. BENNETT:
22     Q. When is the first time -- well, I'm sorry. Let
23  me try it differently.
24          Isn't it true that the first time that you read
25  the Fair Credit Reporting Act text was after TransUnion

**VICTOR STANGO on 12/02/2016**

Page 50

1  hired you to provide an expert witness report in one of
2  its consumer cases?
3      A.  I'm not sure which provision of the Fair Credit
4  Reporting Act you're referring to.  Over the years, as
5  part of my academic research, I've read parts of many,
6  many different government laws and regulations that
7  pertain to consumer household financial matters.  And
8  so, no, I can't say for sure that that would have been
9  the first time.  It's entirely possible that I read it
10  earlier but just don't recall when.
11      Q.  In paragraph 6 you say, "I understand that the
12  legal definition of the sources of information is a
13  disputed point in this litigation."  Do you see that?
14      A.  I don't think that's exactly what I said.
15      MR. NEWMAN:  He's beginning with the second
16  sentence.
17      THE WITNESS:  "I understand that this legal
18  definition is a disputed point in this litigation," yes.
19  I wrote that.
20  BY MR. BENNETT:
21      Q.  What was the source of your information that
22  that is a disputed point in this litigation?
23      A.  The source of that information was counsel.
24      Q.  Mr. Newman.
25      If you'll turn to the next page, on the bottom

Page 51

1  of page 3, there's a term I want to -- I want to
2  understand.  The very last line in the text of page 3
3  you mentioned the term, with quotes, "Credit file
4  disclosure."  Do you see that?
5      A.  Yes.
6      Q.  Where did you hear that term used or read that
7  term, that exact term used?
8      A.  I can't recall exactly.  I believe I've seen
9  that term, and terms like it, in various places as part
10  of my research leading up to the preparation of this
11  report.
12      Q.  That's what defense lawyers in Fair Credit
13  Reporting Act cases typically use.  So it's not an
14  industry term.
15      MR. NEWMAN:  Objection.
16  BY MR. BENNETT:
17      Q.  I'm trying to, therefore, focus, more
18  specifically, on where you got it from.  Because you
19  don't footnote that.
20      MR. NEWMAN:  Objection.
21  BY MR. BENNETT:
22      Q.  Where -- do you know where you got that from?
23      A.  I can't recall exactly.  It's possible that I
24  heard the term from counsel at some point, and it's also
25  possible that I read it somewhere else.

Page 52

1      Q.  Is it possible that you read the term in
2  communications with counsel or Dan?
3      MR. NEWMAN:  The question is --
4  BY MR. BENNETT:
5      Q.  Dan, TransUnion Dan.
6      MR. NEWMAN:  Is the question, did he read that
7  in something that was written and sent to you by --
8      MR. BENNETT:  Yes.
9      MR. NEWMAN:  -- me or Dan Halvorsen?
10      THE WITNESS:  If you mean written by one of the
11  two, I don't believe so, but it's possible the term was
12  included in some of the background materials on which I
13  rely.  I don't recall receiving an e-mail containing
14  that language, for example.
15  BY MR. BENNETT:
16      Q.  If you could turn to page 5 of your report,
17  please.  In paragraph 11 of your report you cite to a --
18  first, you cite to the Federal Reserve bulletin in 2003,
19  quote, "An overview of consumer data and credit
20  reporting."  Do you see that?
21      A.  Yes.
22      Q.  And -- and in your time with the Federal
23  Reserve, this would not have been a publication that
24  you -- well, this is not a subject matter, rather, that
25  you were employed to address at the Federal Reserve,

Page 53

1  right, credit reporting?
2      A.  I didn't write this article, and that's correct
3  that during my time at the Federal Reserve I was not
4  specifically asked by staff to work on issues related to
5  credit reporting.
6      Q.  What was your job --
7      MR. NEWMAN:  Let him finish.
8  BY MR. BENNETT:
9      Q.  What was your job -- what was your area of
10  responsibility at the Federal Reserve when you worked
11  there?
12      A.  I was, first, an economist and then a senior
13  economist at the Federal Reserve Banks of Chicago and
14  then, briefly, New York; and to characterize it,
15  generally, in both of those positions, I was in groups
16  that studied household finance, meaning consumer infirm
17  behavior in retail banking markets.
18      Q.  How many college courses, either undergrad or
19  grad, are you teaching this semester at the University
20  of California?
21      A.  We're on quarters, but I taught four classes
22  this quarter, four sessions of a course called markets
23  and the firm.
24      Q.  What is that about?
25      A.  Markets and the firm is the core course in

**VICTOR STANGO on 12/02/2016**

1  microeconomics in the UC Davis MBA program.

2      Q.  And is it -- is it a marketing-designated course

3  or management or economics?

4      A.  It's a foundational course that precedes other

5  coursework in economics, and also marketing.

6      Q.  So my MBA program didn't -- we didn't have to

7  take -- we didn't have any economic courses that were

8  within the school of management.  So I'm trying to

9  understand the way your -- of course, you're much more

10  well-respected MBA program that handles things.  Can you

11  tell me, is this -- is this a base level -- we'll call

12  it an entry-level MBA course?

13      A.  I suppose you could call it that.  It's a core

14  course that all students are required to take.

15      Q.  All right.  And it doesn't have anything to do

16  with credit reporting, right?

17      A.  The core material would not have anything to do

18  with credit reporting.  No.  It's a general course

19  intended to give students foundational tools in economic

20  thinking, in economic analysis, and to serve as

21  preparation for their later coursework in finance, in

22  accounting, in marketing, and their careers beyond that.

23      Q.  Okay.  And in the previous quarter, other than

24  that course and sections of that course, what other

25  courses did you teach?

1      A.  I didn't teach in the prior quarter.  I teach or

2  have taught for the last several years in the fall

3  quarter alone.

4      Q.  And in each of those fall quarters, have you

5  taught, essentially, the same course, what is it --

6  marketing in firms -- marketing and the firm?

7      A.  I have taught the same course.  Yes.

8      Q.  And how far back do we have to go in your job at

9  the University of California before we pick up a

10  different course besides that one that you've taught?

11      A.  Well, in my time as professor at UC Davis, I've

12  taught only that class.  That's the course that I

13  started teaching when I was hired, and it's the course

14  I've been asked to teach ever since.

15      Q.  And you're an associate professor?

16      A.  That's my title.  Yes.

17      Q.  And you're not tenured, right?

18      A.  That's incorrect.  I have tenure.

19      Q.  You -- okay.  Thank you.  And prior to that, you

20  were at Dartmouth, right?

21      A.  Yes.

22      Q.  And what courses did you teach at Dartmouth?

23      A.  I taught two courses at Dartmouth, one called,

24  as I remember -- actually, I'm just going to say I can't

25  remember the exact course title, but that course was

1  very similar to the course I teach now.  It was the core

2  microeconomics course in our MBA program in the top

3  school at Dartmouth.  I also taught an elective focused

4  on competitive strategy and economics.  That's all.

5      Q.  And then a while before that, back before 2001,

6  you taught at the University of Tennessee, correct?

7      A.  Yes.

8      Q.  Was that the graduate business program or

9  undergraduate or both?

10      A.  I taught both graduate and undergraduate courses

11  and also some executive MBA courses.

12      Q.  Okay.  And what courses did you teach at the

13  university?  Subject courses?

14      A.  I'll do my best to remember.  I taught the same

15  course that I teach now, the core MBA microeconomics

16  course.  I taught a variant of that class to executives.

17  I taught an undergraduate course in regulation and

18  antitrust.  I taught an undergraduate course in what I

19  remember was called public finance.  I taught a Ph.D.

20  course in industrial organization, which is the field of

21  economics that studies competitive interactions between

22  firms.  I think that's it.

23      Q.  Have you ever requested and received from

24  Equifax, TransUnion, Experian a copy of your own

25  personal credit report?

1      A.  Yes.

2      Q.  When is the last time that you saw your own

3  personal credit report?

4      A.  Within the last month.

5      Q.  Was there anything inaccurate in it?

6      MR. NEWMAN:  Looking for another client?

7      THE WITNESS:  I can't be sure.  I didn't look at

8  every page in detail.

9  BY MR. BENNETT:

10      Q.  Why did you look at a copy of your credit

11  report?

12      A.  I'm going through a divorce.

13      Q.  And prior to that -- I'm sorry.

14      But prior to that, had you ever seen a copy of

15  your credit report?

16      A.  Yes.

17      Q.  And why did you look at a copy of your credit

18  report?  And -- what are the different reasons that you

19  have asked for and looked at a copy of your credit

20  report?

21      A.  There have been many over the years.  I have

22  examined my report a few times in the last few years to,

23  in part, understand my credit score.  I have examined my

24  credit report because I knew that I might apply for

25  credit in the future, and I wanted to understand what

**VICTOR STANGO on 12/02/2016**

---

**Page 58**

1  information was on the credit report.  I receive my

2  credit report or obtain it periodically to make sure

3  that I'm current on my loan payments and that I haven't

4  missed any and forgotten about it.  I think there are

5  probably other reasons, too.

6      Q.  Did you ever pay for a copy of your credit

7  report?

8      A.  Yes.

9      Q.  And so, you, of all people, I assume would agree

10  with me, that you would pay an amount for your credit

11  report that was equal to or less than the value of that

12  credit report to you, right?

13      MR. NEWMAN:  Objection; relevance.

14      But you can answer.

15      THE WITNESS:  As a general matter, yes, if I

16  purchased a credit report, I did so because I thought it

17  could provide me with value.

18  BY MR. BENNETT:

19      Q.  And of course, cash is an easy measure of value,

20  but -- but for most individuals, for all -- every

21  individual, really, time itself has some value greater

22  than 0.0, right?

23      MR. NEWMAN:  Objection; incomplete hypothetical.

24      You can answer.

25      THE WITNESS:  It's difficult for me to answer

**Page 59**

1  such a general question.  I understand that some

2  individuals value their time and that the value of such

3  time to them will vary from situation to situation and

4  from individual to individual.

5  BY MR. BENNETT:

6      Q.  Well, again, I'm not assigning a relative

7  valuations to time, but as an economist that studies

8  human behavior, you would agree that the marginal value

9  of time for really all rational humans would be greater

10  than absolute zero, right?

11      MR. NEWMAN:  Objection; incomplete hypothetical.

12      You can answer.

13      THE WITNESS:  I -- I don't quite understand the

14  specific context in which you're framing the question.

15  Time has value to consumers.  You used the word,

16  "rational."  I'm not sure what you mean by, "rational

17  consumer," in that context.

18  BY MR. BENNETT:

19      Q.  Okay.  Well --

20      A.  If I had a more specific --

21      Q.  I think we've agreed.

22      A.  -- case, I think I could answer the question.

23      Q.  So a consumer would not read their consumer

24  report unless they, that consumer, concluded that the

25  time they spent on that consumer report was more

**Page 60**

1  valuable than time they may spend doing something else,

2  right?

3      A.  I discussed the time aspect of reading

4  disclosures and credit reports in the expert report that

5  I've submitted here today and note that in some

6  circumstances consumers may choose not to read a report

7  if it's something that would take too much time for

8  them.

9      Q.  So the point I'm heading to is that the act of

10  obtaining and reading a consumer report is an act by the

11  consumer that reveals the consumer values obtaining and

12  reading the consumer report equal to or more -- or

13  greater than the resource they have given up to access

14  and read the consumer report, time, or money, in your

15  case particularly, when you bought your report, right?

16      MR. NEWMAN:  Objection.

17  BY MR. BENNETT:

18      Q.  You can agree that that is true?

19      MR. NEWMAN:  Objection; lack of foundation;

20  incomplete hypothetical.

21      You can answer.

22      THE WITNESS:  I suppose as a general matter, one

23  would agree -- I would agree that time and money costs

24  are something that some consumers consider when making

25  the decision about whether to obtain a credit report.  I

**Page 61**

1  don't know that a choice to obtain a credit report would

2  reveal anything specific about any one individual's

3  value of time or value from the report.  Different

4  individuals will attach different values to their

5  reports.  They will attend to the things they find most

6  important.

7  BY MR. BENNETT:

8      Q.  Sure.  But I'm assuming my -- my question is not

9  relative value.  It's -- it's whether there is any value

10  greater than absolute zero, whether the consumer

11  believes that the value of reading a report is greater

12  than absolute zero being revealed by the fact that they

13  did buy and/or read, took the time to read the report.

14  You would agree the consumer act of buying or reading or

15  both a consumer report reveals that that consumer

16  believed it was worth more than in time and/or money the

17  not doing so, right?

18      MR. NEWMAN:  Objection; incomplete hypothetical;

19  misstates testimony.

20      THE WITNESS:  I suppose if one thinks about it

21  generally enough, then consumers make choices.  Many

22  consumers make choices using such approaches to

23  decision-making, but every consumer is different.

24  BY MR. BENNETT:

25      Q.  Well, I -- I understand.  So in your

---

VICTOR STANGO on 12/02/2016

Page 62

1  circumstances you have, on multiple occasions, obtained
2  and looked at your personal consumer report, right?
3      A.  Yes.
4      Q.  And you presume that the information that you're
5  reading is an accurate statement of the actual
6  information in your credit file, right?
7      A.  No.  I understand that sometimes credit file
8  disclosures can contain incomplete information or
9  inaccuracies.
10     Q.  Well, that's not my question.  Listen to my
11 question.  I'm not asking whether the information is
12 accurate or inaccurate.  Steve wouldn't have a job if it
13 was -- if it was accurate all the time.
14     MR. NEWMAN:  I would find plenty of things to
15 do, Len.  Don't you worry.
16     MR. BENNETT:  Yes.
17 BY MR. BENNETT:
18     Q.  Okay.  My question is, you are looking at, and
19 in many instances, buying your consumer report or your
20 credit report, based on an assumption that that report
21 will reveal to you -- accurately reveal to you the state
22 of your credit file, not reality, of whether you owe the
23 debt or don't owe the debt, but you're buying that
24 report because you believe that's an accurate statement
25 of what, for example, TransUnion would report about you

Page 63

1  in your credit report, right?
2      MR. NEWMAN:  Objection; relevance.
3      Go ahead.
4      THE WITNESS:  I can't say that I've thought
5  about it in my specific instance quite in that way.  I
6  don't, as a consumer, try to think in that much detail
7  about the length between what I see on the report and
8  information that may be anywhere else within TransUnion.
9  BY MR. BENNETT:
10     Q.  What possible value for any consumer is provided
11 by obtaining and reading that consumer's consumer file
12 disclosure?
13     A.  Consumers obtain reports for many reasons.  They
14 do it to learn their credit scores, they do it to check
15 their reports for accuracy, they do it because they're
16 contemplating taking out a loan and they'd like to know
17 the state of their file.  Every consumer has an
18 individual specific motivation at the time of obtaining
19 the report.  It could be --
20     Q.  That -- that --
21     A.  -- a function of many of those things or even
22 some other things that one would only know by asking
23 that consumer why he or she chose to obtain the report
24 and what value he or she anticipated receiving from that
25 report.

Page 64

1      Q.  Well, let me -- we're -- we're missing each
2  other here.  The purpose for any of those reasons in
3  order for any of the repurposes that a consumer would
4  want to look at their report, to have any value to the
5  inquiring consumer is a basic assumption that the file
6  disclosure the consumer is getting from the agency
7  accurately reflects what is in the agency file, correct?
8      MR. NEWMAN:  Objection; foundation.
9      You can answer.
10     THE WITNESS:  I have no basis for a general
11 statement that all consumers who obtain their files make
12 that assumption, and indeed, I believe that in order to
13 learn whether a particular consumer in -- made that
14 assumption or did not make that assumption or what else
15 that consumer believed about what the file might or
16 might not contain, one would need to ask that consumer
17 at the time of their purchase or at the time during
18 which they otherwise obtained a copy of their report.
19 BY MR. BENNETT:
20     Q.  All right.  I like this line of questioning, and
21 I like your answer.  So I want to keep developing, and I
22 want you to keep saying it in a bunch of different ways.
23 And I want to make sure I understand what you're saying.
24     What you're saying is, response to my question,
25 that you do not take it as a given that a consumer that

Page 65

1  is asking to see their TransUnion file disclosure is
2  doing so under the belief that what they get back is a
3  copy of their TransUnion file?
4      You say you have no idea whether or not that's a
5  basic fair economic assumption that the consumer who's
6  obtaining a copy of their TransUnion file disclosure is
7  assuming that what is being disclosed to them is their
8  TransUnion file?
9      MR. NEWMAN:  Objection.
10 BY MR. BENNETT:
11     Q.  Right?
12     MR. NEWMAN:  Objection; misstates testimony.
13 BY MR. BENNETT:
14     Q.  Your opinion is that consumers do not -- you
15 cannot predict whether a consumer who asks for a copy of
16 their TransUnion credit file assumes in so asking that
17 what they'll get back is a copy of their TransUnion
18 credit file?
19     MR. NEWMAN:  Objection; misstates testimony.
20     You can answer.
21     THE WITNESS:  I wouldn't say anything general
22 about what consumers do or do not assume when each
23 individual consumer obtains his or her TransUnion file.
24 Consumers decide to obtain their files for varying
25 reasons.  They would --

**Page 66**

1  BY MR. BENNETT:
2      Q.  I --
3          MR. BENNETT:  Objection.  I'm not asking that
4  question.
5  BY MR. BENNETT:
6      Q.  I have not asked that question once here in this
7  line, and you're wasting your time and my time.
8          MR. NEWMAN:  Let him finish his response.
9  BY MR. BENNETT:
10     Q.  I asked you --
11         MR. BENNETT:  No, I'm not.  I'm not gonna -- if
12  he wants to sit here and tell me a list of people who
13  won the World Series over the last century, I'm not
14  going to sit here and listen to it.  I'm asking the
15  witness a specific line of questions, which he's refused
16  repeatedly to answer.
17  BY MR. BENNETT:
18     Q.  I'm not asking you why someone asks for a copy
19  of their credit report.  I'm asking you, Professor, a
20  professor who represents themselves as understanding
21  human behavior, whether a core assumption in predicting
22  consumer behavior for consumers who ask for a copy of
23  their TransUnion credit file is that they are assuming
24  what they'd get back would be a copy of their TransUnion
25  credit file.

**Page 67**

1          MR. NEWMAN:  Have you finished yelling at the
2  witness?
3          MR. BENNETT:  I'm not yelling at the witness.
4  I'm yelling at a TV screen.  So yes.
5          MR. NEWMAN:  Well, objection; misstates
6  testimony.
7          You can answer.
8          THE WITNESS:  I'd like to hear the question
9  again.
10  BY MR. BENNETT:
11     Q.  Sure.  Let me try it again.  Save Nicole the
12  effort.
13         Do you agree that a fair assumption for
14  consumers who ask for a copy of their TransUnion credit
15  file is that they are doing so under the belief that
16  they will receive a copy of their TransUnion credit
17  file?
18         MR. NEWMAN:  Same objection.
19         You can answer.
20         THE WITNESS:  If you're asking me whether
21  consumers who obtain a credit file expect that they are
22  obtaining a credit file, I would say as a general
23  matter, yes.
24  BY MR. BENNETT:
25     Q.  Okay.  Now, you have a credit card that you saw

**Page 68**

1  reported as a trade line, at least one credit card you
2  saw reported as a trade line in your credit report,
3  correct?
4      A.  Yes.
5      Q.  And do you believe that the value of the credit
6  reporting agency disclosing to you accurately the
7  identity of the credit card companies that it is
8  reporting about you is greater than absolute zero?
9          MR. NEWMAN:  Objection; relevance.
10         You can answer.
11         THE WITNESS:  I don't think I've ever thought
12  about it in that way before.  I expect that they will
13  show me data and information about my credit card,
14  including the identity of the issuer and other
15  information that they have on file.
16         MR. NEWMAN:  We've -- we've gone for about an
17  hour more.  Do you want to take another short break?
18         MR. BENNETT:  Sure.  If you want to.
19         MR. NEWMAN:  Yeah.
20         THE VIDEOGRAPHER:  Okay.  This is the end of the
21  disk.  So we're off the record at 12:55.
22         (A recess was held from 12:55 p.m. to 1:16 p.m.)
23         THE VIDEOGRAPHER:  This is beginning of disk
24  two.  We're back on the record at 1:16.
25  //

**Page 69**

1  BY MR. BENNETT:
2      Q.  Take a look at page 7 of your report, please.
3  Let's just take a look at subsection D, which is your
4  statement that, "Public record information and credit
5  files may contain several different types of errors and
6  omissions."  Do you see that?
7      A.  Yes.
8      Q.  And then you proceed to describe various types
9  of errors and statistical distribution of those
10  errors -- error categories.  Right?
11         MR. NEWMAN:  On page 8.
12         MR. BENNETT:  Page 7 and 8, right, paragraphs 18
13  and 19.
14         THE WITNESS:  Those paragraphs describe the
15  errors that consumers perceive and how often they
16  dispute because of one perceived error or another.  Yes.
17  BY MR. BENNETT:
18     Q.  Right.  And you -- this is not an area that you
19  consider yourself an expert in.  That is, you do not
20  profess to be an expert in the accuracy or inaccuracy of
21  credit reporting, right?
22     A.  I've described my expertise in my
23  qualifications.  This set of facts forms the basis for
24  my opinion in the case about how consumers would respond
25  to disclosures.

**VICTOR STANGO on 12/02/2016**

Page 70

1    Q.  Right.  But you --
2    A.  It takes the accuracy of the data that consumers
3    quote here and their statements about accuracy as given.
4    Q.  I'm just asking, you're not an expert in the
5    accuracy or inaccuracy of consumer credit reporting,
6    right?
7    A.  I'm not sure what you mean, specifically, by,
8    "accuracy or inaccuracy," but I feel comfortable using
9    this evidence as a foundation for my opinion.
10   Q.  And the evidence is the reports that are cited
11   in your footnotes, right?
12   A.  Yes.
13   Q.  For example, the PERC study that TransUnion and
14   its industry colleagues paid for?
15        MR. NEWMAN:  Objection.
16   BY MR. BENNETT:
17   Q.  PERC.  You're aware they bought that, right?
18   They paid for that?
19        MR. NEWMAN:  Objection.
20   BY MR. BENNETT:
21   Q.  Let me try it differently.  Have you done any
22   analysis of the statistical underpinnings of any of the
23   studies that you have found and used for this expert
24   report?
25   A.  I don't know what you mean by, "analysis."  I've

Page 71

1    examined the sources.  And if I rely on them in my
2    report, I accept them.  And I, in quoting from studies
3    of consumer reporting agencies, do not rely, for
4    example, only on the PERC study; although, in many
5    cases, its findings are consistent with those and other
6    studies such as the FTC study, from which I quote.
7    Q.  Sure.  Did you or did Dan, the economist, find
8    the PERC study?
9    A.  I can't recall exactly who found it.  It may
10   have been provided to me by Dan; it may have been
11   provided to me in another context.  I can't recall
12   exactly.  I may have found it on my own.
13   Q.  Did you or Dan, the economist, find the GAL
14   report that you cite at footnote 31?
15   A.  The same answer would apply there.  We both
16   pursued our research relatively concurrently and shared
17   it with each other.
18   Q.  Well, let's -- if you take a look at page 8 on
19   paragraph 20, in here you describe and discuss the
20   gentleman Virginia district court judgment against the
21   plaintiff Clark, correct?
22   A.  Yes.
23   Q.  When's the last time you were in our wonderful
24   state here, Virginia?
25   A.  I can't recall.

Page 72

1    Q.  When's the last time that you were in a general
2    district court in the state of Virginia, the
3    commonwealth of Virginia?
4    A.  I don't know that I've ever been in one.
5    Q.  Well, do you consider yourself an expert in
6    interpreting the documents from Virginia general
7    district courts?
8        MR. NEWMAN:  Objection.
9        You can answer.
10       THE WITNESS:  I don't know what you mean by
11   expert, but this paragraph relies on documents that were
12   provided to me as facts of the case, and I relied on
13   them as such.
14   BY MR. BENNETT:
15   Q.  Well, in the text that precedes footnote 36, you
16   write -- or someone wrote, quote, "In addition, it
17   appears that on July 26, 2016, the Henrico General
18   District Court clerk issued an abstractive judgment
19   suggesting that the Court still considers the judgment
20   to be valid."  And you footnote for that contention,
21   simply, the abstractive judgment, Bates number Clark 69
22   that TransUnion's lawyer produced in this case.  So --
23       MR. NEWMAN:  Actually, that was produced by your
24   office.
25       MR. BENNETT:  Right.  But the statement

Page 73

1    suggesting that the Court still considers the judgment
2    to be valid was produced by yours.
3    BY MR. BENNETT:
4    Q.  It was produced, Mr. Stango, by Mr. Newman.  So
5    I'm wondering how you learned that fact -- that
6    purported fact that the abstractive judgment somehow
7    seems to represent a belief that the judgment is still
8    valid.
9        MR. NEWMAN:  Objection; mischaracterizes
10   testimony.
11       You can answer the question.
12   BY MR. BENNETT:
13   Q.  Well, who told you that?  Who said that it
14   suggests that the Court believes the judgment to be
15   valid, still considers the judgment to be valid?
16       MR. NEWMAN:  Objection.
17       You can answer.
18   BY MR. BENNETT:
19   Q.  Let me -- let me -- let me be considerate of the
20   objection.  Has any person either in writing or by
21   phone, e-mail or by phone, told you or made a statement
22   that it can be inferred because of the existence of that
23   abstractive judgment that the Court still considers it
24   to be valid?
25       MR. NEWMAN:  Same objection.

**VICTOR STANGO on 12/02/2016**

| Page 74 |
| --- |

```
 1          You can answer.
 2          THE WITNESS:  I wouldn't put it this way, but I
 3   can describe to you how --
 4   BY MR. BENNETT:
 5     Q.  Before you describe it, answer my question.
 6          MR. NEWMAN:  Hold on.  He is answering your
 7   question.
 8          MR. BENNETT:  No.  I want an answer to the
 9   question because this witness has received a subpoena
10   for communications, and this report looks like a lot
11   like your brief, Mr. Newman.
12   BY MR. BENNETT:
13     Q.  So you can describe all you want, anything you
14   want to describe, but I'm asking you to answer a
15   question under oath, under penalty of perjury.  Has
16   anyone ever communicated to you, in writing or
17   orally, that this abstractive judgment somehow suggests
18   that the Court still considers it to be valid?
19          MR. NEWMAN:  It's a little easier for him to
20   answer your questions when you don't interrupt him
21   mid-answer.
22          But go ahead, please.
23          THE WITNESS:  As I was saying, relative to this
24   particular abstractive judgment, I was provided the
25   abstractive judgment as part of the materials I relied
```

| Page 75 |
| --- |

```
 1   upon.  I discussed the abstractive judgment; although, I
 2   don't believe I can go into details with counsel until I
 3   was comfortable with my understanding of what it meant.
 4   And that's the understanding that you see in the
 5   sentence starting, "In addition, it appears that on
 6   July 26, 2016, the Henrico General District Court," et
 7   cetera.  I'm not a lawyer.  I'm not offering a legal
 8   opinion.  I'm merely describing the materials I reviewed
 9   and what I conclude.
10   BY MR. BENNETT:
11     Q.  Was Dan, the economist, on the phone when you
12   had the conversations with either Dan the TransUnion
13   lawyer, or Mr. Newman and his colleagues regarding this
14   judgment?
15          MR. NEWMAN:  Regarding the abstractive judgment?
16          MR. BENNETT:  Yes.
17          THE WITNESS:  I believe that he was, but I can't
18   be 100 percent sure.
19   BY MR. BENNETT:
20     Q.  And do you take notes as well or is it just Dan
21   that takes notes in the substance of those
22   conversations?
23          MR. NEWMAN:  Objection; foundation.
24          THE WITNESS:  When we have calls, sometimes I
25   take notes.  I can't tell you what Dan does or does not
```

| Page 76 |
| --- |

```
 1   do.
 2   BY MR. BENNETT:
 3     Q.  Do you take your notes in a laptop or on a
 4   computer or do you do it using a pen or pencil?
 5     A.  It varies.
 6     Q.  You do both?
 7     A.  Yes.  Sometimes one, sometimes the other.
 8     Q.  And when you type it on the -- sorry.  When you
 9   type on the computer, you want to make sure that you
10   accurately summarize the facts that are being provided
11   to you by TransUnion or its lawyers so that you don't
12   falsely state any such fact, right?
13          MR. NEWMAN:  Objection; foundation.
14          You can answer.
15          THE WITNESS:  I have different reasons for
16   making notes, but in general, my intention is to
17   assemble the facts and evidence and rely on them in
18   forming my opinions.
19   BY MR. BENNETT:
20     Q.  Okay.  And what -- do you keep one comprehensive
21   document, with all the facts that are provided to you by
22   TransUnion or its lawyers, or do you open and save a new
23   document each time you have such discussion?
24     A.  I can't offer a general answer to that question.
25   I sometimes keep paper copies of documents; I sometimes
```

| Page 77 |
| --- |

```
 1   will, as part of the process of formulating my opinions,
 2   keep electronic copies and make notes --
 3     Q.  I guess --
 4     A.  --in various forms.
 5     Q.  I'm sorry.
 6     A.  I do it different ways.
 7     Q.  Okay.  If you turn to page 11, have you made a
 8   credit dispute yourself?
 9     A.  Not in the recent past.  No.
10     Q.  Have you ever done any primary research on the
11   most effective ways to make a credit reporting dispute?
12     A.  I don't know what you mean by, "the most
13   effective ways."
14     Q.  Well, you --
15     A.  I describe the various processes through which
16   disputes are submitted and resolved in my report.
17     Q.  I understand that.  Have you ever read the
18   National Consumer Law Center treatise on fair credit
19   reporting?
20     A.  Without having that document in front of me, I
21   can't say.  And if I relied on that, it's cited in my
22   report.  If I -- it's not cited in my report, I didn't
23   rely on it in forming my opinions.
24     Q.  So there's a section in there on the most
25   effective ways to make disputes and why certain methods
```

**VICTOR STANGO on 12/02/2016**

---

Page 78

1   like this online nonsense are strongly discouraged by
2   consumer advocates.  Have you done any research as to
3   the recommended method of disputing information, the --
4   the method that is recommended by consumer advocates?
5       MR. NEWMAN:  Objection; foundation; and object
6   to the characterization of the source counsel cited.
7       But you can answer the question.
8   BY MR. BENNETT:
9       Q.  Well --
10      A.  I haven't seen, as far as I can recall and I
11  don't have in front of me the study you reference, I
12  can't say that I am familiar with the recommendations of
13  every consumer advocate about what or might not or might
14  be the most effective way.  And furthermore, I'm not
15  sure what effective would mean in that context.
16      Q.  Well -- so do you have any idea what happens if
17  a consumer makes the dispute in the way TransUnion
18  recommends and you cite on page 12 by going to its
19  online website?  Do you know the process of what
20  happens, somebody makes a dispute on TransUnion's
21  website?
22      A.  I believe I know some things about the process,
23  and I describe them in my report.
24      Q.  What do you think happened if somebody goes to
25  TransUnion.com/dispute online?  What do you think

---

Page 79

1   happens?
2       A.  I describe what I know about the dispute process
3   in my report.
4       Q.  I'm asking if they make a dispute online, what
5   do you think happens?
6       MR. NEWMAN:  Objection; asked and answered.
7   BY MR. BENNETT:
8       Q.  If you don't know, that's okay.
9       MR. NEWMAN:  Objection; asked and answered.
10  BY MR. BENNETT:
11      Q.  Not everybody's an expert.
12      MR. NEWMAN:  Objection; argumentative.
13      THE WITNESS:  I describe what I know about the
14  dispute process and how it proceeds in my report.
15  BY MR. BENNETT:
16      Q.  What do you know about the way that TransUnion
17  handles a consumer's dispute made through its online
18  website?
19      MR. NEWMAN:  Objection; asked and answered.
20      THE WITNESS:  I'm not sure what you mean by,
21  "handles by," but I describe in my report dispute
22  resolution and how different disputes may be resolved in
23  different ways from the consumer's perspective.
24  BY MR. BENNETT:
25      Q.  So what's the name of the dispute department,

---

Page 80

1   the employee dispute department at TransUnion?
2       A.  I don't know.
3       Q.  I'll give you a hint.  It's not called dispute
4   department.  Do you not know?  That's okay to not know
5   something.  Do you not know that?
6       A.  It may be described in my report as a reference,
7   but understanding what the dispute department at
8   TransUnion is called is not the focus of my study, so I
9   didn't devote particular attention to remembering it for
10  this deposition.
11      Q.  So if a consumer makes a dispute through the
12  online website of a judgment, does any employee -- any
13  human being at TransUnion see the dispute and -- and the
14  TransUnion is following its primary and ordinary
15  process?
16      MR. NEWMAN:  Objection; the question is vague.
17      You can answer.
18      THE WITNESS:  I described the process, as I
19  understand it, in my report.  Understanding those
20  details of how the dispute information is conveyed is
21  described at the level I found necessary to form my
22  opinions in my report.
23  BY MR. BENNETT:
24      Q.  Well, then, why did you include them in your
25  report?  The information that you can't recall today,

---

Page 81

1   explaining how when you wrote the report, what, a month
2   or so ago, you somehow knew TransUnion conducted
3   disputes?
4       MR. NEWMAN:  Objection; misstates testimony.  I
5   don't think there's a question there anyway.  What's the
6   question?
7   BY MR. BENNETT:
8       Q.  What -- what -- how about this, do you know --
9   have you ever known in your lifetime the specific
10  procedure that TransUnion follows when a consumer makes
11  a dispute to it on its website?
12      MR. NEWMAN:  Objection; asked and answered.
13      You can go ahead.
14      THE WITNESS:  When TransUnion receives a
15  dispute, it can process that dispute in any number of
16  ways.  Sometimes the dispute leads to deletion of the
17  disputed record; sometimes the dispute is referred to
18  LexisNexis even when the dispute --
19  BY MR. BENNETT:
20      Q.  How about --
21      MR. NEWMAN:  Hold on.
22      THE WITNESS:  -- is handled internally.  It can
23  be resolved any number of different ways that I describe
24  in my report.
25  //

---

**VICTOR STANGO on 12/02/2016**

Page 82

```
1   BY MR. BENNETT:
2       Q.  Those are outcomes.  I'm asking you what
3   happens, mechanically, procedurally, when a consumer
4   makes a dispute to TransUnion, and you won't even say, I
5   don't know, right?  You won't, today, here, say, I don't
6   know what TransUnion does internally when a consumer
7   makes a dispute, correct?
8       MR. NEWMAN:  Mr. Bennett, that's -- that's a
9   speech, not a question.  What's the question?
10  BY MR. BENNETT:
11      Q.  No.  I'm asking you.  Will you agree that you do
12  not have knowledge as to what TransUnion does internally
13  when a consumer makes a dispute?
14      MR. NEWMAN:  Objection; vague; asked and
15  answered.
16      You can -- you can go ahead.
17      THE WITNESS:  I disagree with your
18  characterization of things.  I do know what TransUnion
19  does in the sense that I found important for forming my
20  opinions.  I understand, for example, that sometimes
21  they resolve disputes internally and sometimes they send
22  them to LexisNexis.  I understand that they attach
23  different codes to different disputes, and I understand
24  that the dispute process can evolve in different ways
25  for different consumers.  That diversity in consumer
```

Page 83

```
1   behavior is the information that diversity in handling
2   disputes based on outcomes is the information I felt
3   would be useful to me in formulating my opinions.
4   BY MR. BENNETT:
5       Q.  Right.
6       A.  I won't claim to be an expert on the underlying
7   details of every aspect of TransUnion's business
8   processes.  And if that's what you're asking me, no, I'm
9   not an expert on all of those details.
10      Q.  I'm not asking you that.  We know that.  I'm
11  asking you whether you have any knowledge, knowledge
12  greater than 0.0, as to what TransUnion actually does
13  internally when a consumer makes a dispute.  And I'm
14  just right now on the online part of it.
15      MR. NEWMAN:  Object --
16  BY MR. BENNETT:
17      Q.  And you won't admit it, right, that you have no
18  knowledge as to, mechanically, what happens internally
19  at TransUnion --
20      MR. NEWMAN:  Objection --
21  BY MR. BENNETT:
22      Q.  -- when a consumer makes a dispute online,
23  right?
24      MR. NEWMAN:  Objection; argumentative; asked and
25  answered.
```

Page 84

```
1       Go ahead.
2   BY MR. BENNETT:
3       Q.  Well, let me ask you this:  What -- if a
4   consumer makes a dispute online, does any TransUnion
5   employee -- in the dispute of the accuracy of a public
6   record trade line, does any TransUnion employee, if
7   TransUnion follows its ordinary procedures, ever look at
8   the consumer's dispute ever?
9       MR. NEWMAN:  Objection.
10      You can answer.
11  BY MR. BENNETT:
12      Q.  Do you know?
13      A.  I don't know for sure, and I don't think that
14  knowing one way or the other would change any of the
15  conclusions in my report, which is why I'm telling you
16  that right now.
17      Q.  Okay.  So do you know what country -- in what
18  country the human beings that can consider some of
19  TransUnion's disputes that are mailed reside?
20      MR. NEWMAN:  Objection; relevance.
21      You can answer.
22      THE WITNESS:  I --
23  BY MR. BENNETT:
24      Q.  How about continents?  Do you know what
25  continent TransUnion's dispute agents reside?  Do you
```

Page 85

```
1   have any knowledge of that?
2       MR. NEWMAN:  Objection; relevance.
3       THE WITNESS:  I'm sorry.  I was about to answer
4   the question.  I've seen reference in some of the
5   documents that I've reviewed to names of countries in
6   which some of these things may be handled.  But again,
7   understanding those details was something that I did not
8   pursue because I do not see it as information that would
9   affect, in any way, the conclusions I reached in my
10  report, which are about consumer behavior as it pertains
11  to the disclosure at issue.
12  BY MR. BENNETT:
13      Q.  What -- okay.  So you agree with me that you do
14  not have knowledge as to how TransUnion internally
15  processes consumer disputes beyond the words that you or
16  someone has typed into your report, right?
17      MR. NEWMAN:  Objection; argumentative; asked and
18  answered.
19      Go ahead.
20      THE WITNESS:  I've described what happens.  The
21  disputes can be handled internally; the information can
22  be removed from the report; it can be changed; it can
23  remain on the report; the dispute can be sent to
24  LexisNexis; LexisNexis can send the dispute back; other
25  things can happen from the prospective of the consumer
```

**VICTOR STANGO on 12/02/2016**

Page 86

1  and how the consumer pursues the dispute process. And
2  so, those are the things that I describe. That is the
3  knowledge I have that I used in formulating my opinions
4  in this case.
5  BY MR. BENNETT:
6      Q. How much money does TransUnion have to pay
7  LexisNexis if it forwards a dispute to LexisNexis?
8      MR. NEWMAN: Objection.
9      Go ahead.
10     THE WITNESS: Again, although I may have seen
11 reference to such a figure, I didn't consider that
12 figure in formulating my opinion, which was about
13 consumer behavior.
14 BY MR. BENNETT:
15     Q. So what rights does a consumer have against
16 LexisNexis if LexisNexis inaccurately or incompletely
17 furnishes a public record regarding that consumer to
18 TransUnion?
19     A. If you're talking about legal rights, I can't
20 answer the question because I'm not a lawyer.
21     Q. Who is -- who is Kimberly Bye and what is this
22 declaration you cite in your footnotes, for example, at
23 page 14?
24     A. Kimberly Bye is an employee of TransUnion.
25     MR. NEWMAN: And that document was produced in

Page 87

1  the case.
2      MR. BENNETT: In this case --
3      MR. NEWMAN: Yes.
4      MR. BENNETT: -- or in the Dennis case?
5      MR. NEWMAN: It was produced in Dennis, and it
6  was also produced in this case.
7      MR. BENNETT: All right. Can you, then, make
8  sure that you produce it to my firm?
9      MR. NEWMAN: No. It has been produced. I mean,
10 it's -- it's -- I mean, I -- if -- if you don't have a
11 copy in your office, we'll be sure to have another copy
12 sent to your office.
13     MR. BENNETT: No. I'm saying it hasn't been
14 produced to my office --
15     MR. NEWMAN: No. It was --
16     MR. BENNETT: -- I'm not saying I don't have a
17 copy --
18     MR. NEWMAN: No. It was produced in this -- in
19 this litigation. So if -- if we've sent to your
20 co-counsel and not to you in error, we'll -- we'll
21 address that.
22     MR. BENNETT: All right. So -- and is this a
23 declaration that was issued in Dennis and then produced
24 in this case?
25     MR. NEWMAN: So it was initially produced in the

Page 88

1  Dennis case, and then it was reproduced in this case.
2  And as you know, a lot of materials that were originally
3  produced in the Dennis case, also were produced in this
4  case. But it was first prepared in the Dennis case and
5  produced in that case.
6      MR. BENNETT: And that's a good point.
7  BY MR. BENNETT:
8      Q. Mr. Stango, you also provided an expert
9  report -- purported expert report in the Dennis versus
10 TransUnion case, right?
11     MR. NEWMAN: You -- you can you can answer that
12 question and you can -- I'll permit some limited
13 questioning about the nature of your engagement in that
14 case, but the witness has not been prepared on the
15 details of Ms. Dennis and he hasn't been cross-noticed
16 in that that case. So at some point, I will cut off
17 questioning about the Dennis case.
18     But go ahead, you can answer.
19     THE WITNESS: Yes. I prepared a report.
20 BY MR. BENNETT:
21     Q. And what are the facts that you understand
22 regarding the plaintiff Dennis in that case?
23     MR. NEWMAN: Yeah. I'm -- I'm going to object
24 to that questioning. Because the -- you know, this was
25 not noticed for deposition in the Dennis case. His

Page 89

1  understanding is set forth in the report he submitted in
2  the Dennis case, but he has not been prepared on the
3  detail of Ms. Dennis' circumstances. So I'm not
4  comfortable allowing that questioning.
5      MR. BENNETT: So you're instructing the witness
6  not to answer about any facts regarding the Dennis case?
7      MR. NEWMAN: Well, do you feel that you are
8  sufficiently familiar with the facts of Ms. Dennis'
9  circumstances to respond meaningfully to questions
10 today?
11     THE WITNESS: No. I focused my attention and
12 preparation for this deposition entirely on the Clark
13 case because I understood that was to be the subject of
14 the deposition.
15 BY MR. BENNETT:
16     Q. Well, what was different about your -- what
17 different opinions did you render -- I'm not going to
18 ask you about the differences in facts, but what
19 different opinions, if any, did you render in Dennis
20 versus this case?
21     MR. NEWMAN: Objection; the two reports speak
22 for themselves, and they can be compared --
23     MR. BENNETT: I'm not trying to --
24     MR. NEWMAN: -- but he can answer -- I'm not --
25 he can answer the question to the extent he's able.

**VICTOR STANGO on 12/02/2016**

**Page 90**

1  THE WITNESS:  I can't recall the specifics of
2  the opinions word by word in that case and how, if at
3  all, they would have differed from the opinions in this
4  case.  The cases are different, the named plaintiffs
5  were different, and the reports were different.
6  BY MR. BENNETT:
7      Q.  If you could take a look at page 16, paragraph
8  45, you say, in part, in that first sentence, you refer
9  to something called the, "Concrete economic injury."  Do
10  you see that?
11     A.  Yes.
12     Q.  I don't know what that means.  Where did you get
13  that?  Have you ever heard that phrase before?  I've
14  never heard that phrase before, "Concrete economic
15  injury."  It's not a legal term, so I'm wondering if
16  it's something in your trade.
17     MR. NEWMAN:  Objection; the question is vague.
18     THE WITNESS:  It's the term --
19  BY MR. BENNETT:
20     Q.  Well, you --
21     A.  -- that I thought properly characterized this
22  component of what I understood the theory of injury to
23  be, and I describe that theory and all the steps
24  involved.  And I use the word "concrete" to refer to the
25  part of the allegation that read, and I quote, "Credit

**Page 91**

1  damage, higher interest rates, damage to reputation, and
2  so on."  That is what I mean by, "concrete."
3      Q.  You know we're not seeking actual damages
4  regarding the claim that you're opining about, right?
5  You ever heard the phrase "actual damages"?
6      MR. NEWMAN:  Objection.
7      You can answer.
8      THE WITNESS:  I've seen the term, but I'm not a
9  lawyer.  And if it has a specific legal meaning, I can't
10  say much more than that about it.
11  BY MR. BENNETT:
12     Q.  Right.  Have you done any research, legal or
13  nonlegal research, to determine what Congress has
14  determined as to a consumer's harm or risk of harm by
15  the failure to comply with this source of information
16  requirement?
17     MR. NEWMAN:  Objection; question is vague.
18     THE WITNESS:  I'd like to hear the question
19  again.
20     MR. NEWMAN:  Calls for legal conclusion.
21  BY MR. BENNETT:
22     Q.  Sure.  Have you done any research to determine
23  what harm or risk of harm Congress determined when a
24  consumer would suffer when this source of information
25  requirement was violated?

**Page 92**

1      MR. NEWMAN:  Objection; foundation.
2      THE WITNESS:  If Congress did or did not define
3  a legal meaning of harm, I can't nor would I be
4  qualified to offer an opinion on it.  My research -- my
5  background research in this case focused on my expertise
6  in economics and consumer behavior and --
7  BY MR. BENNETT:
8      Q.  And so, if Congress determines that consumers
9  who suffered this violation -- if Congress determined
10  and concluded that consumers who suffered this violation
11  suffered concrete injury, you would disagree with
12  Congress' conclusion, right?
13     MR. NEWMAN:  Objection; foundation; incomplete
14  hypothetical.
15     THE WITNESS:  I'm not sure what you mean by what
16  Congress determining.  I'm focusing my attention on the
17  specifics of this case, and I'm focusing my attention on
18  the issues of uniformity or diversity in any damages
19  that would have been suffered in assessing whether the
20  damages alleged by Ms. Clark would have existed
21  throughout the putative class.  I conclude that they
22  would not have.
23  BY MR. BENNETT:
24     Q.  Yeah.  I -- I understand that your position
25  is -- I understand your position.  Would it be a correct

**Page 93**

1  summary of your position that you conclude that the
2  amount and degree of damages suffered by individual
3  consumers based on whether TransUnion violated the
4  source of information provision will vary?
5      A.  Can I hear the question again, please?
6      (Whereupon the previous question was read.)
7      THE WITNESS:  So I don't focus on violation of
8  any source of information provision because, as I say in
9  my report, I understand that those are legal questions,
10  about which I'm not qualified to offer an opinion.  What
11  I do say in my report is that if one asks the question
12  would all consumers in this putative class have been
13  injured in the way described by Ms. Dennis, the answer
14  is no.
15     MR. NEWMAN:  Ms. Clark.  You said Dennis.
16     THE WITNESS:  Ms. Clark.  I'm sorry.  We were
17  talking about Ms. Dennis.  And furthermore --
18  BY MR. BENNETT:
19     Q.  They're all the same, I know.
20     MR. NEWMAN:  But they're not.  That's why we're
21  here.  They're all different.
22     Sorry.  Go ahead.
23     THE WITNESS:  The conclusion that I reach is
24  that one cannot conclude, based on the evidence I've
25  seen, that such damages, were they to exist, would have

**VICTOR STANGO on 12/02/2016**

**Page 94**

1  been averted were LexisNexis to have disclosed or
2  TransUnion, excuse me, to disclose LexisNexis as a
3  source of public records.
4  BY MR. BENNETT:
5      Q.  Thank you.  Can you turn to page 19 of your
6  report, please?  Or actually, before we turn to 19,
7  let's -- let's start with 18.  Your position is that
8  some consumers would not benefit from knowing that
9  LexisNexis was the -- the company that provided the
10  information, the -- the court or public record
11  information to TransUnion, right?
12     A.  What I discuss in my --
13     Q.  Let me -- Mr. Stango, everything I say is not a
14  trick.
15         MR. NEWMAN:  He's trying to --
16  BY MR. BENNETT:
17     Q.  Everything I say is not a trick.
18         MR. NEWMAN:  He's trying to answer your
19  question.
20  BY MR. BENNETT:
21     Q.  Everything I say is not a trick.  Okay?
22         MR. NEWMAN:  Maybe you can tell us which of the
23  things you say are tricks and which aren't tricks before
24  each question.
25         MR. BENNETT:  Yes.  Well, maybe you shouldn't

**Page 95**

1  have coached the witness to argue with every single
2  question.
3         MR. NEWMAN:  He is -- he is doing his best to
4  answer your questions and you should let him answer your
5  questions.
6         MR. BENNETT:  He's not answering the questions.
7  He is talking about matters that he wants to talk about,
8  filibustering rather than answering the question.
9         MR. NEWMAN:  Well, I disagree.
10  BY MR. BENNETT:
11     Q.  Let me -- let me try it again.  I'm trying to
12  start these -- the premise questions I'm trying to make
13  uncontroversial.
14         Now, yes or no, would some consumers benefit
15  from having knowledge that LexisNexis provided the
16  public record information to TransUnion?
17     A.  My report focuses on the question of whether
18  TransUnion disclosed LexisNexis as a source rather than
19  consumer knowledge.  What I say in my report is that
20  there will be some consumers who's situation would
21  necessarily be unchanged were LexisNexis to have been
22  disclosed.  There would be some consumers who would be
23  worse off, and I will grant the possibility that some
24  consumers may have benefitted, but I view that as
25  unlikely and impossible to evaluate because it would

**Page 96**

1  require individual inquiry of consumers and it would
2  also require confronting consumers with an actual
3  alternative disclosure and assessing how they would
4  respond.
5      Q.  So let me try again.  Yes or no, would some
6  consumers benefit from knowing that LexisNexis was the
7  intermediary or the entity that provided the public
8  records information to TransUnion?
9          MR. NEWMAN:  Objection; asked and answered.
10         Go ahead.
11         MR. NEWMAN:  No, it was not.
12         THE WITNESS:  As I've described, I cannot give a
13  yes-or-no answer to that question because answering it
14  would require confronting consumers with an actual
15  alternative disclosure and asking those individual
16  consumers what they thought, as is the case in the
17  methodology pursued in the government studies of
18  disclosures that I referred to in my report.
19  BY MR. BENNETT:
20     Q.  So yes, no, or you don't know the answer, three
21  options:  A, yes; B, no; C, you don't know the answer.
22         MR. NEWMAN:  Objection; asked and answered.
23  BY MR. BENNETT:
24     Q.  Is the number of consumers who would benefit
25  from knowing of LexisNexis' involvement greater than

**Page 97**

1  zero?
2          MR. NEWMAN:  Objection; asked and answered;
3  argumentative.
4          Go ahead.
5          THE WITNESS:  I can only answer that question,
6  as I describe in my report, by confronting consumers
7  with such an alternative disclosure and conducting an
8  individual level of inquiry assessing their responses to
9  that disclosure, their interpretations of that
10  disclosure, which as I described, would be diverse as
11  they are in study after study that I referred to in my
12  report.  I cannot give --
13  BY MR. BENNETT:
14     Q.  Well, no.  That's overstated.  You don't refer
15  to a single study.
16         MR. NEWMAN:  I don't -- I don't think he's
17  finished his response.
18         MR. BENNETT:  No.  All right.  Let's take five
19  minutes and then let's meet and confer because I'm going
20  to move to compel this witness to answer testimony in
21  Richmond, Virginia, which is not so bad this time a
22  year.  Let's take five minutes.
23         MR. NEWMAN:  Sure.
24         THE VIDEOGRAPHER:  Okay.  We're off the record
25  at 2:04.

Page 98

1    (A recess was held from 2:04 p.m. to 2:14 p.m.)
2        THE VIDEOGRAPHER:  We're back on the record at
3    2:14.
4    BY MR. BENNETT:
5        Q.  I want to go to page 19 of your report, and you
6    have an italicized -- right in the middle of the page,
7    an italicized phrase, "Plaintiff's hypothetical
8    alternative disclosure."  What is that?
9        A.  As I described in my report, I don't know quite
10   what it is.  It's described as a disclosure that lists
11   LexisNexis as a source of public records, but I didn't
12   see anywhere specifics such as whether that listing
13   would supplement or supplant TransUnion as a -- or
14   excuse me -- or the courthouse as sources, nor did I see
15   anywhere information specifying whether this disclosure
16   would continue to direct consumers to report to
17   TransUnion any disputes they have.  Those are two
18   examples of why I call it a hypothetical alternative
19   disclosure rather than an actual one.  I haven't seen
20   it.
21       Q.  I hadn't either.  I just assumed you had talked
22   to some other plaintiff and thought of one.  So would
23   your opinion hold true if there was a plaintiff's
24   hypothetical alternative disclosure that said or that
25   disclosed to the consumer the Court information in full,

Page 99

1    that's the way that it's done now, and included a
2    phrase, "This Court information was reported to
3    TransUnion by LexisNexis," and gave that LexisNexis
4    telephone number?
5        MR. NEWMAN:  Objection; incomplete hypothetical.
6    You can answer.
7        THE WITNESS:  I can't answer any question about
8    how my opinions would change when confronted with new
9    information that I haven't seen yet such as an
10   alternative disclosure like the one you describe.
11   Furthermore, as I state in my report, any conclusion
12   about the effect of such a disclosure on consumers would
13   necessitate individual level inquiry of those consumers
14   and perhaps other parties as well.
15   BY MR. BENNETT:
16       Q.  So again, I've tried this before.  I'm just
17   amazed -- I just have to ask again.  Are you willing
18   to -- to admit and to say that -- in your opinion, that
19   some consumers would be helped from the additional
20   knowledge that LexisNexis provided the Court information
21   to TransUnion?
22       MR. NEWMAN:  Objection; asked and answered.
23   BY MR. BENNETT:
24       Q.  I mean, any -- any at all.  I'm not asking you
25   whether you can identify whether John Smith did and Mary

Page 100

1    Sue didn't.  I'm asking you, in your opinion, whether or
2    not you will even agree that some number of consumers
3    greater than zero would benefit from that knowledge that
4    there was this other company that was involved in
5    reporting public records information to TransUnion.
6        MR. NEWMAN:  Objection; argumentative; asked and
7    answered.
8        Go ahead.
9        THE WITNESS:  I believe I've said this before,
10   but I cannot answer a question about such a hypothetical
11   alternative disclosure and any concrete affect it would
12   have on consumers based on the evidence that I have
13   seen.  What I do conclude, from my report, is that many
14   consumers could not have had such harm averted because
15   they didn't suffer such harm in the first place.
16   BY MR. BENNETT:
17       Q.  Well --
18       A.  As to whether --
19       Q.  Again --
20       A.  -- there may be some consumers who would benefit
21   in a hypothetical world, I've granted that possibility
22   before, and I'll grant it again, but that doesn't change
23   any of the opinions in my report.
24       Q.  So for that granted consumer or group of
25   consumers of whatever size, those, you would -- you

Page 101

1    would agree that those individuals would suffer harm of
2    some disputed magnitude but some degree of harm greater
3    than zero when they are not provided the information
4    that identifies LexisNexis as a source of information?
5        MR. NEWMAN:  Objection; incomplete hypothetical;
6    misstates testimony.
7        Go ahead.
8        THE WITNESS:  I've granted that some such
9    consumers could exist in a hypothetical world.  I have
10   not concluded that some consumers of that kind would
11   exist.  Because as I said in my report, the impact of
12   any alternative disclosure could only be learned via
13   individual inquiry of consumers facing that disclosure.
14   BY MR. BENNETT:
15       Q.  All right.  But I'm not asking you to identify
16   which consumer suffered which -- whether one particular
17   consumer suffered harm versus another, nor am I asking
18   you whether 1 percent, 50 percent, or any particular
19   percent suffered such harm, nor am I asking you the
20   magnitude of the harm.  Other than was -- can you agree
21   or grant that there are at least some consumers amongst
22   the hundreds of thousands or millions who in the
23   putative class would have been harmed by not being told
24   that LexisNexis was a source of the public records
25   information?

**VICTOR STANGO on 12/02/2016**

Page 102

1     MR. NEWMAN: Objection; asked and answered;
2  incomplete hypothetical.
3          Go ahead.
4          THE WITNESS: I believe I've stated this
5  already. I've granted that in an alternative
6  hypothetical world something could be possible. I have
7  not agreed to any statement that I would believe that
8  such consumers do or would exist, and I could only
9  answer that question based on the argument I lay out in
10  my report. I can't answer the question any other way.
11  BY MR. BENNETT:
12     Q. So can you then -- let's try it the other way.
13  Do you agree with the statement that no consumer
14  suffered harm by TransUnion's omission of LexisNexis as
15  a source of information in the consumer file
16  disclosures?
17     MR. NEWMAN: Objection; incomplete hypothetical.
18          Go ahead.
19          THE WITNESS: I'd like to hear the question
20  again.
21          (Whereupon the previous question was read.)
22          THE WITNESS: In that context, again, I am not
23  making a definitive statement about what any consumers
24  in the class would or would not have suffered. What I
25  do state in my report is that taking the theory and

Page 103

1  facts of Ms. Clark on their face, there indeed would be
2  many consumers in the putative class who did not suffer
3  such harm, such as those without errors on their credit
4  files.
5  BY MR. BENNETT:
6     Q. Well, you agree that there is a risk that some
7  consumers could suffer harm greater than zero, right?
8     MR. NEWMAN: Objection; incomplete hypothetical;
9  vague and ambiguous.
10          Go ahead.
11          THE WITNESS: I'm not sure what you mean by,
12  "suffer harm." From what circumstances or in what way?
13  BY MR. BENNETT:
14     Q. So could you turn to page 25?
15     MR. NEWMAN: 25, Len?
16     MR. BENNETT: Yes.
17  BY MR. BENNETT:
18     Q. Paragraph 75, are you familiar with that or do
19  you need to read it?
20     MR. NEWMAN: Well, I'd like to read it, Len.
21     MR. BENNETT: I'm sorry?
22     MR. NEWMAN: I'd like to read it before you ask
23  your question. I've read it.
24          THE WITNESS: I see the paragraph in front of
25  me.

Page 104

1  BY MR. BENNETT:
2     Q. Who wrote it?
3     A. I did.
4     Q. Okay. And you footnote in here -- well, how
5  about this, why don't you -- why don't you explain to me
6  the point you're trying to make in paragraph 75?
7     A. This section of the report details heterogeneity
8  in how information that is in or not in a file may
9  affect things like consumer credit scores reported by
10  the CRAs to third parties. One dimension of that is
11  this point about scorability of a file. In some cases,
12  as I understand things, a file lacks sufficient
13  information for generation of a score. This study that
14  I quote states that removing a public record can change
15  a file from scorable to unscorable.
16     Q. I thought -- what study did you cite?
17     A. The study that I cite is listed in footnote 121.
18  I know it as the VantageScore Study.
19     Q. Who -- who performed that study?
20     A. I can't recall every detail of the study, but as
21  I read the sentence in front of me, it says that the
22  2016 study was by VantageScore and it names VantageScore
23  in the footnote referring to the study. I can't tell
24  you more than that sitting right in front, right here.
25     Q. So do you know who owns VantageScore? And here,

Page 105

1  I'll give you a clue. Who owns the three parts of
2  VantageScore?
3     A. I don't know.
4     Q. Who are the big three owners of VantageScore?
5  Does that help you?
6     A. I don't know who the owners of VantageScore are.
7     Q. Okay. Are you aware -- no. I'm sorry. You are
8  aware.
9          You are aware from your Dennis case and this
10  case, of course, that TransUnion is being sued regarding
11  its public record reporting, right?
12     A. I describe the allegations in this case. They
13  involve TransUnion's reporting of public record sources
14  and whether or not they listed LexisNexis as such as a
15  source. So to that extent --
16     Q. I know you're getting $950 an hour from
17  TransUnion here, but I'd ask you to suspend that
18  knowledge using a veil of ignorance. You know, theory
19  of justice, relevant ignorance, pretend you weren't
20  getting paid by TransUnion.
21          If you as an associate professor were
22  peer-reviewing research regarding the proper method of
23  credit reporting, and you learned that the study you
24  were reviewing was 100 percent paid for by TransUnion,
25  Equifax, and Experian and were 100 percent conducted by

**VICTOR STANGO on 12/02/2016**

<div style="page: 106">

**Page 106**

1  TransUnion, Equifax, and Experian employees, that would
2  be relevant to your knowledge, right --
3           MR. NEWMAN:  Objection --
4  BY MR. BENNETT:
5       Q.  -- your opinion of the reliability of that study
6  you were peer-reviewing?
7           MR. NEWMAN:  Objection; argumentative;
8  relevance.
9           Go ahead.
10          THE WITNESS:  None of the conclusions I reach
11 here are contingent on the fact that I am being paid by
12 TransUnion in this case.
13 BY MR. BENNETT:
14      Q.  Well, paragraph 75 makes the argument -- whoever
15 wrote it is making the argument that it's better to have
16 an -- for some consumers -- an inaccurate judgment,
17 lien, or bankruptcy -- that is, a judgment, lien, or
18 bankruptcy incorrectly attributed to that consumer in
19 some consumer credit reports because that will help them
20 get a VantageScore scored credit score.
21          Your opinion in that regard is dependent upon
22 your review of the VantageScore study, right?
23          MR. NEWMAN:  Objection; mischaracterizes
24 testimony.
25          Go ahead.

</div>

<div style="page: 107">

**Page 107**

1           THE WITNESS:  I wouldn't characterize the
2  VantageScore study as reaching the conclusions that you
3  describe.  The study simply says, as I state here, that
4  removing public records, for some consumers, can render,
5  for some consumer files, that file unscorable.
6  BY MR. BENNETT:
7       Q.  Other than your reading of the documents that
8  you cite in the footnotes to page 75, you do not have
9  any actual knowledge or any -- certainly, any expert
10 knowledge that it's better to have -- that -- that it's,
11 at any time, better to have an inaccurately attributed
12 judgment in your report than not having that in your
13 report, right?
14          MR. NEWMAN:  Objection; incomplete hypothetical;
15 mischaracterizes testimony.
16          THE WITNESS:  I'd like to hear the question
17 again.  Sorry.  That was long.
18          (Whereupon the previous question was read.)
19          MR. NEWMAN:  Same objections.
20          THE WITNESS:  I don't characterize anything as
21 better in my report.  The evidence --
22 BY MR. BENNETT:
23      Q.  If you attribute --
24      A.  -- that I describe here is simply about the link
25 between, as the study describes, removal of a public

</div>

<div style="page: 108">

**Page 108**

1  record and whether the file is scorable.
2           MR. BENNETT:  I don't -- I don't have any other
3  questions this -- for this moment.  We will not agree to
4  close the deposition, and I would like to order an
5  expedited copy.  If I can get it by Wednesday, I'd be
6  grateful.  And I will hold on ordering the DVD.
7           MR. NEWMAN:  And you know our position is that
8  the deposition is complete and the witness should be
9  excused.  I expect you and I will have further
10 communication on the subject.
11          MR. BENNETT:  By pleading we will.  I believe
12 the meet and confer is complete.
13          THE REPORTER:  Would you like to order a copy?
14          MR. NEWMAN:  Yes.  Please.  We're off the
15 record.
16          THE VIDEOGRAPHER:  Okay.  Then this concludes
17 today's deposition.  We're off the record at 2:35.
18      (Whereupon proceedings concluded at 2:35 p.m.)

</div>

<div style="page: 109">

**Page 109**

1                    REPORTER'S CERTIFICATE
2
3
4       I, NICOLE HATLER, a Shorthand Reporter, State of
5  California, do hereby certify:
6       That VICTOR STANGO, in the foregoing deposition
7  named, was present and by me sworn as a witness in the
8  above-entitled action at the time and place therein
9  specified;
10      That said deposition was taken before me at said
11 time and place, and was taken down in shorthand by me, a
12 Certified Shorthand Reporter of the State of California,
13 and was thereafter transcribed into typewriting, and
14 that the foregoing transcript constitutes a full, true
15 and correct report of said deposition and of the
16 proceedings that took place;
17      That before completion of the proceedings,
18 review of the transcript [] was [X] was not requested.
19      IN WITNESS WHEREOF, I have hereunder subscribed
20 my hand this 7th day of December 2016.
21
22          _Nicole Hatler_
22          NICOLE HATLER, CSR NO. 13730
23          State of California
24
25

</div>

VICTOR STANGO on 12/02/2016

Index: $950..75

**$**

**$950**  7:24
  8:4,11,19
  105:16

**-**

**---ooo---**
  3:13

**--in**  77:4

**0**

**0.0**  58:22
  83:12

**1**

**1**  25:9
  35:25
  39:25
  40:22,24
  49:15,17,
  18,19
  101:18

**100**  20:23
  39:19
  75:18
  105:24,25

**10:54**  3:6
  5:6

**11**  52:17
  77:7

**11:55**  40:17,
  18

**12**  78:18

**121**  104:17

**12:03**  40:18,
  20

**12:55**  68:21,
  22

**13**  17:19

**14**  86:23

**16**  90:7

**18**  69:12
  94:7

**19**  69:13
  94:5,6
  98:5

**1980s**  48:8

**1:16**  68:22,
  24

**1A**  3:18

**2**

**2**  41:1  44:1
  49:20

**20**  22:12
  24:14
  71:19

**2001**  56:5

**2003**  52:18

**2009**  9:14,
  22  49:6

**2010**  9:11,
  14  46:17

**2011**  9:9,14

**2012**  9:6
  17:19
  38:16

**2013**  9:4

**2014**  9:2,3

**2016**  3:5
  5:5  72:17
  75:6
  104:22

**2029**  4:3

**202A**  3:21

**22030**  3:22

**23601**  3:18

**25**  103:14,
  15

**26**  72:17
  75:6

**26(a)(2)**
  16:3

**28**  46:17

**2:04**  97:25
  98:1

**2:14**  98:1,3

**2:35**
  108:17,18

**2nd**  3:5  5:5

**3**

**3**  35:23
  51:1,2

**31**  71:14

**310 556-5800**
  4:4

**315-cv-391**
  5:4

**36**  72:15

**4**

**4**  46:4

**400**  3:7

**45**  90:8

**5**

**5**  24:8,11
  52:16

**50**  101:18

**6**

**6**  50:11

**69**  72:21

**7**

**7**  49:6
  69:2,12

**703 424-7572**
  3:22

**70s**  48:8

**71**  3:6

**75**  103:18
  104:6

Maxene Weinberg Agency,
a Huseby Company

VICTOR STANGO on 12/02/2016

106:14
107:8

**757 930-3660**
3:19

**763** 3:18

_____

**8**

**8** 69:11,12
71:18

_____

**9**

**90067-3086**
4:3

**94105** 3:8

**950** 6:12

_____

**A**

**a.m.** 3:6
5:6 40:18

**abilities**
10:12

**absolute**
59:10
61:10,12
68:8

**abstractive**
72:18,21
73:6,23
74:17,24,
25 75:1,15

**academia**
42:16

**academic**
24:21
41:13,24
42:24
43:23 50:5

**accept** 71:2

**access** 60:13

**account**
25:16

**accounting**
54:22

**accounts**
17:10

**accuracy**
20:20,25
63:15
69:20
70:2,3,5,8
84:5

**accurate**
62:5,12,
13,24

**accurately**
47:8 62:21
64:7 68:6
76:10

**acquainted**
14:14

**act** 19:12
20:6 49:25
50:4 51:13
60:9,10
61:14

**action** 3:10

7:21

**actual** 33:14
42:10,11
62:5 91:3,
5 96:2,14
98:19
107:9

**addition**
72:16 75:5

**additional**
22:13
99:19

**address** 26:5
52:25
87:21

**addressed**
26:8

**addresses**
26:9,11

**administration**
36:12

**administrative**
25:15 33:8

**admit** 83:17
99:18

**advanced**
20:19

**advice** 11:25
16:2

**advocate**
47:21,24
78:13

**advocates**

78:2,4

**affect** 85:9
100:11
104:9

**affected**
48:12

**affiliation**
15:5

**afield** 37:24

**agencies**
25:1,20
71:3

**agency** 5:9
19:11
46:19
64:6,7
68:6

**agent** 14:23
15:4

**agents** 84:25

**agree** 13:6
42:24 58:9
59:8
60:18,23
61:14
67:13
82:11
85:13
100:2
101:1,20
102:13
103:6
108:3

**agreed** 59:21

VICTOR STANGO on 12/02/2016

102:7

Aguzzo@
kellyandcranda
ll.com   3:23

ahead   10:10
11:12
14:18
18:10
19:23
20:22 27:2
31:17
35:17 37:7
45:5 47:6
63:3 74:22
81:13
82:16 84:1
85:19 86:9
88:18
93:22
96:10 97:4
100:8
101:7
102:3,18
103:10
106:9,25

allegation
90:25

allegations
105:12

alleged
92:20

allowing
89:4

alternative
96:3,15
97:7 98:8,

18,24
99:10
100:11
101:12
102:5

amazed   99:17

ambiguous
9:23 33:18
36:21
103:9

amount
18:23,24
58:10 93:2

analysis
54:20
70:22,25

analyzed
49:12

and/or
61:13,16

Andrew   3:20
5:19

anecdotal
42:2

Angeles   4:3

answering
74:6 95:6,
8 96:13

answers
21:12

anticipated
63:24

antitrust

56:18

apparently
48:15

APPEARANCES
3:14

appeared   3:9

appearing
5:15,17

appears   48:5
72:17 75:5

appendix
21:22 22:9
49:18

apply   57:24
71:15

approaches
61:22

area   53:9
69:18

argue   46:17
95:1

argument
38:4 102:9
106:14,15

argumentative
6:25 10:9
14:17 15:1
19:6 24:16
36:8,11
38:5 41:21
42:12
43:19
79:12
83:24

85:17 97:3
100:6
106:7

arguments
23:23

arranging
28:24
29:12 32:5

article
46:22
47:4,19,22
48:1 53:2

articles
18:21 20:4

asks   65:15
66:18
93:11

aspect   60:3
83:7

assemble
76:17

assess   48:8

assessing
92:19 96:3
97:8

assessment
8:22

assigning
59:6

assignment
27:4,9

assistance
6:14

VICTOR STANGO on 12/02/2016

associate
  55:15
  105:21

Associates
  3:17

assume  58:9
  65:22

assumed
  98:21

assumes
  65:16

assuming
  61:8 65:7
  66:23

assumption
  62:20
  64:5,12,14
  65:5 66:21
  67:13

ATM  23:4

attach  61:4
  82:22

attend  61:5

attention
  26:20 80:9
  89:11
  92:16,17

attorney
  29:23,24

attribute
  107:23

attributed
  106:18

107:11

averted  94:1
  100:14

aware  70:17
  105:7,8,9

———————

B

back  9:7,21
  39:24
  40:19
  49:15 55:8
  56:5 65:2,
  17 66:24
  68:24
  85:24 98:2

background
  38:21
  39:4,21
  52:12 92:5

bad  36:5,19
  37:11,16
  97:21

Bank  12:17

banking  21:3
  24:22,24
  53:17

bankruptcy
  106:17,18

Banks  53:13

base  54:11

based  8:22
  38:25
  48:13
  62:20 83:2

93:3,24
  100:12
  102:9

baseline
  36:13 38:3

basic  64:5
  65:5

basis  37:1
  64:10
  69:23

Bates  72:21

BB  31:25

beginning
  5:2 50:15
  68:23

behalf  5:16,
  17,20 8:20
  11:6 12:4,
  13,19

behavior
  21:3,4
  24:22 26:9
  27:5,7
  41:2,14
  42:22 46:1
  53:17 59:8
  66:21,22
  83:1 85:10
  86:13 92:6

beings  84:18

belief  36:7
  65:2 67:15
  73:7

believed

61:16
  64:15

believes
  38:2 61:11
  73:14

benefit  94:8
  95:14
  96:6,24
  100:3,20

benefitted
  95:24

Bennett  3:16
  5:14,24
  6:5 7:8,16
  10:1,7,14,
  20,24
  11:14,22,
  24 12:2
  13:14,15
  14:22
  15:8,14,17
  16:1,10,
  22,24
  17:13
  18:12
  19:8,9,14,
  19,24
  20:9,16
  21:7,13,
  16,21
  22:1,5,8,
  20 23:1,8,
  11,13,15,
  17,20,23
  24:3,9,12
  25:2,8
  27:11,19

VICTOR STANGO on 12/02/2016

29:8 30:21
31:7,22
33:23
34:4,8,15
35:4,16,19
36:10,15
37:2,13,19
38:1,6,13
39:12
40:2,6,9,
12,14,21
41:16
42:1,14
43:14
44:2,13,
18,23
45:2,4,24
47:11,23
49:4,19,21
50:20
51:16,21
52:4,8,15
53:8 57:9
58:18
59:5,18
60:17
61:7,24
62:16,17
63:9 64:19
65:10,13
66:1,3,5,
9,11,17
67:3,10,24
68:18
69:1,12,17
70:16,20
72:14,25
73:3,12,18

74:4,8,12
75:10,16,
19 76:2,19
78:8 79:7,
10,15,24
80:23
81:7,19
82:1,8,10
83:4,16,21
84:2,11,23
85:12
86:5,14
87:2,4,7,
13,16,22
88:6,7,20
89:5,15,23
90:6,19
91:11,21
92:7,23
93:18
94:4,16,
20,25
95:6,10
96:11,19,
23 97:13,
18 98:4
99:15,23
100:16
101:14
102:11
103:5,13,
16,17,21
104:1
106:4,13
107:6,22
108:2,11

**Bias**   45:9
49:7

**big**   105:4

**bill**   6:12
7:21 8:10

**billings**
6:13 7:14

**bit**   18:20
40:3 41:9

**book**   42:7

**born**   26:13,
14

**borrowing**
25:10,11,
22

**Boston**   26:18

**bottom**   40:24
50:25

**bought**   60:15
70:17

**Boulevard**
3:18

**Bradstreet**
12:16,20,
22 14:6

**break**   40:3,
10 68:17

**briefly**
53:14

**bringing**
15:6

**broader**
19:8,10

**bulletin**

52:18

**bunch**   64:22

**bureau**   25:19
35:24
36:18 37:4
38:16
47:9,10,13

**Bureau's**
36:4

**bureaucracy**
46:21

**bureaus**
26:10

**business**   3:6
14:8 15:23
28:22 56:8
83:7

**buy**   61:13

**buying**   61:14
62:19,23

**Bye**   86:21,
24

---

C

---

**CA**   4:3

**California**
3:7,9 7:25
53:20 55:9

**call**   15:3
28:24 32:5
38:17
42:16
54:11,13

VICTOR STANGO on 12/02/2016

98:18

**called** 53:22
55:23
56:19
80:3,8
90:9

**calls** 15:12
29:12
30:17 31:2
75:24
91:20

**card** 17:2,
10 25:16,
23 67:25
68:1,7,13

**career** 41:13
42:24

**careers**
54:22

**Carolyn** 5:3

**case** 6:19,
21 7:4,5,
6,18,22
8:25
12:22,25
14:4,7
15:9,12
17:9,17
22:18,22
23:3 24:15
26:8 27:4,
10,14,23
28:15,19
29:1,7,10,
18 30:10,

19,23
31:8,16
32:11
33:10,17
39:6,7
59:22
60:15
69:24
72:12,22
86:4 87:1,
2,4,6,24
88:1,3,4,
5,10,14,
16,17,22,
25 89:2,6,
13,20
90:2,4
92:5,17
96:16
105:9,10,
12 106:12

**cases** 6:15,
22 7:14,17
8:2,3,8,12
9:15
10:18,23,
25 11:1,2
12:23
13:23 14:1
17:23
18:7,8,15
39:16,17,
20 48:2
50:2 51:13
71:5 90:4
104:11

**cash** 58:19

**categories**
69:10

**caution**
11:8,25

**Center** 3:6
77:18

**century** 4:3
66:13

**Certified**
3:8

**cetera** 75:7

**CFPB** 20:5
38:17
39:6,15

**change** 18:19
84:14 99:8
100:22
104:14

**changed**
85:22

**characterizati
on** 28:3
78:6 82:18

**characterize**
14:1,4
29:14
48:22
53:14
107:1,20

**characterized**
90:21

**charged**
34:19

**Chase** 12:17
13:1,2,20,
21

**cheap** 47:15

**check** 63:14

**checking**
33:13

**Chicago**
53:13

**childhood**
26:17

**choice** 38:3,
8 61:1

**choices**
61:21,22

**choose** 60:6

**chose** 63:23

**circumstances**
31:12 60:6
62:1 89:3,
9 103:12

**cite** 35:12
43:3,8
52:17,18
71:14
78:18
86:22
104:16,17
107:8

**cited** 70:10
77:21,22
78:6

**cites** 35:22

VICTOR STANGO on 12/02/2016

38:15

**Citimortgage**
12:17,23,
25 14:3

**claim** 44:10
45:25 83:6
91:4

**Clark** 5:3
71:21
72:21
89:12
92:20
93:15,16
103:1

**class** 5:17
55:12
56:16
92:21
93:12
101:23
102:24
103:2

**classes**
53:21

**clear** 11:16

**clerk** 72:18

**client** 7:18
8:11 12:1
15:16
16:11,19
57:6

**clients**
11:11
17:1,21

**close** 25:12
108:4

**clue** 105:1

**Clyde** 3:18

**co-counsel**
87:20

**coached** 95:1

**coauthors**
44:21

**codes** 82:23

**colleagues**
70:14
75:13

**college**
26:16
53:18

**combination**
19:16

**comfortable**
70:8 75:3
89:4

**commencing**
3:5

**comments**
18:22
23:25

**commonwealth**
72:3

**communicated**
18:14
27:13,16,
21,22,25
28:1

29:18,19
74:16

**communication**
16:8 27:17
30:10
108:10

**communications**
30:24
31:10,11
49:14 52:2
74:10

**companies**
12:4 68:7

**company**
14:16
29:17 94:9
100:4

**comparable**
16:4

**compared**
89:22

**compel** 97:20

**compensation**
6:11

**competitive**
56:4,21

**complete**
108:8,12

**comply** 91:15

**component**
90:22

**components**
6:11

**comprehensive**
76:20

**compromise**
16:23

**computer**
76:4,9

**concept**
36:6,16,20

**conclude**
75:9 92:21
93:1,24
100:13

**concluded**
59:24
92:10
101:10
108:18

**concludes**
108:16

**conclusion**
37:10
91:20
92:12
93:23
99:11

**conclusions**
84:15 85:9
106:10
107:2

**concrete**
90:9,14,24
91:2 92:11
100:11

**concurrently**

**VICTOR STANGO on 12/02/2016**

71:16

**conducted**
43:22 81:2
105:25

**conducting**
97:7

**confer** 97:19
108:12

**conference**
14:15

**confidential**
15:13

**confine**
23:23

**confined**
32:4

**confronted**
99:8

**confronting**
96:2,14
97:6

**confused**
45:18

**Congress**
91:13,23
92:2,8,9,
16

**Congress'**
23:4 92:12

**connection**
14:20 29:6

**consequences**
25:11

**considerate**
73:19

**consideration**
38:19

**considered**
17:5 20:19
30:25
31:15

**considers**
72:19
73:1,15,23
74:18

**consistent**
37:22 71:5

**consulting**
11:10
13:12 15:4
16:2,8

**consumer**
3:17 13:24
21:2,4,9
24:22,23,
25 25:20
26:9,20
27:4,5
35:23
36:4,5,18
37:3 38:3,
7,8,15
41:2,6,14,
18 42:4,22
43:1,11,25
44:6,14,21
45:7,13,
15,20
46:1,18

47:9,10,13
50:2,7
52:19
53:16
59:17,23,
24,25
60:10,11,
12,14
61:10,14,
15,23
62:2,19
63:6,10,
11,17,23
64:3,5,6,
13,15,16,
25 65:5,
15,23
66:22 70:5
71:3 77:18
78:2,4,13,
17 80:11
81:10
82:3,6,13,
25 83:13,
22 84:4
85:10,15,
25 86:1,
13,15,17
91:24 92:6
95:19
98:25
100:24
101:16,17
102:13,15
104:9
106:18,19
107:5

**consumer's**
63:11
79:17,23
84:8 91:14

**consumers**
17:11
21:6,15
25:17,22
26:1 36:5,
19 37:5,9,
11,12,15,
16 42:11
43:3,17
45:7 48:3,
10,12,24
49:9,13
59:15
60:6,24
61:21,22
63:13
64:11
65:14,22,
24 66:22
67:14,21
69:15,24
70:2 82:25
92:8,10
93:3,12
94:8
95:14,20,
22,24
96:1,2,6,
14,16,24
97:6 98:16
99:12,13,
19 100:2,
12,14,20,
25 101:9,

**VICTOR STANGO on 12/02/2016**

10,13,21
102:8,23
103:2,7
106:16
107:4

**consumers'**
41:14

**contact**
33:10

**contacted**
15:10
17:1,17,
21,24
18:13

**contemplating**
63:16

**contend** 49:8

**contention**
72:20

**context**
14:8,14
27:6 45:8
59:14,17
71:11
78:15
102:22

**continent**
84:25

**continents**
84:24

**contingent**
106:11

**continuation**
28:21

**continue**
25:24
98:16

**contract**
32:6

**contracts**
45:7

**conversation**
30:11

**conversations**
30:23
31:14 32:1
75:12,22

**conveyed**
80:20

**copies** 76:25
77:2

**copy** 19:1
56:24
57:10,14,
17,19 58:6
64:18
65:3,6,15,
17 66:18,
22,24
67:14,16
87:11,17
108:5,13

**core** 34:19
53:25
54:13,17
56:1,15
66:21

**Cornerstone**
6:14

14:16,24
15:3,4,6
32:18,25
33:5,12,
15,25
34:19,23,
25 35:5
38:22
39:22

**Corporation**
12:16

**correct**
13:9,18
18:15 28:2
30:6 36:7
53:2 56:6
64:7 68:3
71:21 82:7
92:25

**correspondence**
32:3

**cost** 47:25
48:3

**costs** 25:12,
22 60:23

**counsel** 5:10
31:11
50:23
51:24 52:2
75:2 78:6

**countries**
85:5

**country**
84:17,18

**couple** 34:22

**courses**
53:18
54:7,25
55:22,23
56:10,11,
12,13

**coursework**
54:5,21

**court** 5:8,
11,25 8:3
9:15 22:7
71:20
72:2,18,19
73:1,14,23
74:18 75:6
94:10
98:25
99:2,20

**courthouse**
98:14

**courts** 72:7

**covered** 5:24

**Crandall**
3:21 5:19

**CRAS** 104:10

**credit** 13:8,
9,18,21,
24,25
14:2,5,7
17:2,10
19:3,10,
11,12
20:11,20,
25 21:4,5
24:25

**Maxene Weinberg Agency,**
**a Huseby Company**

25:4,16,
19,23
26:1,3,10
38:16
41:6,18
42:4,23
43:12,17
44:20
47:25
48:3,6,9
49:25 50:3
51:3,12
52:19
53:1,5
54:16,18
56:25
57:3,10,
15,17,19,
23,24,25
58:1,2,6,
10,12,16
60:4,25
61:1 62:6,
7,20,22
63:1,14
65:16,18
66:19,23,
25 67:14,
16,21,22,
25 68:1,2,
5,7,13
69:4,21
70:5 77:8,
11,18
90:25
103:3
104:9
105:23

106:19,20

criticizing
20:5

cross   22:17

cross-noticed
88:15

current
36:12 58:3

curriculum
18:25 21:1
26:7 27:8
48:5

customers
8:20

cut   88:16

CV   19:2
21:23

—————

D

damage   91:1

damages
91:3,5
92:18,20
93:2,25

Dan   30:1,2,
4,7,24
31:14 32:2
33:2,7,9
35:11,14
36:2 52:2,
5,9 71:7,
10,13
75:11,12,
20,25

Dan's   32:1
33:6

Dartmouth
55:20,22,
23 56:3

data   23:6
25:15,17,
18,19
42:11
45:6,12
48:7 49:13
52:19
68:13 70:2

date   5:4

dates   9:8

Davis   54:1
55:11

day   3:5

debate   46:18

debt   25:23
62:23

December   3:5
5:5 38:16

decent
18:23,24

decide   65:24

decision
60:25

decision-
making   61:23

declaration
86:22
87:23

defendant
4:1 5:21
7:22

defense
51:12

define   92:2

definition
50:12,18

definitive
102:23

definitively
39:1

degree   93:2
101:2

delete   28:22

deleted
28:7,14,19
29:1

deletion
81:16

delivered
13:13

Dennis   39:7
87:4,5,23
88:1,3,4,
9,15,17,
22,25
89:2,6,19
93:13,15,
17 105:9

Dennis'
89:3,8

department

**VICTOR STANGO on 12/02/2016**

79:25
80:1,4,7

**dependent**
106:21

**deposition**
3:1 5:2
21:25 22:3
37:25
80:10
88:25
89:12,14
108:4,8,17

**describe**
15:15
30:9,11
47:14
69:8,14
71:19
74:3,5,13,
14 77:15
78:23
79:2,13,21
81:23 86:2
90:23 97:6
99:10
105:12
107:3,24

**describes**
24:20 47:8
107:25

**describing**
16:17 75:8

**detail** 57:8
63:6 89:3
104:20

**detailed**
31:21

**details** 15:7
21:1 26:5
75:2 80:20
83:7,9
85:7 88:15
104:7

**determine**
8:15 37:21
91:13,22

**determined**
91:14,23
92:9

**determines**
92:8

**determining**
92:16

**developed**
15:23

**developing**
64:21

**development**
30:18

**devote** 80:9

**differed**
90:3

**differences**
89:18

**differently**
24:5 42:15
49:23
70:21

**difficult**
41:10
58:25

**dimension**
104:10

**direct** 98:16

**direction**
38:23
39:22

**directions**
38:25

**directly**
26:5 43:23

**disagree**
15:17
82:17
92:11 95:9

**disagrees**
23:8

**discipline**
42:21

**disciplines**
42:19,20

**disclose**
23:5 31:5
94:2

**disclosed**
11:12 65:7
94:1
95:18,22
98:25

**disclosing**
68:6

**disclosure**
44:20
47:22,24
48:2,6
51:4 63:12
64:6 65:1,
6 85:11
96:3,15
97:7,9,10
98:8,10,
15,19,24
99:10,12
100:11
101:12,13

**disclosures**
20:6 21:9,
15 24:23
36:5,17
37:3,11
38:2,7
41:15
43:2,18,25
44:7,15,22
45:21 46:4
47:14,15
49:10,13
60:4 62:8
69:25
96:18
102:16

**discouraged**
78:1

**discrete**
17:23

**discuss**
44:21
71:19

**Maxene Weinberg Agency,**
**a Huseby Company**

**VICTOR STANGO on 12/02/2016**

94:12

**discussed**
60:3 75:1

**discussion**
18:17
76:23

**disk** 68:21,
23

**dispersion**
25:11,21,
24

**disposing**
28:11

**dispute**
69:16
77:8,11
78:17,20
79:2,4,14,
17,21,25
80:1,3,7,
11,13,20
81:11,15,
16,17,18
82:4,7,13,
24 83:13,
22 84:4,5,
8,25
85:23,24
86:1,7

**disputed**
50:13,18,
22 81:17
101:2

**disputes**
26:1

77:16,25
79:22 81:3
82:21,23
83:2 84:19
85:15,21
98:17

**disputing**
78:3

**distort**
38:2,8

**distribution**
69:9

**district**
71:20
72:2,7,18
75:6

**diverse**
48:11,13
97:10

**diversity**
25:22
45:6,14
48:14
82:25 83:1
92:18

**divorce**
57:12

**document**
25:21
76:21,23
77:20
86:25

**documented**
31:10
48:11,14

**documenting**
45:6

**documents**
32:20,23
35:12
45:13
72:6,11
76:25 85:5
107:7

**Dodd-frank**
37:15

**dollars**
34:20

**drafted**
13:21

**drafting**
33:16

**Drive** 3:21

**duet** 20:5

**duly** 3:11

**Dun** 12:16,
20,22 14:6

**DVD** 108:6

---

**E**

---

**e-mail** 28:1,
2,4,11,23,
25 29:20,
22,25 32:3
52:13
73:21

**e-mails**
28:7,9,14,

19,21
29:5,6,10,
15 32:2

**earlier**
32:14
50:10

**early** 48:8

**easier** 74:19

**easy** 58:19

**economic**
38:8 54:7,
19,20 65:5
90:9,14

**economics**
54:3,5
56:4,21
92:6

**economist**
33:6,8
53:12,13
59:7 71:7,
13 75:11

**economists**
34:22 36:3

**effect** 99:12

**effective**
77:11,13,
25 78:14,
15

**effects**
48:11

**effort** 8:22
67:12

**Maxene Weinberg Agency,**
**a Huseby Company**

VICTOR STANGO on 12/02/2016

elective
  56:3

electronic
  77:2

Elizabeth
  3:17 5:18

else's  48:20

employ  25:18

employed
  52:25

employee
  33:8 80:1,
  12 84:5,6
  86:24

employees
  106:1

enactment
  37:15

end  68:20

engaged  11:9
  37:9

engagement
  14:21 32:7
  88:13

engaging
  16:7

enlighten
  30:24

entitled
  15:19,22

entity  96:7

entry-level

54:12

equal  58:11
  60:12

Equifax
  56:24
  105:25
  106:1

Erausquin
  3:16 5:18

Ereste  6:8

error  69:10,
  16 87:20

errors  33:14
  69:5,9,10,
  15 103:3

essentially
  42:7 46:8
  55:5

estimate
  7:11 17:22

evaluate
  95:25

evaluated
  20:19

everybody's
  79:11

evidence
  26:20
  70:9,10
  76:17
  93:24
  100:12
  107:21

evolve  82:24

exact  6:20
  8:6 9:8
  51:7 55:25

EXAMINATION
  6:5

examined
  3:11 49:12
  57:22,23
  71:1

examples
  98:18

exchange
  32:2

excluded
  34:21

excuse  47:10
  94:2 98:14

excused
  108:9

executive
  56:11

executives
  56:16

exhibit
  21:24 22:3

exhibits
  22:7

exist  93:25
  101:9,11
  102:8

existed
  92:20

existence
  73:22

expect  11:11
  67:21
  68:12
  108:9

expedited
  108:5

Experian
  56:24
  105:25
  106:1

expert  8:4,
  25 9:15
  11:6,10
  12:5,8,14,
  19,24
  13:7,12,17
  14:16,21
  16:7,8
  17:24
  18:14,15
  20:18
  21:17
  33:16 35:6
  40:23 41:2
  43:6,11
  44:10,14
  50:1 60:4
  69:19,20
  70:4,23
  72:5,11
  79:11
  83:6,9
  88:8,9
  107:9

VICTOR STANGO on 12/02/2016

expertise
  69:22 92:5

explain   23:9
  104:5

explaining
  81:1

explore
  25:23

Exponential
  45:9 49:7

express
  33:21

extent   11:9
  27:3 31:3
  36:24
  89:25
  105:15

_____

F

_____

face   103:1

facing
  101:13

fact   20:17
  35:20
  43:15
  47:12
  61:12
  73:5,6
  76:12
  106:11

factors
  8:16,18

facts   29:1
  30:24

31:5,20
69:23
72:12
76:10,17,
21 88:21
89:6,8,18
103:1

factual
  31:14

failure
  91:15

fair   19:11
  49:25 50:3
  51:12 65:5
  67:13
  77:18

Fairfax   3:22

fall   55:2,4

falsely
  76:12

familiar
  78:12 89:8
  103:18

Federal
  52:18,22,
  25 53:3,
  10,13

feel   70:8
  89:7

fees   7:11
  26:21

felt   83:2

field   56:20

fields   42:19

figure   10:2
  43:10
  86:11,12

file   32:24
  43:17 51:3
  62:6,7,22
  63:11,17
  64:5,7,15
  65:1,3,6,
  8,16,18,23
  66:23,25
  67:15,17,
  21,22
  68:15
  102:15
  104:8,11,
  12,15
  107:5
  108:1

files   14:1
  26:3 42:23
  64:11
  65:24 69:5
  103:4
  107:5

filibustering
  95:8

finance
  45:10 49:7
  53:16
  54:21
  56:19

financial
  27:7 35:23
  36:4,17,18

37:4 38:15
41:2,14
42:22
43:25
44:6,15,22
45:14,16,
20 46:4,18
47:9,10,13
48:14
49:10,14
50:7

find   19:4,
  15 61:5
  62:14
  71:7,13

findings
  71:5

finish   21:11
  25:5 44:16
  48:25 49:1
  53:7 66:8

finished
  45:3 67:1
  97:17

firm   15:4
  29:17
  32:17
  53:23,25
  55:6 87:8

firms   12:7,
  13 55:6
  56:22

focus   29:21
  32:1 44:3
  47:13

VICTOR STANGO on 12/02/2016

51:17 80:8
93:7

**focused**
41:12 49:9
56:3 89:11
92:5

**focuses**
95:17

**focusing**
92:16,17

**footnote**
35:22,24
38:14
51:19
71:14
72:15,20
104:4,17,
23

**footnotes**
35:12
70:11
86:22
107:8

**forgotten**
58:4

**form** 19:13
24:1 80:21

**formed** 31:24

**forming**
31:20,21
76:18
77:23
82:19

**forms** 69:23

77:4

**formulating**
31:4 77:1
83:3 86:3,
12

**forwards**
86:7

**found** 19:20
38:23
39:3,21,22
70:23
71:9,12
80:21
82:19

**foundation**
29:2 36:9,
10 60:19
64:8 70:9
75:23
76:13 78:5
92:1,13

**foundational**
54:4,19

**fourth** 7:6,
19,20
18:11

**frame** 23:25
24:4

**framed** 31:1

**framing**
59:14

**Francisco**
3:7

**friends** 42:3

**front** 21:18
22:11
35:21
40:23
47:19
77:20
78:11
103:24
104:21,24

**FTC** 71:6

**full** 6:6
46:16
98:25

**function**
63:21

**furnishes**
86:17

**future** 57:25

**fuzzier** 9:8

**Fuzzy** 44:19
46:4 48:6,
20 49:5

---

G

---

**GAL** 71:13

**gather** 9:21
33:24
42:11

**gave** 12:19
13:7,17
38:19 99:3

**general**
10:13
16:17

28:3,10
29:4 30:8
36:6,16,
20,23
37:10
38:12 48:3
54:18
58:15 59:1
60:22
64:10
65:21
67:22
72:1,6,17
75:6
76:16,24

**generally**
10:3 15:16
30:12
31:19
37:16
53:15
61:21

**generation**
104:13

**gentlemen**
71:20

**give** 11:25
24:1 26:12
30:17,19
54:19 80:3
96:12
97:12
105:1

**good** 5:1
24:3 37:5,
9,11,15

VICTOR STANGO on 12/02/2016

43:9 88:6

**government**
50:6 96:17

**government's**
46:20

**grad** 53:19

**graduate**
56:8,10

**grammar**
33:14

**grant** 95:23
100:22
101:21

**granted**
100:21,24
101:8
102:5

**grateful**
108:6

**greater**
58:21 59:9
60:13
61:10,11
68:8 83:12
96:25
100:3
101:2
103:7

**group** 100:24

**groups** 53:15

**Growth** 45:9
49:7

**guess** 49:19

77:3

**guesstimate**
29:9

**Guzzo** 3:20
5:19

———————
**H**
———————

**H-a-l-v-o-r-s-e-n** 30:5

**half** 34:20

**Halvorsen**
30:2,5
52:9

**handled**
81:22
85:6,21

**handles**
54:10
79:17,21

**handling**
83:1

**HANES** 3:17

**happen** 85:25

**happened**
78:24

**harm** 91:14,
23 92:3
100:14,15
101:1,2,
17,19,20
102:14
103:3,7,12

**harmed**

101:23

**Hatler** 3:8
5:8

**Haynes** 5:18

**heading** 60:9

**hear** 51:6
67:8 91:18
93:5
102:19
107:16

**heard** 51:24
90:13,14
91:5

**held** 40:18
68:22 98:1

**helped** 35:5
99:19

**Henrico**
72:17 75:6

**heterogeneity**
104:7

**high** 25:10

**higher** 25:10
91:1

**hint** 80:3

**hire** 14:15

**hired** 9:14
39:15 50:1
55:13

**hold** 23:12
74:6 81:21
98:23
108:6

**holds** 16:13

**hoping** 19:21

**hour** 3:5
7:24 8:4,
11,19
68:17
105:16

**hourly** 6:12
8:22

**household**
27:7 45:9
49:7 50:7
53:16

**human** 59:8
66:21
80:13
84:18

**humans** 59:9

**hundreds**
101:22

**hypothetical**
58:23
59:11
60:20
61:18
92:14
98:7,18,24
99:5
100:10,21
101:5,9
102:2,6,17
103:8
107:14

VICTOR STANGO on 12/02/2016

**I**

idea  46:1
65:4 78:16

identifies
101:4

identify
5:10 39:2
44:4 99:25
101:15

identity
17:20
68:7,14

ignorance
105:18,19

III  6:8

impact  48:9
101:11

impacts
17:11

important
17:7 61:6
82:19

impossible
95:25

in-house
30:1

inaccuracies
62:9

inaccuracy
69:20
70:5,8

inaccurate

57:5 62:12
106:16

inaccurately
86:16
107:11

include  21:2
80:24

included
52:12 99:1

includes
25:19

including
8:16 25:16
36:12
68:14

Incompatibilit
y  23:3

incomplete
58:23
59:11
60:20
61:18 62:8
92:13 99:5
101:5
102:2,17
103:8
107:14

incompletely
86:16

incorrect
55:18

incorrectly
106:18

increase

48:2

increased
47:25

incur  8:23

incurs  6:14

indicating
15:16

individual
25:11 43:2
58:21 59:4
63:18
65:23 93:2
96:1,15
97:8 99:13
101:13

individual's
61:2

individuals
58:20 59:2
61:4 101:1

industrial
56:20

industry
51:14
70:14

inferred
73:22

infirm  53:16

influenced
13:25

information
13:25
15:13 27:6

31:3,15,19
45:13,16
50:12,21,
23 58:1
62:4,6,8,
11 63:8
68:13,15
69:4 78:3
80:20,25
83:1,2
85:8,21
91:15,24
93:4,8
94:10,11
95:16 96:8
98:15,25
99:2,9,20
100:5
101:3,4,25
102:15
104:8,13

initially
87:25

injured
93:13

injury  90:9,
15,22
92:11

inquired
15:19

inquiring
64:5

inquiry  96:1
97:8 99:13
101:13

VICTOR STANGO on 12/02/2016

inside  29:17

instance
 63:5

instances
 62:19

institution
 36:17

institutions
 44:22
 45:14
 48:15
 49:14

instructing
 89:5

intend  22:6

intended
 54:19

intention
 76:16

interactions
 56:21

interest
 91:1

intermediary
 96:7

internally
 81:22
 82:6,12,21
 83:13,18
 85:14,21

interpret
 43:17 45:7
 49:9

interpretation
 21:14
 24:23 27:5
 41:15
 43:1,25
 44:21
 45:15 46:3

interpretations  21:9
 41:6,18
 42:4,23
 43:12
 44:6,15
 45:20
 48:13 97:9

interpreting
 72:6

interrupt
 74:20

invoices
 29:25 32:4

invoicing
 30:13

involve
 24:24 43:2
 105:13

involved
 13:9,24
 14:7 15:6
 17:2,9
 27:4 28:22
 39:20
 90:24
 100:4

involvement

17:9 96:25

involving
 18:5,17
 24:22,23
 26:9,10
 32:4

issue  7:2
 41:12
 85:11

issue-by-issue
 37:1

issued  11:6
 72:18
 87:23

issuer  17:3,
 10 68:14

issues
 24:15,20,
 22 25:7
 26:8,9,11
 27:4,5
 43:24 53:4
 92:18

italicized
 98:6,7

J

job  33:5
 53:6,9
 55:8 62:12

John  99:25

journal
 22:13

judgment
 71:20
 72:18,19,
 21 73:1,6,
 7,14,15,23
 74:17,24,
 25 75:1,
 14,15
 80:12
 106:16,17
 107:12

July  72:17
 75:6

justice
 105:19

K

K-e-e-l-e-y
 34:10

Keeley  34:9,
 14,21,22,
 25 35:3

Kelly  3:21
 5:19

Kimberly
 86:21,24

kind  101:10

knew  57:24
 81:2

knowing
 84:14 94:8
 96:6,25

knowledge
 82:12

**Maxene Weinberg Agency,**
**a Huseby Company**

VICTOR STANGO on 12/02/2016

83:11,18
85:1,14
86:3
95:15,19
99:20
100:3
105:18
106:2
107:9,10

---

**L**

---

lack  36:10
60:19

lacks  36:8
104:12

language
52:14

laptop  76:3

large  25:15
29:15
45:12

late  48:8

Lavan  4:2

law  29:17
77:18

laws  50:6

lawsuit
26:25

lawyer  6:18
11:17,18
24:6 30:1
72:22
75:7,13
86:20 91:9

lawyers
51:12
76:11,22

lay  46:8,10
102:9

leading
51:10

leads  81:16

learn  15:22
26:2 63:14
64:13

learned  73:5
101:12
105:23

leave  11:2

legal  11:25
50:12,17
75:7 86:19
90:15
91:9,12,20
92:3 93:9

Len  22:23
40:10 45:1
62:15
103:15,20

Lending  20:6
48:7

length  63:7

Leonard  3:16
5:14

Leonard@
clalegal.com
3:19

letter  32:7

level  54:11
80:21 97:8
99:13

Lexisnexis
81:18
82:22
85:24
86:7,16
94:1,2,9
95:15,18,
21 96:6
98:11
99:3,20
101:4,24
102:14
105:14

Lexisnexis'
96:25

lien  106:17

lifetime
81:9

limit  38:3,8

limited
26:19
88:12

link  107:24

list  22:12
24:20 44:1
66:12

listed  18:25
19:2 45:11
49:11
104:17

105:14

listen  62:10
66:14

listing
98:12

lists  98:10

litigation
3:17 17:5,
8 50:13,
18,22
87:19

LLC  5:4

LLP  4:2

loan  45:7
48:13 58:3
63:16

loans  48:10

located
46:20

Logic  34:19

long  107:17

longer  28:21

looked  57:19
62:2

Los  4:3

lot  18:20,
22 23:11
74:10 88:2

---

**M**

---

made  6:16
64:13

**Maxene Weinberg Agency,**
**a Huseby Company**

VICTOR STANGO on 12/02/2016

73:21 77:7
79:17

**magnitude**
101:2,20

**mailed**  84:19

**major**  25:20

**make**  10:12
11:16
19:8,10
26:1 58:2
61:21,22
64:11,14,
23 76:9
77:2,11,25
79:4 87:7
95:12
104:6

**makes**  78:17,
20 80:11
81:10
82:4,7,13
83:13,22
84:4
106:14

**making**  60:24
76:16
102:23
106:15

**management**
54:3,8

**mandate**  23:4
36:4

**mandated**
36:18 37:4
47:15,22,

24 48:2

**mandating**
47:14

**manner**
27:21,24

**manners**
27:22

**March**  46:17

**marginal**
59:8

**mark**  21:24
22:2

**market**  38:2
44:20 48:6

**marketing**
54:5,22
55:6

**marketing-
designated**
54:2

**markets**
21:3,4
23:4 24:24
38:8 41:3
42:22
53:17,22,
25

**Mary**  99:25

**material**
24:14,19
25:7 54:17

**materials**
52:12

**Math**  44:19
46:5 48:6,
20 49:5

**Matt**  5:18

**matter**  5:3
13:12
15:16
16:16,17,
19,20,25
17:2 18:18
26:25
30:17
52:24
58:15
60:22
67:23

**matters**  7:12
13:12 32:4
50:7 95:7

**MATTHEW**  3:16

**Maxene**  5:9

**MBA**  54:1,6,
10,12
56:2,11,15

**meaning**
25:22
42:19
53:16 91:9
92:3

**meaningfully**
89:9

**means**  90:12

**meant**  75:3

**measure**
58:19

**mechanically**
82:3 83:18

**media**  5:2

**meet**  14:9
97:19
108:12

**memory**  9:7,
17 10:8,16

**mention**
41:12

**mentioned**
26:6 43:24
51:3

**method**  78:3,
4 105:22

**methodology**
96:17

**methods**
77:25

**microeconomics**
54:1 56:2,
15

**mid-answer**
74:21

**middle**  98:6

**million**
34:20

**millions**
101:22

**VICTOR STANGO on 12/02/2016**

mind  13:4

mine  33:20, 21,22

minutes 40:15 97:19,22

mischaracterizes  14:25 73:9 106:23 107:15

missed  58:4

missing  64:1

misstated 10:20

misstates 10:19 34:6 61:19 65:12,19 67:5 81:4 101:6

moment  46:2 108:3

money  6:16 60:14,23 61:16 86:6

month  57:4 81:1

morning  5:1

Morris  3:18

motivation 63:18

move  97:20

multiple 62:1

**N**

named  90:4

names  11:5 12:3,15 85:5 104:22

narrow  31:12

National 77:18

nature  15:15 16:25 17:4 30:11 88:13

necessarily 95:21

necessitate 99:13

neighbors 42:3

Newman  4:2 5:13,21 6:17,22,25 7:7,10,18 9:23 10:6, 9,19,21,22 11:8,20,24 13:10 14:9,11, 14,17,20, 25 15:10, 11,15,25

16:5,11 17:1,6,16, 21,23 18:9,14 19:6,13, 17,22 20:8,13,21 21:11,19, 24 22:2, 19,23 23:7,10, 14,16,19, 22 24:7, 10,16 25:5 27:1,13, 15,23 28:8 29:2,10,13 30:9 31:1, 17 32:16 33:18 34:3,6,13 35:2,14,17 36:8,21 37:6,17,23 38:4,9 39:11,16 40:5,8,10, 13 41:7,21 42:12 43:13,19 44:12,16 45:1,3,22 47:4,17 48:25 49:17 50:15,24 51:15,20 52:3,6,9

53:7 57:6 58:13,23 59:11 60:16,19 61:18 62:14 63:2 64:8 65:9, 12,19 66:8 67:1,5,18 68:9,16,19 69:11 70:15,19 72:8,23 73:4,9,16, 25 74:6, 11,19 75:13,15, 23 76:13 78:5 79:6, 9,12,19 80:16 81:4,12,21 82:8,14 83:15,20, 24 84:9,20 85:2,17 86:8,25 87:3,5,9, 15,18,25 88:11,23 89:7,21,24 90:17 91:6,17,20 92:1,13 93:15,20 94:15,18, 22 95:3,9 96:9,22

**Maxene Weinberg Agency, a Huseby Company**

97:2,16,23
99:5,22
100:6
101:5
102:1,17
103:8,15,
20,22
106:3,7,23
107:14,19
108:7,14

**Newman's**
7:18

**Newport**   3:18
5:15

**news**   3:18
5:15 18:22

**newspaper**
20:5 46:7,
11

**Nicole**   3:8
5:8 30:3
67:11

**non-transunion**
17:21

**nonfact-based**
31:11

**nonlegal**
91:13

**nonsense**
78:1

**note**   60:5

**notes**   75:20,
21,25
76:3,16

77:2

**notice**   3:4
16:12

**noticed**
88:25

**number**   5:4
6:20 8:6,
8,16 13:2,
11 17:22
26:11
29:14
37:19
72:21
81:15,23
96:24 99:4
100:2

**numbering**
25:17

---
            O
---

**oath**   39:10,
14 49:8
74:15

**object**   15:12
16:18
19:13
43:13 78:5
83:15
88:23

**objection**
6:25 9:23
10:6,9,19
13:10
14:17,25
19:6,17,22

20:8,13,21
22:19
24:16 27:1
29:2 33:18
34:3,6
36:8,21
37:6,17
38:9 41:7,
21 42:12
43:19
47:4,17
51:15,20
58:13,23
59:11
60:16,19
61:18 63:2
64:8 65:9,
12,19 66:3
67:5,18
68:9
70:15,19
72:8 73:9,
16,20,25
75:23
76:13 78:5
79:6,9,12,
19 80:16
81:4,12
82:14
83:20,24
84:9,20
85:2,17
86:8 89:21
90:17
91:6,17
92:1,13
96:9,22
97:2 99:5,

22 100:6
101:5
102:1,17
103:8
106:3,7,23
107:14

**objections**
107:19

**obtain**   58:2
60:25 61:1
63:13,23
64:11
65:24
67:21

**obtained**
62:1 64:18

**obtaining**
60:10,11
63:11,18
65:6 67:22

**obtains**
65:23

**obvious**
15:20

**occasions**
62:1

**occurred**
33:9

**October**   5:5

**offer**   16:23
28:3 36:23
37:10
38:11
47:20

VICTOR STANGO on 12/02/2016

76:24 92:4
93:10

**offered**    21:5

**offering**
75:7

**office**    5:19
72:24
87:11,12,
14

**offices**    3:6

**omission**
102:14

**omissions**
69:6

**online**    78:1,
19,25
79:4,17
80:12
83:14,22
84:4

**open**    76:22

**opining**    91:4

**opinion**    6:23
7:4 9:20
11:6 12:5
30:25
31:4,20,24
65:14
69:24 70:9
75:8 86:12
92:4 93:10
98:23
99:18
100:1

106:5,21

**opinions**    7:4
9:15 13:7
31:16,21
33:21
36:14,25
76:18
77:1,23
80:22
82:20 83:3
86:3
89:17,19
90:2,3
99:8
100:23

**opportunity**
18:20

**opposed**    33:8

**options**
96:21

**orally**    74:17

**order**    64:3,
12 108:4,
13

**ordering**
108:6

**ordinary**
80:14 84:7

**organization**
56:20

**original**
49:3

**originally**
88:2

**outcomes**
44:20 48:7
82:2 83:2

**Overdraft**
26:21

**overstated**
97:14

**overview**
52:19

**owe**    62:22,
23

**owners**
105:4,6

**owns**    104:25
105:1

---

**P**

---

**P.C.**    3:17

**p.m.**    40:18
68:22 98:1
108:18

**pages**    39:25

**paid**    6:9,22
7:3,18,24
8:2,4,25
10:25
11:1,2
12:19
15:22
25:23
48:10
70:14,18
105:20,24
106:11

**paper**    25:21
26:4 44:19
45:8,9
48:23 49:3
76:25

**papers**    24:20
45:11,12

**paragraph**
41:1 44:1
50:11
52:17
71:19
72:11 90:7
103:18,24
104:6
106:14

**paragraphs**
69:12,14

**Park**    4:3

**part**    6:14
26:6,7
27:9 28:20
39:3,21
41:13 50:5
51:9 57:23
74:25 77:1
83:14
90:8,25

**participate**
33:15

**participated**
34:1

**parties**    12:4
99:14
104:10

**Maxene Weinberg Agency,**
**a Huseby Company**

VICTOR STANGO on 12/02/2016

parts  30:23 50:5 105:1

party  11:5 16:12

past  77:9

pay  48:3 58:6,10 86:6

paying  8:10

payments 58:3

peer-reviewed 24:20

peer-reviewing 105:22 106:6

pejorative 23:2

pen  76:4

penalty 74:15

pencil  76:4

pending 44:17

Pennsylvania 26:14

people  33:25 35:5 36:11 58:9 66:12

people's 31:24 42:8 43:5

PERC  70:13, 17 71:4,8

perceive 69:15

perceived 69:16

percent 20:23 39:19 75:18 101:18,19 105:24,25

percentage 6:13

performed 104:19

periodically 58:2

perjury 74:15

permit  88:12

person  28:1 33:1 73:20

personal 28:12 56:25 57:3 62:2

personally 3:9

perspective 79:23

pertain 24:21 50:7

pertains 43:23 85:10

Ph.d.  34:22 56:19

Philadelphia 26:14

phone  5:23 27:25 28:24 30:17 32:5 73:21 75:11

phrase 90:13,14 91:5 98:7 99:2

pick  55:9

piece  47:2 48:16 49:7

pieces  46:25

place  23:22 100:15

places  51:9

plaintiff 5:20 71:21 88:22 98:22

plaintiff's 24:6 98:7, 23

plaintiffs 3:15 5:16 90:4

PLC  3:21

pleading 108:11

plenty  62:14

point  15:18 16:1 26:16 33:10 50:13,18, 22 51:24 60:9 88:6, 16 104:6, 11

position 47:12,15 92:24,25 93:1 94:7 108:7

positions 53:15

positive  8:8

possibility 95:23 100:21

potential 18:15

practice 28:10,12, 20 29:4

precedes 54:4 72:15

precise 47:20

predict 65:15

Maxene Weinberg Agency, a Huseby Company

VICTOR STANGO on 12/02/2016

predicting
66:21

premise   7:2
95:12

preparation
51:10
54:21
89:12

prepared
88:4,14,19
89:2

preparing
42:5

presented
27:6  45:8

presume   62:4

pretend
105:19

pretty   18:23
37:24

previous
54:23 93:6
102:21
107:18

primarily
49:9

primary
27:12,24
33:10
42:17,21
43:16
48:21
77:10
80:14

prior   48:17
55:1,19
57:13,14

privilege
16:13
31:2,8

privileged
16:9,21
30:15
31:12

problem   10:8
16:16 17:4

procedurally
82:3

procedure
81:10

procedures
84:7

proceed   69:8

proceeding
16:13

proceedings
108:18

proceeds
79:14

process   77:1
78:19,22
79:2,14
80:15,18
81:15
82:24 86:1

processes
77:15 83:8
85:15

produce
32:20 87:8

produced
3:10
72:22,23
73:2,4
86:25
87:5,6,9,
14,18,23,
25 88:3,5

products
13:24
45:17

profess
69:20

professional
28:13
36:6,14

professor
55:11,15
66:19,20
105:21

program
54:1,6,10
56:2,8

project
38:20

projects
44:5,9
49:12

proper   22:23
105:22

properly
90:21

proposed
46:18

prospective
85:25

protection
35:24
36:4,18
37:4 38:15
46:19
47:9,10,13

provide   9:15
11:10 16:3
32:20,23
35:11 50:1
58:17

provided
11:6 12:8,
13,14
28:25
31:14
38:24,25
39:2 63:10
71:10,11
72:12
74:24
76:10,21
88:8 94:9
95:15 96:7
99:20
101:3

provision
50:3 93:4,
8

public   23:5
26:2 56:19
69:4 84:5

VICTOR STANGO on 12/02/2016

86:17
94:3,10
95:16 96:7
98:11
100:5
101:24
104:14
105:11,13
107:4,25

**publication**
20:10,18
24:8,10
26:19,22
52:23

**publications**
18:21,25
19:2,4,15,
25 20:1,4,
24 22:12,
13 24:14,
21 32:25
33:7
37:20,22
42:9 44:5
45:19 49:8

**publish**  46:8

**published**
20:7,18
41:5,11,23
43:23,24

**publishing**
46:10

**punitive**
5:17

**purchase**

**purchased**
58:16

**pure**  31:11

**purported**
73:6 88:9

**purpose**
16:6,7
64:2

**purposes**
42:5

**pursuant**  3:4

**pursue**  85:8

**pursued**
71:16
96:17

**pursues**  86:1

**put**  8:21
22:6 74:2

**putative**
92:21
93:12
101:23
103:2

_____
**Q**
_____

**qualifications**
21:1 26:8
27:9 43:8
69:23

**qualified**
43:7 92:4
93:10

**quarter**
53:22
54:23
55:1,3

**quarters**
53:21 55:4

**question**
7:3,10,11
11:12 17:6
19:13 20:2
22:23
23:10
24:1,7,10,
17 27:15,
16,17
30:15
31:1,6
33:9,24
34:11,13
36:24
39:9,11,17
41:17,19
43:22
44:17
45:22
52:3,6
59:1,14,22
61:8
62:10,11,
18 64:24
66:4,6
67:8 73:11
74:5,7,9,
15 76:24
78:7 80:16
81:5,6
82:9 85:4

86:20
88:12
89:25
90:17
91:17,18
93:5,6,11
94:19,24
95:2,8,17
96:13 97:5
99:7
100:10
102:9,10,
19,21
103:23
107:16,18

**questioning**
15:20
64:20
88:13,17,
24 89:4

**questions**
22:4,25
23:24 24:4
66:15
74:20 89:9
93:9 95:4,
5,6,12
108:3

**quick**  11:15

**quote**  25:9,
12 26:19
46:17
52:19 70:3
71:6 72:16
90:25
104:14

VICTOR STANGO on 12/02/2016

quoted  47:8

quotes  51:3

quoting  71:2

_____

R

raised  26:15

rate  6:12
  8:14,15,
  19,22

rates  91:1

rational
  59:9,16

reach  93:23
  106:10

reached  85:9

reaching
  107:2

read  18:20
  19:21
  31:23
  37:19
  39:5,14,19
  42:8 49:24
  50:5,9
  51:6,25
  52:1,6
  59:23
  60:6,14
  61:13
  77:17
  90:25 93:6
  102:21
  103:19,20,
  22,23

104:21
107:18

reading
  43:9,11
  60:3,10,12
  61:11,14
  62:5 63:11
  107:7

real  11:15

reality
  62:22

reasons
  25:23
  57:18 58:5
  63:13 64:2
  65:25
  76:15

recall  7:15,
  23 8:6 9:1
  12:15,21,
  24 13:3
  14:12,20
  15:5 17:2,
  8,14 19:4
  20:1,15
  25:18
  26:21
  29:11
  31:18
  32:3,24
  34:17
  41:11,24
  46:10
  47:1,2
  48:16
  50:10

51:8,23
52:13
71:9,11,25
78:10
80:25 90:1
104:20

receive  6:13
  32:10 58:1
  67:16

received
  28:14
  29:13 31:3
  32:16,18
  45:14
  56:23 74:9

receives
  81:14

receiving
  52:13
  63:24

recent  45:11
  77:9

recess  40:18
  68:22 98:1

recollection
  8:7,13
  29:6 47:21

recommendation
s  78:12

recommended
  78:3,4

recommends
  78:18

record  5:11

6:7 40:3,
14,16,19
68:21,24
69:4 81:17
84:6 86:17
94:10
95:16
97:24 98:2
104:14
105:11,13
108:1,15,
17

records  23:6
  26:2 94:3
  96:8 98:11
  100:5
  101:24
  107:4

refer  28:9
  90:8,24
  97:14

reference
  48:4,17
  78:11 80:6
  85:4 86:11

references
  20:25

referred
  48:1 81:17
  96:18
  97:11

referring
  35:14 50:4
  104:23

reflects

Maxene Weinberg Agency,
a Huseby Company

VICTOR STANGO on 12/02/2016

64:7

**reform**   48:8, 15

**refused** 66:15

**regard**  29:21 106:21

**regarded** 13:18,21 49:9

**regulation** 44:20 48:6,9 56:17

**regulations** 50:6

**Regus**  3:6

**relate**  30:13

**related** 16:15 30:18,22 36:17 53:4

**relating** 30:12

**relationship** 15:23,24 21:4

**relationships** 24:24

**relative** 59:6 61:9 74:23

**relevance**

58:13 63:2 68:9 84:20 85:2 106:8

**relevant** 105:19 106:2

**reliability** 106:5

**relied**  31:4, 19,20 72:12 74:25 77:21

**relies**  9:20 72:11

**rely**  52:13 71:1,3 76:17 77:23

**remain**  37:21 85:23

**remember** 10:3,4,12 15:7 17:11 41:10 46:14 55:24,25 56:14,19

**REMEMBERED** 3:4

**remembering** 80:9

**remotely** 5:18

**removal** 107:25

**remove**   26:2

**removed** 85:22

**removing** 104:14 107:4

**render** 89:17,19 107:4

**rendered** 9:20

**repeat**   27:20 39:10

**repeatedly** 66:16

**report**  11:11 12:8,14, 19,22,24 13:13,17 16:3 19:3, 11 20:11, 19 21:2,17 22:2,6,10 23:9 31:21,25 33:16,20, 21 34:2,21 35:6,7,13, 21,24 38:15,16, 17,19,21 39:6,15,19 40:1,23

41:19 42:4,6,8 43:3 49:16,17, 19,20 50:1 51:11 52:16,17 56:25 57:3,11, 15,18,20, 22,24 58:1,2,7, 11,12,16 59:24,25 60:4,6,10, 12,14,15, 25 61:1,3, 11,13,15 62:2,19, 20,24,25 63:1,7,19, 23,25 64:4,18 66:19 68:2 69:2 70:24 71:2,14 74:10 77:16,22 78:23 79:3,14,21 80:6,19, 22,25 81:1,24 84:15 85:10,16, 22,23 88:9,19 89:1 93:9,

VICTOR STANGO on 12/02/2016

11 94:6
95:17,19
96:18
97:6,12
98:5,9,16
99:11
100:13,23
101:11
102:10,25
104:7
107:12,13,
21

**reported**
24:25
26:10
68:1,2
99:2 104:9

**reporter**  3:9
5:8,11 6:1
22:7 23:12
108:13

**reporting**
13:8,9,18,
22 14:2,5,
7 19:11,12
20:11,20,
25 24:25
25:20 26:1
38:16
49:25 50:4
51:13
52:20
53:1,5
54:16,18
68:6,8
69:21 70:5
71:3

77:11,19
100:5
105:11,13,
23

**reports**
13:2,7,11,
16,20
34:23 41:6
43:12,17
60:4 61:5
63:13,15
70:10
89:21 90:5
106:19

**represent**
16:14 73:7

**representing**
5:9 29:16

**represents**
11:17
39:16
66:20

**reproduced**
88:1

**repurposes**
64:3

**reputation**
91:1

**requested**
56:23

**require**
96:1,2,14

**required**
54:14

**requirement**
91:16,25

**research**
6:14 9:20,
21 15:4,6
20:20
31:24
32:19,25
35:11,23
36:25
37:10
38:21,23
39:4,21
41:5,18,
20,24
42:2,3,10,
17,21
43:5,8,11,
16,23 44:4
45:19
48:1,5,19,
21,23 49:2
50:5 51:10
71:16
77:10 78:2
91:12,13,
22 92:4,5
105:22

**researched**
44:6

**Reserve**
52:18,23,
25 53:3,
10,13

**reside**
84:19,25

**resolution**
79:22

**resolve**
82:21

**resolved**
13:13
16:20
77:16
79:22
81:23

**resource**
60:13

**respond**
49:13
69:24 89:9
96:4

**responded**
48:15

**response**
32:21 45:3
64:24 66:8
97:17

**responses**
45:13,15
97:8

**responsibility**
53:10

**rest**  27:7

**Restricting**
12:7

**restroom**
40:11

**retail**  53:17

retained
12:21
15:18
16:2,3
17:18
18:4,8,18
28:2

reveal 61:2
62:21

revealed
61:12

revealing
16:19
17:20
30:14

reveals
60:11
61:15

review
106:22

reviewed
39:14 75:8
85:5

reviewing
105:24

Richmond
97:21

rights
86:15,19

risk 91:14,
23 103:6

role 18:14
36:3

room 11:18

roughly
10:17,18
11:3,4
34:19

—————————
S
—————————

S-c-h-m-i-e-r-
e-r 33:4

Salience
26:21

San 3:7

save 67:11
76:22

Schmierer
33:2 35:15

school 54:8
56:3

scope 37:17,
25

scorability
104:11

scorable
104:15
108:1

score 57:23
104:13
106:20

scored
106:20

scores 21:5
24:25
26:10

63:14
104:9

screen 67:4

search 19:3

searchable
19:1

section
77:24
104:7

sections
54:24

seeking 91:3

semester
53:19

send 33:7
82:21
85:24

senior 53:12

sense 82:19

sentence
50:16 75:5
90:8
104:21

Series 66:13

serve 8:4
54:20

served 32:10

service 41:2
44:1 45:16

services
41:14
42:22

sessions
53:22

set 12:7
25:15,17
45:12
69:23 89:1

setting 8:19

settings
44:1

shared 71:16

Shocks 26:20

short 40:10
68:17

Shorthand
3:8

show 68:13

showing 48:1

side 24:6

similar
44:25 45:6
56:1

simple 23:25

simply 72:21
107:3,24

single 95:1
97:15

Sir 6:6

sit 8:8
9:18 20:25
39:2
41:10,24
47:1

VICTOR STANGO on 12/02/2016

66:12,14

**sitting**
12:15
104:24

**situation**
59:3 95:20

**size** 100:25

**skills** 43:11

**skip** 39:13
49:20

**slipping**
13:4

**small** 14:7

**Smith** 99:25

SNEWMAN@
STROOCK.COM
4:4

**social** 14:15

**solely** 11:9

**source** 23:5
39:1
50:21,23
78:6
91:15,24
93:4,8
94:3 95:18
98:11
101:4,24
102:15
105:15

**sources**
25:10
38:24

50:12 71:1
98:14
105:13

**speak** 16:6
42:10
89:21

**speaking**
11:3,4

**speaks** 47:4

**specific**
23:24
41:12 44:4
46:13
48:18
59:14,20
61:2 63:5,
18 66:15
81:9 91:9

**specifically**
51:18 53:4
70:7

**specifics**
30:20
31:18 90:1
92:17
98:12

**speech** 82:9

**spell** 30:3,4
33:3

**spend** 60:1

**spent** 26:17
59:25

**spoke** 14:19

**spoken** 29:23
30:7

**staff** 38:22
53:4

**standard**
6:12 8:14,
15 28:10,
20

**Stango** 3:1,
10 5:3
6:2,8 12:3
24:13
26:13
40:22 73:4
88:8 94:13

**start** 11:15
16:22 22:3
23:13 25:9
31:13
35:21 41:1
94:7 95:12

**started**
55:13

**starting**
75:5

**state** 3:9
6:6 62:21
63:17
71:24 72:2
76:12
99:11
102:25
107:3

**stated** 102:4

**statement**

10:13
13:11
36:24
38:12
48:4,16
62:5,24
64:11 69:4
72:25
73:21
102:7,13,
23

**statements**
70:3

**states**
104:14

**statistical**
69:9 70:22

STEPHEN 4:2

**steps** 90:23

**Steve** 7:7
14:9,11,19
23:1,9
24:3 62:12

**Steven** 5:13,
21 6:17

**Stevenson**
3:7

**stop** 11:15

**Strategic**
23:3

**strategy**
56:4

**Street** 3:7

**strongly**
78:1

**Stroock** 4:2

**students**
54:14,19

**studied**
41:13
53:16

**studies**
21:2,3
41:11 43:3
56:21 59:7
70:23
71:2,6
96:17

**study** 25:15,
19 43:1
70:13
71:4,6,8
78:11 80:8
97:11,15
104:13,16,
17,18,19,
20,22,23
105:23
106:5,22
107:2,3,25

**subject** 17:8
26:24
30:8,17
47:2 52:24
56:13
89:13
108:10

**submitted**
7:15

12:21,24
13:2 26:7
27:8 60:5
77:16 89:1

**subpoena**
32:10,21
74:9

**subsection**
69:3

**subsequent**
18:5

**substance**
27:16
30:10,14
75:21

**substantively**
33:14

**subtitle**
47:7

**Sue** 100:1

**sued** 105:10

**suffer** 91:24
100:15
101:1
103:2,7,12

**suffered**
92:9,10,
11,19 93:2
101:16,17,
19 102:14,
24

**sufficient**
104:12

**sufficiently**
89:8

**suggesting**
72:19 73:1

**suggests**
73:14
74:17

**Suite** 3:7,
18,21

**summarize**
76:10

**summarized**
42:9 48:19

**summarizing**
48:20

**summary**
28:25 93:1

**summer** 49:6

**supplant**
98:13

**supplement**
98:13

**suppose**
54:13
60:22
61:20

**supposed**
34:11

**survey** 45:8

**suspend**
105:17

**Suszckiewicz**
5:7

**swear** 5:11
6:1

**sworn** 3:11
6:3

———————

**T**

———————

**takes** 70:2
75:21

**taking** 63:16
102:25

**talk** 14:11
23:17,20
43:5 95:7

**talked** 98:21

**talking**
41:23
86:19
93:17 95:7

**taught** 53:21
55:2,5,7,
10,12,23
56:3,6,10,
14,16,17,
18,19

**teach** 54:25
55:1,14,22
56:1,12,15

**teaching**
53:19
55:13

**teleconference**
3:16,17

**telephone**
29:12 99:4

VICTOR STANGO on 12/02/2016

**telephonically**
3:16

**telling**
10:11
37:23
84:15

**ten**  8:7,11
10:18,25
11:1

**Tennessee**
56:6

**tenure**  55:18

**tenured**
55:17

**term**  19:3,4
38:5 42:18
51:1,3,6,
7,9,14,24
52:1,11
90:15,18
91:8

**terms**  13:24
16:17
17:10
19:16 21:5
25:4 45:7,
16 48:9,
12,13 51:9

**Terrell**  5:7

**testified**
6:4 7:5
10:5,17

**testify**
10:22

11:10
16:20

**testimony**
8:20 9:15
10:19 11:7
12:5 15:1
34:6 61:19
65:12,19
67:6 73:10
81:4 97:20
101:6
106:24
107:15

**text**  33:14
34:1 35:6
49:25 51:2
72:15

**theory**
90:22,23
102:25
105:18

**thing**  11:21
34:24

**things**  10:3
45:13
54:10 61:5
62:14
63:21,22
78:22
82:18
85:6,25
86:2 94:23
104:9,12

**thinking**
13:23
18:17

54:20

**thinks**  61:20

**thought**  7:13
58:16 63:4
68:11
90:21
96:16
98:22
104:16

**thousand**
25:18

**thousands**
101:22

**time**  5:5
8:17,19
9:13 14:19
17:16
23:12,22
28:24
32:5,13,14
49:22,24
50:9 52:22
53:3 55:11
57:2 58:21
59:2,3,7,
9,15,25
60:1,3,7,
14,23
61:3,13,16
62:13
63:18
64:17 66:7
71:23 72:1
76:23
97:21
107:11

**times**  12:18
29:12
46:16,24
47:3 48:16
57:22

**title**  20:3,
12 55:16,
25

**today**  6:10,
18 9:18
11:18
12:15 21:1
39:2 60:5
80:25 82:5
89:10

**today's**  5:4
108:17

**told**  17:25
18:3
73:13,21
101:23

**tools**  54:19

**top**  45:11
49:11 56:2

**topic**  18:19
46:2

**total**  6:18,
19 7:14
18:15

**trade**  68:1,2
84:6 90:16

**transaction**
25:16

**Transunion**

Maxene Weinberg Agency,
a Huseby Company

VICTOR STANGO on 12/02/2016

5:3 7:21
8:20 10:18
11:2 12:6,
16 13:8,16
15:11
16:15
17:17
18:5,7,8
23:5 26:1
29:16,24
31:10 32:6
39:15,18
49:25 52:5
56:24
62:25 63:8
65:1,3,6,
8,16,17,23
66:23,24
67:14,16
70:13
75:12
76:11,22
78:17
79:16
80:1,8,13,
14 81:2,
10,14
82:4,6,12,
18 83:12,
19 84:4,6,
7 85:14
86:6,18,24
88:10 93:3
94:2,11
95:16,18
96:8
98:13,17
99:3,21

100:5
105:10,17,
20,24
106:1,12

**Transunion's**
6:18 72:22
78:20 83:7
84:19,25
102:14
105:13

**Transunion.
com/dispute**
78:25

**treatise**
77:18

**trick** 94:14,
17,21

**tricks** 94:23

**true** 20:17
42:24
43:15
49:24
60:18
98:23

**trust** 22:6

**Truth** 20:5
48:7

**turn** 50:25
52:16 77:7
94:5,6
103:14

**TV** 67:4

**type** 76:8,9

**typed** 85:16

**types** 69:5,8

**typically**
51:13

**typing** 33:13

**typographic**
33:13

_____

U

_____

**UC** 54:1
55:11

**unable** 20:2

**unchanged**
95:21

**uncontroversia
l** 95:13

**undergrad**
53:18

**undergraduate**
56:9,10,
17,18

**underlying**
83:6

**underpinnings**
70:22

**understand**
11:21
31:23
34:24
39:10 43:7
50:11,17
51:2 54:9
57:23,25
59:1,13

61:25 62:7
64:23
77:17
80:19
82:20,22,
23 88:21
92:24,25
93:9
104:12

**understanding**
66:20
75:3,4
80:7,19
85:7 89:1

**understood**
89:13
90:22

**undertake**
27:9

**undertaken**
38:22

**undertook**
48:23 49:2

**uniformity**
92:18

**unique** 10:8

**university**
3:21 7:25
53:19 55:9
56:6,13

**unnecessary**
28:11

**unscorable**
104:15

**VICTOR STANGO on 12/02/2016**

107:5

**unsolicited**
11:25

---

**V**

---

**VA**  3:18,22

**vague**  9:23
33:18
36:21
80:16
82:14
90:17
91:17
103:9

**valid**  72:20
73:2,8,15,
24 74:18

**valuable**
60:1

**valuations**
59:7

**values**  60:11
61:4

**Vantagescore**
104:18,22,
25 105:2,
4,6
106:20,22
107:2

**variant**
56:16

**varies**  42:20
76:5

**variety**  21:3

**vary**  42:18
59:3 93:4

**varying**
26:20
65:24

**veil**  105:18

**version**
46:9,11

**versus**  5:3
25:10 88:9
89:20
101:17

**Victor**  3:1,
10 5:2
6:2,8

**videoconferenc
e**  5:15

**view**  15:20
95:24

**views**  37:22

**violated**
91:25 93:3

**violation**
92:9,10
93:7

**Virginia**
5:16
71:20,24
72:2,3,6
97:21

**vitae**  18:25
21:1 26:7

27:8 48:5

---

**W**

---

**waived**  31:9

**wanted**  57:25

**wasting**  66:7

**ways**  64:22
77:6,11,
13,25
79:23
81:16,23
82:24

**website**
46:15
78:19,21
79:18
80:12
81:11

**Wednesday**
108:5

**week**  32:15

**Weinberg**  5:9

**well-respected**
54:10

**When's**  32:13
71:23 72:1

**witness'**
36:13
37:20

**witnesses**
43:6

**won**  66:13

**wonderful**
71:23

**wondering**
73:5 90:15

**word**  19:1
20:1,11
33:20
41:10
59:15
90:2,24

**words**  35:7
85:15

**work**  6:17
7:25 8:11
30:18,22
39:25
48:18 53:4

**worked**  6:21
7:7,12,14
8:7 39:18
53:10

**working**
38:23
39:22

**works**  34:18

**world**  66:13
100:21
101:9
102:6

**worry**  62:15

**worse**  95:23

**worth**  61:16

**write**  18:22,
23 34:23

**Maxene Weinberg Agency,
a Huseby Company**

**VICTOR STANGO on 12/02/2016**

35:6  46:24        24  47:3
53:2  72:16        48:16
                   53:14
**writing**  31:8
34:1  73:20    **youth**  26:17
74:16
                   ―――――――――
**written**            Z
52:7,10        ―――――――――

**wrote**  35:7    **Z-i-n-m-a-n**
46:22              26:22
50:19
72:16  81:1    **Zinman**  26:22
104:2              46:8,17,
106:15             22,25

―――――――――
        Y
―――――――――

**year**  8:24
17:14
97:22

**year-end**
35:24

**years**  10:4
14:12
17:19
36:19
48:17  50:4
55:2
57:21,22

**yelling**
67:1,3,4

**yes-or-no**
96:13

**Yesterday**
14:10

**York**  46:16,